# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VERNETTE WALKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 06-138-MPT |
| | ) | |
| THE NEWS JOURNAL and | ) | |
| ANN HINES, | ) | |
| | ) | |
| Defendants. | ) | |

## OPENING BRIEF IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Jennifer C. Jauffret (#3689)
Jauffret@rlf.com
Lori A. Brewington (#4522)
Brewington@rlf.com
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware  19899
(302) 651-7700
Attorneys for Defendants

Dated: October 4, 2007

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... iv

NATURE AND STAGE OF PROCEEDINGS ........................................................ 1

SUMMARY OF ARGUMENT ............................................................................... 2

STATEMENT OF FACTS ...................................................................................... 3

    A.    The Parties ................................................................................................ 3

    B.    Finance Department's Structure In 2004 ................................................. 4

    C.    Walker's Car Accident ............................................................................. 5

    D.    The Company Notifies Walker Of Her Benefit Eligibility ..................... 6

    E.    Walker Fails To Provide Timely And Adequate Supporting
        Documentation .......................................................................................... 7

    F.    Walker's Release To Return To Work Regular Duty ............................... 9

    G.    Walker Fails To Return To Work After Being Informed Of The Need
        To Return To Work ................................................................................ 10

    H.    Walker Fails To Request An Accommodation ....................................... 11

    I.    The Company's Reduction In Force ....................................................... 11

        1.    Company-Wide Budgetary Concerns ......................................... 12

        2.    Job Freezes, Eliminations And Layoffs ..................................... 12

        3.    The Elimination Of Walker's Position In The Finance
            Department ................................................................................... 13

    J.    Walker Fails To Contact The Company Or Search For New
        Employment ............................................................................................ 15

    K.    Walker Deemed Totally Disabled By SSA ............................................ 15

ARGUMENT .......................................................................................................... 16

    I.    THE STANDARD FOR SUMMARY JUDGMENT ............................. 16

# TABLE OF CONTENTS

Page

II.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON
      WALKER'S ADA CLAIM BECAUSE SHE CANNOT ESTABLISH A
      *PRIMA FACIE* CASE. .................................................................................16

      A.   Walker Is Not Disabled As Defined By The ADA..........................17

      B.   Walker Is Not Qualified Under The ADA......................................20

      C.   Walker Did Not Request An Accommodation. ...............................24

      D.   Assuming *Arguendo* That Walker Requested An Accommodation,
           Any Request For An Unlimited Leave Of Absence Is Unreasonable
           And/Or Creates An Undue Burden. ................................................25

           1.   An Unlimited Leave Is Inherently Unreasonable Because It
                Would Exempt Walker From An Essential Job Function........25

           2.   An Unlimited Leave Creates An Undue Hardship On The
                Company. ..........................................................................26

           3.   Walker Failed To Actively Engage In The Interactive Process............28

      E.   Walker Cannot Rebut The Company's Legitimate, Non-
           Discriminatory Reason For The Elimination Of Her Position......................30

III.  WALKER'S RETALIATION CLAIM MUST BE DISMISSED BECAUSE
      SHE CANNOT SET FORTH A *PRIMA FACIE* CASE...............................32

      A.   Walker Never Engaged In A Protected Activity..............................33

      B.   Telephone Calls Regarding Medical Status And A Medical Exam Do
           Not Rise To The Level Of An Adverse Employment Action............................33

           1.   Hines's Conversations With Walker........................................34

           2.   Rumpf's Conversations With Walker.....................................34

           3.   Walker's Concentra Exam With Dr. Surdo. ...........................35

      C.   No Causal Link Exists Because There Is No Protected Activity.....................35

IV.   DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT
      BECAUSE THERE IS NO EVIDENCE TO SUPPORT WALKER'S ADEA
      CLAIM.............................................................................................36

# TABLE OF CONTENTS

Page

V.   WALKER'S FAILURE TO MITIGATE PRECLUDES ANY WAGE
     DAMAGES ........................................................................................... 37

     A.   Back Pay Is Precluded Because Walker Never Entered The Job
          Market ................................................................................... 37

     B.   Alternatively, No Damages Should Be Awarded Because Walker
          Failed To Exercise Reasonable Diligence. ...................................... 39

CONCLUSION ............................................................................................... 40

RLF1-3199553-1

# TABLE OF AUTHORITIES

## Cases

Page

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986)...................................................................................................16

Barber v. CSX Distrib. Servs.,
68 F.3d 694 (3d Cir. 1995)..........................................................................................33

Bixler v. Cent. Pa. Teamsters Health & Welfare Fund,
12 F.3d 1292 (3d Cir. 1993).........................................................................................16

Booker v. Taylor Milk Co.,
64 F.3d 860 (3d Cir. 1995)...........................................................................................37

Brady v. Thurston Motor Lines, Inc.,
753 F.2d 1269 (4th Cir. 1985) .....................................................................................38

Burlington N. & Santa Fe Ry. Co. v. White,
126 S. Ct. 2405 (2006)............................................................................................33, 34

Buskirk v. Apollo Metals,
307 F.3d 160 (3d Cir. 2002)........................................................................................17

Celotex Corp. v. Catrett,
477 U.S. 317 (1986).....................................................................................................16

Cleveland v. Policy Mgmt. Sys. Corp.,
526 U.S. 795 (1999).....................................................................................................23

Conneen v. MBNA Am. Bank N.A.,
182 F. Supp. 2d 370 (D. Del. 2002), aff'd, 334 F.3d 318 (ed Cir. 2003)...................17

Conoshenti v. Pub. Serv. Elec. & Gas Co.,
364 F.3d 135 (3d Cir. 2004)...................................................................................25, 26

EEOC v. Serv. News Co.,
898 F.2d 958 (4th Cir. 1990) ..................................................................................39, 40

Emory v. AstraZeneca Pharma.,
2003 WL 22953185 (D. Del. Dec. 3, 2003)............................................................17, 18

Ferguson v. E.I. duPont de Nemours & Co.,
560 F. Supp. 1172 (D. Del. 1983)................................................................................35

# TABLE OF AUTHORITIES

Page

Finch v. Hercules Inc.,
941 F. Supp. 1395 (D. Del. 1996) .................................................................. 39

Fogleman v. Greater Hazleton Health Alliance, 122 Fed. Appx. 581, 586 (3d Cir. 2004) .......... 25

Fogleman v. Mercy Hosp., Inc.,
283 F.3d 561 (3d Cir. 2002) ......................................................................... 32

Fuentes v. Perskie,
32 F.3d 759 (3d Cir. 1994) ....................................................................... 17, 30

Gaul v. Lucent Techs, Inc.,
134 F.3d 576 (3d Cir. 1998) .......................................................................... 17

Greenway v. Buffalo Hilton Hotel,
143 F.3d 47 (2d Cir. 1998) ........................................................................... 38

Hunter v. Allis-Chalmers Corp.,
797 F.2d 1417 (7th Cir. 1986) ....................................................................... 38

Jackson v. Wal-Mart Stores,
2007 WL. 1041027 (W.D. Pa. Apr. 5, 2007) ........................................................ 26

Jones v. Southcentral Employment Corp.,
488 F. Supp. 2d 475 (M.D. Pa. 2007) .............................................................. 24

Kelly v. Drexel Univ.,
94 F.3d 102 (3d Cir. 1996) .................................................................... 17, 18, 30

Kratzer v. Rockwell Collins, Inc.,
398 F.3d 1040 (8th Cir. 2005) ....................................................................... 28

Krouse v. Am. Sterilizer Co.,
126 F.3d 494 (3d Cir. 1997) .......................................................................... 33

Logue v. Int'l Rehabilitation Assoc., Inc.,
837 F.2d 150 (3d Cir. 1988) .......................................................................... 31

Lorde v. City of Philadelphia,
2000 U.S. Dist. LEXIS 17196 (E.D. Pa. Nov. 30, 2000) ......................................... 23

Loulseged v. Akso Nobel Inc.,
178 F.3d 731 (5th Cir. 1999) ......................................................................... 28

RLF1-3209072-1

**TABLE OF AUTHORITIES**

<u>Page</u>

Magel v. Fed. Reserve Bank,
776 F. Supp. 200 (E.D. Pa. 1991), <u>aff'd</u>, 5 F.3d 1490 (3d Cir. 1993) ............................21

Marinelli v. City of Erie, Pa.,
216 F.3d 354 (3d Cir. 2000) ..........................................................................................18

Mason v. Avaya Commc'ns, Inc.,
357 F.3d 1114 (10th Cir. 2004) .....................................................................................21

McDonnell Douglas Corp. v. Green,
411 U.S. 792 (1973) ...................................................................................16, 17, 36

Myer v. United Airlines, Inc.,
950 F. Supp. 874 (N.D. Ill. 1997) .................................................................................38

Myers v. Hose,
50 F.3d 278 (4th Cir. 1995) ...........................................................................................26

Oestringer v. Dillard Store Servs., Inc.,
92 Fed. Appx. 339, 341-42 (7th Cir. 2004) ..................................................................26

Potence v. Hazleton Area Sch. Dist.,
357 F.3d 366 (3d Cir. 2004) ..........................................................................................36

Robinson v. City of Pittsburgh,
120 F.3d 1286 (3d Cir. 1997) ........................................................................................34

Russell v. TG Missouri Corp.,
340 F.3d 735 (8th Cir. 2003) .........................................................................................28

Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,
81 F.3d 355 (3d Cir. 1996) ............................................................................................22

Santiago v. Temple Univ.,
739 F. Supp. 974 (E.D. Pa. 1990), <u>aff'd without opinion</u>, 928 F.2d 396 (3d Cir. 1991) ...............21

Sempler v. Johnson & Higgins,
45 F.3d 724 (3d Cir. 1995) ............................................................................................30

Sheridan v. E.I. duPont de Nemours & Co.,
100 F.3d 1061 (3d Cir. 1996), <u>cert. denied</u>, 521 U.S. 1129 (1997) ..............................36

RLF1-3209072-1

# TABLE OF AUTHORITIES

Page

Showalter v. Univ. of Pittsburgh Med. Ctr.,
190 F.3d 231 (3d Cir. 1999)................................................................................................30

Skerksi v. Time Warner Cable Co.,
257 F.3d 273 (3d Cir. 2001)................................................................................................25

Smith v. Davis,
248 F.3d 249 (3d Cir. 2001)................................................................................................20

Southeastern Cmty. Coll. v. Davis,
442 U.S. 397 (1979).............................................................................................................20

Spangler v. Federal Home Loan Bank,
278 F.3d 847 (8th Cir. 2002)..............................................................................................21

Taylor v. Phoenixville Sch. Dist.,
184 F.3d 296 (3d Cir. 1999)...............................................................................................24

Torre v. Casio, Inc.,
42 F.3d 825 (3d Cir. 1994)..................................................................................................31

Toyota Motor Mfg., Kentucky, Inc. v. Williams,
534 U.S. 184 (2002).............................................................................................................18

Tubari Ltd., Inc. v. NLRB,
959 F.2d 451 (3d Cir. 1992)...............................................................................................37

Tyndall v. Nat'l Educ. Ctrs., Inc. of Ca.,
31 F.3d 209 (4th Cir. 1994).........................................................................................20, 21

Vice v. Blue Cross & Blue Shield of Oklahoma,
113 Fed. Appx. 854 (10th Cir. 2004).................................................................................26

Wagner v. Dillard Dept. Stores, Inc.,
17 Fed. Appx. 141 (4th Cir. 2001).....................................................................................37

Walton v. Mental Health Ass'n of Se. Pa.,
168 F.3d 661 (3d Cir. 1999)................................................................................................26

Weston v. Commonwealth of Pennsylvania,
251 F.3d 420 (3d Cir. 2001)................................................................................................17

Wooley v. Colonial Sch. Dist.,
1993 WL 431208 (D. Del. May 11, 1993).........................................................................37

## TABLE OF AUTHORITIES

Page

### Statutes and Other Authorities

42 U.S.C. § 12102(2) ............................................................................................ 18

42 U.S.C. § 12111(8) ......................................................................................... 22, 27

42 U.S.C. § 12112(a) ............................................................................................ 22

42 U.S.C.A. § 423(d)(2)(A) .................................................................................. 22

29 C.F.R. § 1630.2(i) ......................................................................................... 18, 28

Fed. R. Civ. P. 56(c) ............................................................................................ 16

18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper,
Federal Practice & Procedure Juris. 2d § 4477 (1981) ....................................... 23

## NATURE AND STAGE OF PROCEEDINGS

Plaintiff Vernette Walker ("Walker") filed a Charge of Discrimination ("Charge") against The News Journal (the "Company") with the United States Equal Employment Opportunity Commission ("EEOC") and the Delaware Department of Labor ("DDOL") on or about October 7, 2004, alleging she was discriminated against solely on the basis of a disability (Ex. 1).[1]  The DDOL, on June 30, 2005, determined that "there is no reasonable cause to believe that an unlawful employment practice has occurred" because "Charging Party is not a covered disabled individual" and "Charging Party has provided no corroborative evidence that she was harassed or denied a reasonable accommodation." (Ex. 2).  On December 5, 2005, Walker was issued her Dismissal and Notice of Rights letter by the EEOC which adopted the findings of the DDOL. (Ex. 5).

The DDOL's and the EEOC's determination notwithstanding, Walker filed a complaint against the Company and benefits manager Ann Hines ("Hines") in her individual capacity on March 1, 2006 (the "Complaint") specifically alleging she was discriminated against on the basis of age and disability and indirectly alleging retaliation. (Ex. 4).

On August 14, 2006, the Company and Hines ("Defendants") filed motions to dismiss and opening briefs in support of their motion to dismiss Walker's Age Discrimination and Employment Act ("ADEA") and Title VII of the Civil Rights Act of 1964 ("Title VII") claims because such claims were not alleged, as required, in her Charge.  In addition, Hines moved to dismiss herself as an individual defendant in regards to the entire Complaint.  The Company also filed an Answer that responded to Walker's allegations.  Thereafter, on August 3, 2007, Walker

---

[1] References to exhibit numbers are those exhibits attached hereto.  References to exhibit letters are those exhibits attached to the cited affidavit.

filed an answering brief in response to Defendants' motions to dismiss. In her response, Walker failed to challenge or address any of the legal arguments raised in Defendants' opening briefs. As such, Defendants did not respond by way of a formal reply brief. Instead, Defendants filed a letter addressed to this Court on August 13, 2007, explaining that because Walker did not allege any additional facts that would require a response or a counter legal argument, Defendants would rely on the arguments previously set forth in their opening briefs. Subsequently, Defendants took Plaintiff's deposition in which she admitted that she did not allege or intend to allege race in her Complaint. (Ex. 10 at 202, 214).[2] However, Walker continued to allege that she suffered age discrimination, but did not offer any supportive evidence. Accordingly, Defendants do not further address the race claim herein, but do rebut, as a supplement to their motions to dismiss, the ADEA claim.

Discovery in this matter closed on September 14, 2007. The motions to dismiss are pending before this Court. Defendants continue to rely on the arguments contained in their opening briefs and such arguments are for the most part not reiterated herein. As to all the arguments not addressed in their motions to dismiss, this is Defendants' Opening Brief in Support of their Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

1.      Walker does not have a disability within the meaning of the ADA. She is not substantially limited in any major life activity.

2.      Further, or in the alternative, Walker is not a qualified individual under the ADA. First, she cannot perform the essential functions of the job with or without an accommodation. Second, she never requested an accommodation. Third, assuming *arguendo* that Walker

---

[2] Excerpts of Walker's deposition are referenced herein as "Ex. 10 at ___."

requested an indefinite leave of absence, this request is unreasonable and creates an undue burden on the Company, and Walker failed to actively engage in the interactive process.

3. Walker has not and cannot show pretext to rebut the Company's legitimate business reason for her termination, specifically a company-wide reduction in force.

4. Walker's retaliation claim must be dismissed because she cannot set forth a *prima facie* case: Walker never engaged in a protected activity, the majority of the alleged acts are not adverse employment actions, and she cannot show a causal connection given the legitimate company-wide reduction in force.

5. Walker's claim under the ADEA must fail because she failed to set forth any evidence to support her claim.

6. Because Walker made no attempt to pursue subsequent employment, her failure to mitigate her alleged damages precludes any wage damages.

## STATEMENT OF FACTS

### A.    The Parties.

Walker is a 48-year-old woman who was employed by the Company from December 1987 through August 2004. (Ex. 10 at 7, 9, 78). She began her employment with the Company working part-time in the Advertising Department, where she was responsible for soliciting customers to sell ads. (Ex. 10 at 9). Thereafter, Walker became a full-time employee working as an input sales representative. (Ex. 10 at 10). On February 12, 2001, Walker transferred to the Finance Department and worked as a credit clerk. (Ex. 10 at 11). As a credit clerk, Walker was responsible for retail advertising, collections on delinquent accounts, preparing reports concerning delinquent customers, and handling both inbound and outbound calls. (Ex. 10 at 12, 13; Rumpf Aff. Ex. A). The majority of Walker's job duties as a credit clerk involved sitting,

and she was able to take breaks when needed. (Ex. 10 at 17). Many of the job duties needed to be performed at the Company. (Rumpf Aff. ¶ 5).

At all relevant times, Walker reported to Shelly Rumpf ("Rumpf"), the credit manager in the Finance Department. According to Rumpf, Walker was the strongest performer in her group in 2003 and 2004. (Rumpf Aff. ¶ 44). Walker was competent and Rumpf rarely had concerns about her work. (Rumpf Aff. ¶ 44). Each believed they had a good working relationship with the other. (Ex. 10 at 12; Rumpf Aff. ¶ 44).

The Company is a newspaper publisher with its principal place of business at 950 Basin Road, New Castle, Delaware 19720. (Pinto Aff. ¶ 2). Currently, the Company employs approximately 700 in various departments. (Pinto Aff. ¶ 2).

Hines was the benefits manager for the Company since May 8, 1998 (Pinto Aff. ¶ 12). As benefits manager, her job duties included contacting employees in writing and on the telephone about their benefits, managing employee medical benefits, facilitating status updates for department heads, and ensuring that Family and Medical Leave Act ("FMLA") requirements were met. (Hines Aff. ¶ 1 and Ex. A). According to Walker, she and Hines had a good rapport as well as a good working relationship. (Ex. 10 at 26). Hines retired from the Company in August 2007. (Pinto Aff. ¶ 12).

**B.     Finance Department's Structure In 2004.**

In early 2004, there were four full-time regular[3] employees that reported to Rumpf in the Finance Department:  Walker, Joan Raser ("Raser"), Cheryl Drummond ("Drummond") and Melissa Govens ("Govens"). (Rumpf Aff. ¶ 4). The credit clerks shared responsibilities and

---

[3] The Company uses the term "regular" employee to identify an ongoing employee (yet still at-will) who is entitled to certain Company-funded benefits.

provided work support for each other. (Rumpf Aff. ¶ 5). Govens went out on a leave of absence and failed to return. (Rumpf Aff. ¶ 6). As a result, her employment was terminated on February 23, 2004, and shortly thereafter Rumpf hired a full-time temporary employee[4] to fill the void created by Govens's absence. (Rumpf Aff. ¶ 6).

Beginning in early 2004, several temporary employees held the position of credit clerk in the Finance Department in succession, including Alainna Thomas ("Thomas"), Adwoa Mprengo ("Mprengo") and Andrea Johnson ("Johnson"). (Rumpf Aff. ¶ 7).

### C.    Walker's Car Accident.

On April 27, 2004, during the business day, Rumpf received a telephone call from a police officer concerning Walker. (Rumpf Aff. ¶ 8; Ex. 10 at 34). The officer's voicemail message indicated that Walker had been involved in a car accident, that she was "okay," and that she was at the Christiana Hospital. (Rumpf Aff. ¶ 8). Out of concern for Walker, Rumpf left work immediately and went to Christiana Hospital's emergency room. (Rumpf Aff. ¶ 9; Ex. 10 at 34). Walker sustained injuries to her neck and back in the accident. (Ex. 10 at 37). Rumpf remained with Walker for approximately one hour until Walker's significant other arrived. (Rumpf Aff. ¶ 9). Shortly thereafter, Rumpf returned to work. (Rumpf Aff. ¶ 9; Ex. 10 at 35). Walker was released from the hospital that same day. (Ex. 10 at 36).

A short time later, Rumpf learned that Walker would be absent due to the car accident and that Walker would continue to update the Company on her status. (Rumpf Aff. ¶ 10; Ex. 10 at 37). At that time, Walker did not give Rumpf an anticipated return to work date. (Rumpf Aff.

---

[4] The Company uses the term "temporary" employee to identify an employee hired only for a temporary duration who is not entitled to certain Company-funded benefits.

¶ 10). As such, Rumpf was not aware of when Walker would be returning to her position. (Rumpf Aff. ¶ 10).

During the time Walker was out of work beginning in April 2004, Rumpf and the other credit clerks performed many of Walker's job duties. (Rumpf Aff. ¶ 14). During this time there was a steady flow of work that needed to be performed. As a result, Raser, Drummond and Johnson sometimes worked past their normal departure time to complete the group's assignments and were paid overtime. (Rumpf Aff. ¶ 14).

D. **The Company Notifies Walker Of Her Benefit Eligibility.**

On April 30, 2004, three days after Walker's car accident, Hines sent Walker two (2) letters via certified mail, notifying Walker of her benefits entitlement under the Company's Income Protection Plan (short-term disability benefits) (the "Plan") and under the Company's FMLA policy.[5] (Hines Aff. ¶ 3). Hines also enclosed copies of the Plan and policy for Walker's review. (Hines Aff. ¶ 3). Additionally, in the FMLA letter, Hines enclosed a Certification of Healthcare Provider Form ("FMLA Certification") for completion and return to Hines on or before May 15, 2004. (Hines Aff. ¶ 3 and Ex. B).

The Plan stated in part, "At its discretion, the Company may require written information from your personal physician or through an examination by a company-selected physician, before payments under this plan are authorized." (Hines Aff. Ex. B). Further, the Plan required Walker's physician to indicate the nature of the condition, illness or injury and the length of time she was expected to be absent from work. (Hines Aff. Ex. B). The Plan also indicated that short-term disability would continue until Walker was "medically fit to return to work" and that

---

[5] The News Journal's FMLA policy clearly states that employees are eligible for up to 12 weeks of benefits. (Hines Aff. Ex. B).

a physical exam or periodic reports from her attending physician may be requested in order to commence or continue benefits. (Hines Aff. Ex. B). Walker acknowledged her receipt and understanding of the Company's Plan. (Ex. 10 at 45, 46).

On May 13, 2004, pursuant to the terms of the Plan, Hines sent Walker a claim for disability benefits form ("Disability Certification") and requested that she have her physician complete the doctor's statement on or before May 28, 2004. (Hines Aff. ¶ 6 and Ex. C).

### E.     Walker Fails To Provide Timely And Adequate Supporting Documentation.

The Company did not receive a completed FMLA Certification from Walker in order to determine her eligibility for FMLA by May 15, 2004, as Hines requested. (Hines Aff. ¶ 7). On or about May 19, 2004, the Company received a completed copy of Walker's claim for disability benefits form in which Walker's physician determined that she was "completely disabled" for an "indeterminate" period of time. (Hines Aff. Ex. D). The form indicated that Walker was diagnosed with a "cervical lumbosacral sprain or strain." (Ex. 10 at 86; Hines Aff. ¶ 8 and Ex. D). The Company also received Walker's doctor's note dated May 26, 2004, which indicated that she would be out of work for the following four weeks and would be reevaluated at that time. (Hines Aff. ¶ 8 and Ex. D). Notwithstanding her failure to provide medical support for her requested leave, other than statements from her physician that she was "completely disabled" for an "indeterminate" period, Walker was approved for short-term disability ("STD") benefits and provisionally approved for FMLA pending receipt of the FMLA certification. (Hines Aff. ¶ 8).

As standard Company procedure, Hines updated relevant managers and her supervisor, Dolores Pinto ("Pinto"), vice president of Human Resources ("HR"), on the status of employees

who were on a leave of absence from work. (Hines Aff. ¶ 9).[6]  Similarly, Hines provided

updates on Walker based on Walker's doctors' notes.

In June 2004, Walker advised Rumpf that she planned to come back to work "soon"

because she was feeling better. (Ex. 10 at 39).  But on June 23, 2004, Walker provided the

Company with another doctor's note that she would be out of work until at least July 21, 2004, at

which time she would be reevaluated. (Hines Aff. ¶ 13 and Ex. H).  However, all of the doctor's

notes provided by Walker failed to detail (1) the nature of the injury, (2) the period of expected

recovery, or (3) if Walker could return to work on an intermittent basis with appropriate

treatment. (Hines Aff. ¶ 14).

Due to Walker's failure to provide the Company with the requested FMLA Certification

by May 15, 2004, Hines sent another letter to Walker via certified mail on July 1, 2004,

enclosing another FMLA Certification for completion by July 16, 2004. (Hines Aff. ¶ 15 and

Ex. I).  Under separate cover and pursuant to her normal practice, Hines sent Walker another

letter dated July 1, 2004, advising Walker that her 12-week entitlement to FMLA benefits would

end on July 20, 2004. (Hines Aff. ¶ 16).  Walker was specifically advised, *"If you remain*

*unable to return to work as of July 20, 2004, business necessity requires us to fill your position*

*as Credit Clerk."* (Hines Aff. ¶ 16 and Ex. J).[7]

---

[6] On May 5, 2004, Hines sent an email to Rumpf, as well as to Pinto and Erich Walburn
("Walburn"), vice president of Finance, informing them that Walker would be out of work for
the next three (3) weeks. (Hines Aff. ¶ 10 and Ex. E).  Again, on May 28, 2004, Hines sent
another email to Rumpf, Pinto and Walburn informing them that Walker would be out of work
for an additional four (4) weeks and that her next doctor's appointment was scheduled for June
23, 2004. (Hines Aff. ¶ 11 and Ex. F).  Again, on June 1, 2004, Hines sent another email to
Rumpf, Pinto and Walburn advising them that "[d]ue to severe neck and back pain and muscle
spasms, Vernette is unable to sit or stand for prolonged periods." (Hines Aff. ¶ 12 and Ex. G).

[7] As a courtesy, Hines generally contacts employees prior to their receipt of this letter to
advise that the Company, as applicable, has not made any decisions concerning the termination
(cont.)

-8-

Four days before the FMLA leave was set to expire, on July 15, 2004, the Company finally received a copy of Walker's completed FMLA Certification via fax. (Hines Aff. ¶ 18). Once again, the information provided by Walker's doctor was vague, and the description of her medical facts read, "*involving a motor vehicle accident on 4/27/04 injuring neck and low back*." (Hines Aff. ¶ 18). The form did not identify the nature of the actual injury, the period of expected recovery, or whether Walker could return to work on an intermittent basis. (Hines Aff. ¶ 18). Additionally, the Company received a copy of her doctor's note dated July 14, 2004, without any detail as to why she would continue to be out of work, only indicating that she would be out of work for another month and would be revaluated on August 11, 2004. (Hines Aff. ¶ 18 and Ex. K).

**F.   Walker's Release To Return To Work Regular Duty.**

After requests from Hines, Walker, on Tuesday, August 17, 2004, provided Hines with copies of various medical records from her treating physicians and a doctor's note, dated August 11, 2004, which stated only that Walker would be out of work for the next four weeks and that she would be reevaluated at that time. (Hines Aff. ¶ 24; Ex. 10 at 103, 113). These medical records did not identify a prognosis or a long-term recovery date. (Hines Aff. ¶ 24).

In an effort to gauge whether Walker could in fact return to work in any capacity, whether she was still eligible for Plan benefits, and based upon the vagueness of the previous notes provided by Walker, the Company arranged for Concentra Medical Center ("Concentra")

---

of their employment at that time, but she makes no promises as to how long their job will be held open.   The time period of qualification of benefits under the Plan does not guarantee a corresponding amount of time that the Company will hold an employee's position open (after the 12-week FMLA period). (Pinto Aff. ¶ 21).

to perform a return to work exam ("Concentra exam").[7]  (Hines Aff. ¶ 25).  Shortly thereafter,

Hines verbally notified Walker of the scheduled exam on August 23, 2004.  (Ex. 10 at 106).[8]

In a letter dated August 18, 2004 to Dr. Linda Surdo ("Dr. Surdo") at Concentra in

advance of the Concentra exam, Hines noted that Walker's position was a "light duty" position

and that the Company could accommodate physical restrictions/limitations accordingly.[9]  (Hines

Aff. ¶ 27 and Ex. L).  Hines enclosed a copy of Walker's job description and medical records for

Dr. Surdo's review.  As agreed to by Walker, the job description detailed that her job entailed

sitting in a chair ninety percent of the time, walking five percent of the time and standing five

percent of the time.  (Ex. 10 at 17, 110).  Walker also could take breaks as needed while at work,

which Walker acknowledged.  (Ex. 10 at 17).

Dr. Surdo examined Walker on August 23, 2004.  During Walker's examination, Dr.

Surdo asked her about her accident, pain levels and specific job duties.  (Ex. 10 at 117).  At the

end of the examination, Dr. Surdo gave Walker a note stating that she was able to return to work

that day without any restrictions.  (Ex. 10 at 119, 120; Hines Aff. ¶ 28 and Ex. M).

### G.    Walker Fails To Return To Work After Being Informed Of The Need To Return To Work.

Walker did not return to work on August 23 or August 24, 2004.  Hines then contacted

Walker to specifically advise her to return to work.  (Hines Aff. ¶ 29).  In response to Hines's

request, Walker stated that she could not return to work because she already had scheduled

---

[7] Hines had begun the process of setting up the return to work exam in July 2006.  (Pinto Aff. ¶12).

[8] Any telephone calls Hines made to Walker were pursuant to her position as the Company's benefits manager.  (Hines Aff. ¶ 36).  Further, Walker never complained to anyone at the Company that Hines was harassing her.  (Ex. 10 at 57).

[9] This is consistent with business practice as acknowledged by Walker.  She had a prior injury and medical leave which had been fully accommodated by the Company.  (Ex. 10 at 24).

-10-

doctors' appointments and treatment, particularly injections. (Hines Aff. ¶ 29). Walker never returned to work.[10] Hines also made Pinto aware of Dr. Surdo's report. (Pinto Aff. ¶ 13).

### H.    Walker Fails To Request An Accommodation.

During the same conversation in which Hines asked Walker to return to work, Hines advised Walker that the Company could accommodate physical restrictions/limitations and/or doctors' appointments, if any. (Hines Aff. ¶ 29). Walker declined to return to work due to appointments and treatment. (Hines Aff. ¶ 29). Hines then informed Walker that she was expected to return to work the next day to discuss any accommodations. (Hines Aff. ¶ 29). Nevertheless, Walker did not agree to return to work, even in a limited or part-time capacity. (Hines Aff. ¶ 29). Walker did not notify Hines that she was able to work and perform the essential functions of her position with or without restrictions, nor did Walker request any accommodation for any alleged disability (including a personal leave of absence), which she admitted on multiple occasions. (Ex. 2; Ex. 10 at 162, 198; Hines Aff. ¶ 31; Rumpf Aff. ¶ 24). Thereafter, Hines informed Pinto of her conversation with Walker. (Hines Aff. ¶ 32; Pinto Aff. ¶ 16).

### I.    The Company's Reduction In Force.

On or about August 16, 2004, Pinto learned from Curtis Riddle ("Riddle"), the publisher, that the Company needed to significantly cut expenses due to financial and budgetary pressure. (Pinto Aff. ¶ 4).

---

[10] Although Walker testified at her deposition that she did not know that she was supposed to return to work, she had previously written to her counsel representing her in relation to her car accident, explaining to him that Hines asked her to return to work on August 30, 2004. (Ex. 10 at 157, 158, 163; Ex. 8; Ex. 7). Hines believed she asked Walker to return earlier than August 30, 2004 based upon the return to work date of August 23, 2004 and her handwritten notes from the telephone conversation. (Hines Aff. ¶¶ 20, 29). In any event, the parties agree on the material issue that Hines told Walker to return to work and that Walker never returned.

### 1. Company-Wide Budgetary Concerns.

Pinto and other department heads were asked by Riddle on or about August 16, 2004 to identify areas within their departments, where non-payroll and potentially payroll expenses could be reduced. (Pinto Aff. ¶¶ 5, 6). As Vice President of HR, Pinto was also asked to coordinate and work with Riddle on these same areas Company-wide. (Pinto Aff. ¶ 6 and Ex. B). A hiring freeze was implemented on all open positions. Many department heads identified non-payroll areas where expenses could be reduced. (Pinto Aff. ¶¶ 5, 6). Unfortunately, the Company still found that it needed to lay off some employees Company-wide in a reduction in force ("RIF"). (Pinto Aff. ¶ 6).

Riddle, other department heads, VP of Finance Dan Lemire, and Pinto met regularly in August to discuss payroll reductions and budget issues. (Pinto Aff. ¶ 7). It was a fluid process and the prospective positions and individuals to be eliminated changed due to business needs and unexpected events, such as voluntary resignations. (Pinto Aff. ¶ 7). In connection, on or about August 20, Riddle made handwritten notes concerning which potential positions the Company could freeze, eliminate and lay off. (Pinto Aff. ¶ 8 and Ex. C). That list became the starting point as the Company looked at the jobs open in each area and those employees to whom the Company might offer a buyout or involuntarily terminate. (Pinto Aff. ¶ 8).

### 2. Job Freezes, Eliminations And Layoffs.

On or about August 20, 2004, Pinto received an email from Riddle informing her and other department heads that the Company's revenue shortfalls had continued through August 2004 and were quite serious. (Pinto Aff. ¶ 10). Consequently, Riddle indicated that the Company "would be forced to reduce the number of fulltime employees" by about "20 folks." (Pinto Aff. ¶ 10). Thus, at this point, the Company was looking at "eliminating eight positions,"

"offering buyouts" to eight people, and "laying off an additional four persons." (Pinto Aff. ¶ 10 and Ex. F).[12]

In regards to the Finance Department, from the time of the initial discussions of which departments and jobs would be impacted, there was always a full-time credit clerk position on the list. (Pinto Aff. ¶ 11). During this time, there were four credit clerk employees, including Walker, who was on leave, two other regular full-time employees, and one temporary full-time employee (Johnson). (Pinto Aff. ¶ 11). The Company did not know when or if Walker would return to work, but her return or failure to do so would impact which credit clerk position was eliminated. (Pinto Aff. ¶ 11). If Walker was unable to return, her position would be eliminated. (Pinto Aff. ¶ 11). Conversely, if she could return to work, the position was hers. (Pinto Aff. ¶ 11).[13]

### 3.    The Elimination Of Walker's Position In The Finance Department.

Throughout, Hines made Pinto aware of Walker's failure to return to work and her failure to discuss or request an accommodation. (Hines Aff. ¶ 32; Pinto Aff. ¶ 16). By August 30,

---

[12] At one point, on or about August 26, 2007, the Company planned to lay off ten employees company-wide; specifically, one employee in the Information Technology ("IT") Department, two employees in the Circulation Department, three employees in the News Department, two employees in the Finance Department, and two employees in the Advertising Department. (Pinto Aff. ¶ 9). Further, the Company planned to eliminate four positions Company-wide; specifically, one position in the Human Resources Department, two positions in the Circulation Department, and one position in the Advertising Department. (Pinto Aff. ¶ 9). All but one of those positions was already vacant. (Pinto Aff. ¶ 9). Under a hiring freeze, those positions would simply not be filled. (Pinto Aff. ¶ 9). The Company also planned to offer buyouts to two employees in the Advertising Department, two employees in the Circulation Department, one employee in the IT Department, three employees in the News Department, and one employee in the Finance Department. (Pinto Aff. ¶ 9 and Ex. E).

[13] On or about August 26, 2004, Pinto prepared a written document addressing unusual circumstances affecting specific individuals, including a note about the credit clerk position which indicated that the Company would lay off Johnson if Walker returned to work. (Pinto Aff. ¶ 14 and see Ex. I).

2004, Walker still had not returned to work, though she had been released to do so for a full week.  (Hines Aff. ¶ 31).   Based on this information, it was Pinto's recommendation that Walker's position be eliminated if she was not willing (or even able, as she had exhausted her FMLA leave) to return to work.  (Pinto Aff. ¶¶ 16, 17).

By August 30, 2004, Walker had not returned to work, nor did the Company have information that her return to work was imminent.  Accordingly, it was decided to eliminate her position effective August 30, 2004.  Pinto instructed Hines to notify Walker in writing.[13]  (Pinto Aff. ¶ 17).

In the end, the final RIF plan included offering nine buyouts, of which five were eventually accepted.  (Pinto Aff. ¶ 18).  All of those positions were permanently eliminated. (Pinto Aff. ¶ 18).  In addition, five positions, including Walker's, were eliminated.  (Pinto Aff. ¶ 18).  Pinto's decision to eliminate Walker's position was solely based upon business needs and budgetary constraints and had nothing to do with any protected class.  (Pinto Aff. ¶ 19).

Accordingly, on August 30, 2004, Hines advised Walker in a certified letter that *due to business necessity, the Company no longer had a job available but that when she did decide to return to work, available openings would be assessed to determine whether a position for which she was qualified was available.*  (Hines Aff. ¶ 34 and Ex. N) (emphasis added).  Walker did not report to work on August 30 or 31, 2004.  (Pinto Aff. ¶ 17).  Walker received the letter from Hines on August 31, 2004.  (Ex. 10 at 177).  She never called Hines or anyone at the Company for an explanation or to argue against the decision.  (Ex. 10 at 167).

---

[13] Hines was not involved in the RIF decision making process.  (Hines Aff. ¶ 35; Ex. 10 at 221).

**J.    Walker Fails To Contact The Company Or Search For New Employment.**

To date, despite being told by Hines in a letter in August 2004 and again in a letter in December 2004 that she should contact the Company when she was ready to return to work to discuss available openings, to date Walker has not contacted Hines, Rumpf or anyone else at the Company to discuss open positions for which she may be qualified. (Hines Aff. ¶ 38; Rumpf Aff. ¶ 42; Ex. 10 at 181).

Walker has not taken any steps to search for employment since leaving the Company. (Ex. 10 at 186, 196). Despite filing an unemployment claim in December 2004 and receiving benefits for 26 weeks, her only attempt to find employment was going to Wilmington Transportation with the hope that she could work by selling tickets, but there were no jobs available. (Ex. 6; Ex. 10 at 186).

Ironically, Walker testified she loved her job and would love to come back. (Ex. 10 at 77). Her actions to date have not demonstrated such. Walker complained that the Company hired a part-time credit clerk in or around January 2006 as business needs increased, but she did not apply for this position because she claimed she did not know there was an opening. (Ex. 10 at 240; Rumpf Aff. ¶ 40). However, the position, along with others, had been advertised in the Company's newspaper at various points since her termination. (Rumpf Aff. ¶¶ 38, 40). Walker never applied for any. She was not looking for job openings in the newspaper or elsewhere. (Ex. 10 at 186, 196).

**K.    Walker Deemed Totally Disabled By SSA.**

On or about August 27, 2007, Walker was awarded Supplement Security Disability Insurance benefits ("SSDI") by the Social Security Administration ("SSA") based on a finding that Walker was disabled beginning April 27, 2004 and ending December 18, 2006. (Ex. 9).

SSDI benefits were awarded to Walker based upon her statements and treating physician Dr. King's opinion that she was totally and physically disabled. (Ex. 10 at 149, 212; Ex. 9).[14]

## ARGUMENT

### I.     THE STANDARD FOR SUMMARY JUDGMENT.

Summary judgment is appropriate when, viewing the evidence in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact." Fed. R. Civ. P. 56(c); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party is not required to present evidence "negating the opponent's claim," but rather need only show "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 323, 325 (1986). Once the moving party makes this showing, the burden shifts to the non-moving party to point to specific evidence -- as opposed to allegations, general denials or vague statements -- establishing a genuine issue for trial. Id. at 324; Bixler v. Cent. Pa. Teamsters Health & Welfare Fund, 12 F.3d 1292, 1302 (3d Cir. 1993). In the event the non-moving party fails to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," the court must grant the moving party's motion for summary judgment. Celotex, 477 U.S. at 322.

Defendants' motion for summary judgment should be granted because Walker has failed to state a viable claim as a matter of law and there are no genuine issues of material fact.

### II.    DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON WALKER'S ADA CLAIM BECAUSE SHE CANNOT ESTABLISH A *PRIMA FACIE* CASE.

In discrimination cases, proof at the summary judgment stage follows the well-established "burden-shifting" approach in McDonnell Douglas Corp. v. Green, 411 U.S. 792

---

[14] Interestingly, Walker received unemployment benefits during the same time period. (Ex. 6).

(1973). To establish a *prima facie* disability discrimination claim under the ADA, a plaintiff must establish that she: (1) has a disability within the meaning of the ADA; (2) is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) was subject to some adverse action as a result of her disability. Buskirk v. Apollo Metals, 307 F.3d 160, 166 (3d Cir. 2002). Once the plaintiff has established a *prima facie* case, the defendant must rebut an inference of wrongdoing with evidence of a legitimate, non-discriminatory reason for the action taken. Weston v. Commonwealth of Pennsylvania, 251 F.3d 420, 432 (3d Cir. 2001). If defendant successfully meets this burden, then in order to avoid summary judgment, the plaintiff must present evidence of pretext, or cover-up, or show that discrimination played a role in the employer's decision making and had a determinative effect on the outcome. Weston, 251 F.3d at 432; Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

In the instant case, Walker cannot establish a *prima facie* ADA discrimination claim because (1) she is not disabled; (2) she is not qualified under the ADA; (3) she did not request an accommodation; and (4) even if she requested an accommodation, such was unreasonable. As such, summary judgment should be entered in favor of Defendants. Emory v. AstraZeneca Pharma., 2003 WL 22953185, at *2 (D. Del. Dec. 3, 2003) (when plaintiff cannot establish *prima facie* case of disability discrimination, summary judgment is appropriate); Kelly v. Drexel Univ., 94 F.3d 102, 105, 109 (3d Cir. 1996) (same).

## A. Walker Is Not Disabled As Defined By The ADA.

Walker does not have a "disability" within the meaning of the ADA. In order to assert a claim under the ADA, a plaintiff must prove that she is an individual with a "disability." Conneen v. MBNA Am. Bank N.A., 182 F. Supp. 2d 370 (D. Del. 2002), aff'd, 334 F.3d 318 (ed Cir. 2003); Gaul v. Lucent Techs, Inc., 134 F.3d 576, 580 (3d Cir. 1998). The term "disability,"

-17-

with respect to an individual, means: (A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) the individual is regarded as having such an impairment. 42 U.S.C. § 12102(2) (1995); Emory, 2003 WL 22953185, at *2; Kelly, 94 F.3d at 105. Walker claims that she has a disability that substantially limits one or more of her major life activities; however, the evidence shows otherwise.

Although Walker suffered a back injury as a result of her car accident, such injury does not "substantially limit" her in any "major life activity." Although the ADA does not define either phrase, the Supreme Court has helped to define these terms. In doing so, the Supreme Court emphasized that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." Toyota Motor Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, 197 (2002). The Supreme Court held that "major life activities" within the meaning of the ADA refers to those "activities that are of central importance to daily life." Id. at 197. Regarding the phrase "substantially limited," to qualify as "disabled," a plaintiff must further show that the limitation on the major life activity is "substantia[l]." 42 U.S.C. § 12102(2)(A). To clarify, the Court explained that "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." Toyota, 534 U.S. at 198. The Third Circuit has further explained that "major life activities" are those "activities that the average person in the general population can perform with little or no difficulty." Marinelli v. City of Erie, Pa., 216 F.3d 354, 361 (3d Cir. 2000). Examples of major life activities as defined by the EEOC are "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, or working." 29 C.F.R. § 1630.2(i).

By her own admission, Walker is not substantially limited in any major life activity. Since the 2004 car accident, Walker admits that she is able to cook lunch for herself and swallow and chew food. (Ex. 10 at 135). She is able to grocery shop and carry small bags of groceries. (Ex. 10 at 137). She is able to use her home computer, pay bills, bathe herself, drive a car and travel on vacation. (Ex. 10 at 139-141). She is able to stand for more than 10 minutes and she is able to read newspapers and magazines. (Ex. 10 at 144). She is able to walk up and down stairs. (Ex. 10 at 144). She has the ability to brush her teeth, change her clothes and go to the bathroom. (Ex. 10 at 144, 146). She is able to listen and communicate clearly without slurred speech. (Ex. 10 at 146). When asked if she could work in 2004 after her car accident, Walker responded that she is "sure [she] could have been able to do something." (Ex. 10 at 147). Walker also testified that had she known her job would be eliminated, she would have returned to work immediately.[15] (Ex. 10 at 168).

Further, although Walker takes medication, she is not dependent on this medication to carry on her daily activities, as she was able to travel to and from her deposition, attend the deposition, and sit through her entire deposition without any medication. (Ex. 10 at 3). She was able to walk at a normal gait during breaks in her deposition. (Pinto Aff. ¶ 26). Perhaps most important, Walker was examined and released to return to work regular duty *without any restrictions* by Dr. Surdo, who conducted the Concentra exam on August 23, 2004. (Hines Aff. ¶ 28; Ex. 10 at 119).

---

[15] Notwithstanding her allegation, Walker did know by letter dated July 1, 2004 (Hines Aff. Ex. I) that her job was not guaranteed after exhaustion of FMLA benefits on July 20, 2004.

-19-

Obviously, Walker was not and is not limited in any major activity if she was willing to work and is again beginning to look for work.[16] Moreover, Walker acknowledges that she was able to perform the essential functions of her job without any restrictions. (Ex. 10 at 171). Thus, there is more than sufficient evidence to support Defendants' contention that Walker is not substantially limited in any major life activity. Accordingly, she cannot satisfy the ADA *prima facie* case requirements.

**B.**     **Walker Is Not Qualified Under The ADA.**

Walker's ADA claim must fail because she is not a "qualified individual" within the meaning of the ADA as she cannot perform at least one of the essential functions of the job with or without an accommodation.

The ADA proscribes discrimination against only "*qualified* individual[s] with a disability." 42 U.S.C. § 12112(a) (emphasis added). A "qualified individual" is one "who, with or without reasonable accommodation, can perform the essential functions of the employment position." 42 U.S.C. § 12111(8). An otherwise qualified individual is "one who is able to meet all of a program's requirements in spite of [rather than 'but for'] his handicap." Southeastern Cmty. Coll. v. Davis, 442 U.S. 397, 406 (1979). An employee who does not come to work is not "qualified" under the ADA. Smith v. Davis, 248 F.3d 249, 251 (3d Cir. 2001).

In the instant case, Walker cannot perform the essential functions of her job as a credit clerk with or without a reasonable accommodation. "Except in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform any of his job functions, essential or otherwise.'" Tyndall v. Nat'l

---

[16] To the extent Walker claims working is a major life activity, her own testimony that she would have returned to work if the Company had told her her job would be eliminated weakens such an argument.

Educ. Ctrs., Inc. of Ca., 31 F.3d 209, 213 (4th Cir. 1994) (citations omitted). One of the essential functions of Walker's credit clerk position was regular attendance (Rumpf Aff. ¶ 5), and due to the alleged injuries from a car accident, she was not coming to work in any capacity from April 27, 2004 through the elimination of her position in August 2004.[17]

Although Walker could do some of her job duties from home, she admits that at the workplace regular attendance is required for credit clerks to complete many of their job duties such as reconciliations and discrepancies. (Ex. 10 at 23; Rumpf Aff. ¶ 5). Walker, although competent at her position, still required daily management supervision. (Rumpf Aff. ¶ 45). Courts frequently hold that regular attendance can be an essential job function. Santiago v. Temple Univ., 739 F. Supp. 974, 979 (E.D. Pa. 1990), aff'd without opinion, 928 F.2d 396 (3d Cir. 1991); see also Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1119-20 (10th Cir. 2004) (plaintiff's position as customer service coordinator required physical attendance because job was administrative and required physical supervision and teamwork); Spangler, 278 F.3d at 850 (regular attendance was essential job function for bank employee who was responsible for facilitating case services for client financial institutions). See also Magel v. Fed. Reserve Bank, 776 F. Supp. 200, 203-204 (E.D. Pa. 1991), aff'd, 5 F.3d 1490 (3d Cir. 1993) (holding employer has substantial interest in employee absenteeism matters, and thus not required to create a position that allows long periods of regular absences.)

Further, or in the alternative, Walker is estopped from establishing that she could perform the essential functions of the credit clerk position with or without an accommodation. Walker

---

[17] Assuming, *arguendo*, Walker requested an open-ended leave of absence, her request is inherently unreasonable because it seeks to exempt her from regular attendance, which is an essential job function. Spangler v. Federal Home Loan Bank, 278 F.3d 847 (8th Cir. 2002) (holding employee could not show ability to perform essential functions because of absenteeism).

previously represented in 2005 and in subsequent filings to the SSA that she was totally and permanently disabled from April 27, 2004 to December 18, 2006 and therefore was unable to perform her job duties or any other job due to neck and back injuries. (Ex. 10 at 148). Walker claimed that she was not "able to physically get out and work" due to her injuries. (Ex. 10 at 148). On her SSA forms, Walker indicated that she had a "physical and mental disability. Not able to work per disabilities and Doctor [sic] order." (Ex. 9). Walker's representations are corroborated in the record by third-party professionals with knowledge of her conditions. Dr. King, Walker's treating physician, recommended that she apply for SSDI benefits because, in his opinion, she was totally and physically disabled. (Ex. 10 at 149, 212; Ex. 9). Additionally, Dr. Sternberg, Walker's other treating physician, consistently maintained that Walker was unable to work in any occupation while under his care. (Ex. 9). The SSA accepted those representations as true in awarding Walker SSDI benefits. (Ex. 9). Accordingly, she is estopped from now claiming that she was, in fact, qualified to perform the essential functions of her previous position.[19]

Judicial estoppel is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with the one that she has previously asserted in the same or in a previous proceeding. Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996). The basic principle is that "absent any good explanation, a party should not be allowed to

_____

[19] A person "under disability" is entitled to SSDI benefits "if his physical or mental impairment or impairments are of such severity that he *is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy*." 42 U.S.C.A. § 423(d)(2)(A). Conversely, the ADA, prohibits employers from discriminating against a "qualified individual with a disability," which is defined as "an individual with a disability who, with or without reasonable accommodation, *can perform the essential functions of the employment positions that such individual holds or desires*." 42 U.S.C.A. § 12111(8).

-22-

gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory." 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, <u>Federal Practice & Procedure</u> Juris. 2d § 4477 (1981).

As one district court has explained, the potential for inconsistency arises where a plaintiff, like Walker, applies for and receives SSDI benefits under the theory that she is totally disabled and thereafter alleges that she could have worked but for some discriminatory act. <u>Lorde v. City of Philadelphia</u>, 2000 U.S. Dist. LEXIS 17196, at *4 (E.D. Pa. Nov. 30, 2000). When faced with a plaintiff's previous sworn statement asserting "total disability" or the like, the court should require an explanation of any apparent inconsistency with the ADA claim. <u>Cleveland v. Policy Mgmt. Sys. Corp.</u>, 526 U.S. 795 (1999). To defeat summary judgment, that explanation must be sufficient to warrant a reasonable conclusion that, assuming the truth of,[19] or the plaintiff's good-faith belief in, the earlier statement, the plaintiff could nonetheless "perform the essential functions" of her job, with or without "reasonable accommodation." <u>Id.</u> at 807.

Notwithstanding Walker's assertion to the SSA in 2005 and in 2006 that she is completely and totally disabled and her failure to contact the Company about available positions, Walker now appears to assert that if she had known she was going to be terminated she would have returned to work at the Company and would have continued working until retirement. (Ex. 10 at 81). Further, Walker previously asserted in March 2006 and in October 2006 in written submissions that she was able to perform the essential functions of her position with or without accommodation. (Ex. 10 at 217). She has offered no explanation for this major inconsistency. An ADA plaintiff may not, simply by disavowing a prior claim of total disability, perform an

---

[19] Courts must assume that plaintiff's representations to the SSA were truthful. <u>Id.</u>, 526 U.S. at 807.

about-face and assert that he or she is a "qualified individual" who is capable of working. Jones

v. Southcentral Employment Corp., 488 F. Supp. 2d 475 (M.D. Pa. 2007).

Despite Walker's certainty that she would have been able to work in August 2004, she

applied for Social Security benefits some time in 2005 for the retroactive time period beginning

on April 27, 2004 through December 18, 2006. (Ex. 10 at 146-148; Ex. 9). These

representations are manifestly inconsistent with her current position that she was qualified for

and capable of performing the essential functions as a credit clerk with or without reasonable

accommodations. Simply citing to an accommodation that would have allowed her to work will

not resolve the inconsistency here because an accommodation was not requested and an

unlimited leave of absence is not a reasonable accommodation even if requested. Thus, Walker

cannot be deemed a qualified individual under the ADA.

C.    **Walker Did Not Request An Accommodation.**

Although the Third Circuit has recognized that requests for workplace accommodation

need not be in writing or use the words "reasonable accommodation," the Court has explained

that the notice of disability and request for accommodation nonetheless must make clear that the

employee wants assistance for his disability. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296,

313 (3d Cir. 1999). Employers cannot assume employees are disabled and need

accommodations. Id.

In the instant case, Walker admitted on more than one occasion that she never requested

any accommodations for any alleged disability or a personal leave of absence. (Ex. 10 at 162,

198; Ex. 2). By August 2004, Walker had been out of work for more than four months since her

car accident in April, and she had been released to return to work regular duty by Concentra's

doctor. (Hines Aff. ¶ 29). Hines telephoned Walker after the Concentra exam and told Walker

to return to work and that the Company could accommodate her. (Hines Aff. ¶ 29; Pinto Aff.

-24-

¶ 22; Exs. 7, 8). Unfortunately, Walker declined to return to work in any capacity or discuss accommodations. (Hines Aff. ¶ 29). Further, Walker <u>never</u> notified Hines or Rumpf that she was able to perform the essential functions of her position with or without restrictions, nor did she request an accommodation. (Hines Aff. ¶ 31; Rumpf Aff. ¶ 24).

Even after Walker received her termination letter that informed her that she was encouraged to contact the Company when ready to return to work, she inexplicably chose not to contact the Company to inquire about coming back to work. (Ex. 10 at 167). As noted, it is a plaintiff's burden to identify the reasonable accommodations. <u>Skerkski v. Time Warner Cable Co.</u>, 257 F.3d 273, 284 (3d Cir. 2001). For these reasons, Walker cannot prove that she met her burden of identifying and requesting a reasonable accommodation from the Company.

**D.    Assuming *Arguendo* That Walker Requested An Accommodation, Any Request For An Unlimited Leave Of Absence Is Unreasonable And/Or Creates An Undue Burden.**

**1.    An Unlimited Leave Is Inherently Unreasonable Because It Would Exempt Walker From An Essential Job Function.**

The ADA does not require an employer to accommodate an employee by allowing her to take indefinite or open-ended leaves due to medical reasons when there is no evidence that allowing this time off from work will enable the employee to perform the essential functions of her job within a reasonable time.[20] <u>Fogleman v. Greater Hazleton Health Alliance</u>, 122 Fed. Appx. 581, 586 (3d Cir. 2004) (holding that an indefinite or open-ended leave "does not constitute a reasonable accommodation"). An accommodation, such as a leave of absence, must enable the employee to perform his or her essential job function in the near future. <u>Conoshenti v.</u>

---

[20] Walker admitted on several occasions that she never requested an accommodation, but late in her deposition took a new stance that her doctor's note for indefinite leave was notice of the need for an accommodation. Even if true, such is unreasonable.

Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 151 (3d Cir. 2004). See also Jackson v. Wal-Mart Stores, 2007 WL 1041027, at *10 (W.D. Pa. Apr. 5, 2007) (open-ended leave not required under ADA); Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995) (holding that employer not required to wait indefinitely for medical conditions to be corrected"); Oestringer v. Dillard Store Servs., Inc., 92 Fed. Appx. 339, 341-42 (7th Cir. 2004) (request for continuous absences was not reasonable accommodation because employee had been absent from work for six weeks already and did not request a specific amount of time off); Vice v. Blue Cross & Blue Shield of Oklahoma, 113 Fed. Appx. 854, 856 (10th Cir. 2004) (upholding termination because employer not obligated under ADA to continue employee on indefinite medical leave). Accordingly, indefinite leaves or leaves with no proposed end date are not reasonable and need not be granted.

To date, Walker's doctors have not cleared her to return to work, which she admits. (Ex. 10 at 152, 212, 228).[22] Assuming, *arguendo*, that Walker requested a leave of absence as an accommodation in 2004 and that she remained employed with the Company, a three-year leave of absence is an inherently unreasonable accommodation under the ADA.[23]

## 2.    An Unlimited Leave Creates An Undue Hardship On The Company.

Even if Walker could show she requested a reasonable accommodation, such as an unlimited leave, and that leave does not interfere with her essential job functions, the Company would be able to show that the proposed accommodation creates an "undue hardship." Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 670 (3d Cir. 1999). The ADA defines undue burden as "an action requiring significant difficulty or expense, when considered in light of [a

_____

[22] Specifically, Dr. Sternberg as of 2005 had still not released Walker to return to work and the last medical record from Dr. King from May 2007 indicated that Walker is disabled through at least July 2007. (Ex. 10 at 206, 212).

[23] Her SSA paperwork alleges total disability from April 2004 through December 2006, which is similarly unreasonable.

series of factors]." 42 U.S.C. § 12111(10)(A). Among the factors to be considered are "the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility," along with the nature and cost of the accommodation, the number of persons employed by the company, and the financial resources of the company. 42 U.S.C. § 12111(10)(B)(ii).

As previously noted, Walker left work on April 27, 2004 and never returned. (Pinto Aff. ¶ 17). The Company provided Walker with 12 weeks of FMLA job protection. (Pinto Aff. ¶ 21). It also provided her with more than an additional month of leave after her FMLA benefits were exhausted. (Pinto Aff. ¶ 21; Ex. 10 at 52). During such time, the Company provided Walker with short-term disability benefits through August 30, 2004 (which was one week after she had been cleared to return to work by Dr. Surdo). (Pinto Aff. ¶ 21).

Granting Walker any additional time off without a definite return date after August 30, 2004 would have created an undue burden for the Company because contemporaneous with Walker's leave, the Company began experiencing financial and budgetary pressure as explained above. (Pinto Aff. ¶ 23). As a result of these financial constraints, the Company planned to reduce the number of its workforce by 20 employees. (Pinto Aff. ¶ 10). Throughout the process, the Company targeted one credit clerk position in the Finance Department. To accomplish this, the Company planned to eliminate the temporary credit clerk position, which was held by Johnson. (Pinto Aff. ¶¶ 11, 14, 15). However, once Pinto learned that Walker would not be returning in the foreseeable future, that she refused to return to work despite being released to do so by Dr. Surdo, and that she was not amenable to working around her treatment schedule, it was Pinto's recommendation that Walker's position be eliminated instead of Johnson's, since Johnson was able and willing to work. (Pinto Aff. ¶¶ 16, 17). Thus, in light of the Company's

overall RIF, allowing Walker to remain an employee while not actually working instead of Johnson would have created an undue hardship on the current staff and the Company.

### 3.    Walker Failed To Actively Engage In The Interactive Process.

Walker failed to actively participate in the interactive process of identifying a reasonable accommodation for her to be able to perform the essential functions of her position. When an employee requests an accommodation for a disability, the ADA regulations suggest that the employer and employee engage in an informal, interactive process to find a way to enable the employee to perform the essential functions of the job without causing the employer an undue hardship. 29 C.F.R. § 1630.2(o)(3). Because "the responsibility for fashioning a reasonable accommodation is shared between the employee and the employer," the employer is not liable under the ADA if the breakdown in the "interactive process is traceable to the employee." Loulseged v. Akso Nobel Inc., 178 F.3d 731, 736 (5th Cir. 1999); see also Russell v. TG Missouri Corp., 340 F.3d 735 (8th Cir. 2003) (holding employee forfeited right to further accommodation when she walked out of work instead of correcting manager's mistaken assumption about her medical restrictions).

Where the need for accommodation is not obvious, an employee must provide sufficient documentation that "(1) describes the nature, severity and duration of the employee's impairment, the activity or activities that the impairment limits, and the extent to which the impairment limits the employee's ability to perform the activity or activities; and (2) substantiates why the requested reasonable accommodation is needed." EEOC Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees Under the Americans With Disabilities Act, at Question No. 10 (July 2000); see also Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040, 1045 (8th Cir. 2005) (interactive process failed because plaintiff did not provide updated physical evaluation).

-28-

Here, Walker failed to engage in and/or stalled the interactive process for several reasons. First, Walker failed to provide adequate, sufficient, updated medical information that included her diagnosis and expected prognosis. (Hines Aff. ¶¶ 8, 14, 18, 24). Many of the doctors' notes provided by Walker were extremely vague and only indicated that she would be out of work for a fixed period of time ranging from three to four weeks which were continuously extended. (Hines Aff. ¶¶ 11, 12, 13; Rumpf Aff. ¶¶ 11, 15).

Second, Walker failed to return to work after the Concentra exam and Hines's request that she return to work, and failed to request a discuss possible accommodations after Hines offered to provide such. (Hines Aff. ¶ 29; Ex. 10 at 168, 169, 171). Lastly, Walker did not question Hines as to why Concentra released her to return to work. (Ex. 10 at 171).

Third, although Walker contends that she thought Hines gave her permission to stay out of work until after her treatment on August 30, 2007[23] (Ex. 10 at 171), she never called Hines after the treatment to advise that she was ready and able to come back to work. (Ex. 10 at 171, 167, 168). Further, if she truly believed she did not need to report to work, oddly, she never called to question Hines after the receipt of the termination letter. (Ex. 10 at 167). Rather, at another point, Walker admits that she was not sure what to do once she received her return to work note from Concentra and that her medical counselor suggested she call Hines. (Ex. 10 at 165). Nonetheless, she made an inexplicably conscious decision not to call Hines to find out whether she should return to work. (Ex. 10 at 167). Walker did not attempt to appeal or even contact anyone at the Company after her receipt of Concentra's return to work note to challenge such nor did she ask her doctor to respond and/or support the need for ongoing leave. (Ex. 10 at

---

[23] Ironically, Walker so testified after first testifying that Hines had never called her to discuss returning to work or treatments; then recanting for the most part after viewing Hines's phone log. (Ex. 10 at 158).

172). Based upon her unwillingness to engage in the interactive process, Walker has forfeited her right to a reasonable accommodation even if such was warranted.

**E.      Walker Cannot Rebut The Company's Legitimate, Non-Discriminatory Reason For The Elimination Of Her Position.**

Even assuming Walker could present a *prima facie* case, the Company has a legitimate, non-discriminatory and non-retaliatory reason for the elimination of Walker's position. If the plaintiff can establish a *prima facie* case, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason" for its employment decision, after which plaintiff may offer evidence that this reason was actually a "pretext." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994) (citations omitted). Once the defendant has articulated a legitimate business reason, the burden shifts back to the plaintiff, who must "point to evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence." Sempler v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995). "To discredit the employer's proffered reason, ... the plaintiff cannot simply show that the employer's decision was wrong or mistaken...." Fuentes, 32 F.3d at 765. Rather, the plaintiff must produce evidence that demonstrates "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." Fuentes, 32 F.3d at 765 (citations and internal quotation marks omitted).

Here, the Company eliminated job positions due to financial issues, including Walker's position. The Third Circuit has recognized reductions in force as legitimate, non-discriminatory reasons for employee terminations. See, e.g., Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d 231, 236 (3d Cir. 1999) (termination of plaintiff as part of reduction in force due to budgetary constraints was legitimate reason that plaintiff could not rebut); Kelly, 94 F.3d at 104 (recognizing defendant's actions that it eliminated plaintiff's position because of university-wide

-30-

effort to cut spending and a related budget decrease); <u>Torre v. Casio, Inc.</u>, 42 F.3d 825, 832 (3d Cir. 1994) (upholding transfer of plaintiff as part of a reduction in force); <u>Logue v. Int'l Rehabilitation Assoc., Inc.</u>, 837 F.2d 150, 153 (3d Cir. 1988) (finding plaintiff could not rebut defendant's claim that it reorganized personnel structure to increase efficiency).

In response, Walker has failed to proffer any evidence to dispute the Company's rationale for the elimination of her position. Prior to the Concentra exam, company-wide budgetary constraints were in place at the Company. (Pinto Aff. ¶ 4). A hiring freeze was implemented.[24] (Pinto Aff. ¶ 5). Reduction in expenses in non-payroll areas was not sufficient to solve the financial problems and thus jobs needed to be eliminated. (Pinto Aff. ¶ 6).

Concerning the Finance Department, from the time of the initial discussions of which departments would lose staff and which specific jobs would be impacted, there was always a full-time credit clerk position on the list. (Pinto Aff. ¶ 11). If Walker could return to work, the position was hers; if not, the temporary full-time employee Johnson's position would be eliminated. (Pinto Aff. ¶ 11). Walker was then released to return to work regular duty as of August 23, 2004 by Dr. Surdo, but refused to return to work in any capacity, even with accommodations. It was Pinto's recommendation that Walker's position be eliminated if she was not willing (or even able since she had exhausted her FMLA leave) to return to work. (Pinto Aff. ¶¶ 16, 17).

Walker cannot prove that the Company's non-discriminatory business reason is pretextual. Fatal to her claim, all Walker points to in this regard is her mistaken belief that she was guaranteed 26 weeks of STD benefits under the Plan and thus she had until October 20,

---

[24] Although Walker was not aware of a hiring freeze during this time, she admits that she was aware that in the summer of 2004 the Company offered early retirement to some employees. (Ex. 10 at 201).

2004 to return to work. (Ex. 10 at 67). Although Walker acknowledges her receipt and understanding of the Company's Plan, she completely ignores the Plan's terms, which specifically state that "[s]hort-term disability continues until you are medically fit to return to work." (Hines Aff. Ex. B). Additionally, Hines's letter to Walker dated April 30, 2004 explained that she was eligible for "up to 25 weeks of STD and that the duration of benefits, of course, is solely based on medical information, and periodic updates will be requested." (Hines Aff. ¶ 3 and Ex. B). Walker was released to return to work with no restrictions on August 23, 2004, and Hines requested her return. (Hines Aff. ¶¶ 28, 29 and Ex. M). Thus, Walker was fully aware that the Company would not continue to pay disability benefits through October 20, 2004 since she was no longer disabled under the Plan. In sum, Walker has not and cannot show that the Company-wide RIF was a cover-up to discriminate.

## III.    WALKER'S RETALIATION CLAIM MUST BE DISMISSED BECAUSE SHE CANNOT SET FORTH A *PRIMA FACIE* CASE.

Walker cannot establish a claim for retaliation under the ADA. Although her Complaint does not specifically allege any facts to support her vague claim of retaliation, based upon her elicited deposition responses, along with documents she supplied to the DDOL, Defendants will respond to three potential claims. Specifically, Walker purports to argue that the Company retaliated against her by way of (1) "harassing" telephone calls concerning her medical status from Hines and Rumpf; (2) the Concentra exam; and (3) the elimination of her position.

According to the Third Circuit, in order to establish a *prima facie* case of illegal retaliation, a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Fogleman v. Mercy Hosp., Inc., 283 F.3d 561, 567-8 (3d Cir. 2002) (quoting Krouse v. Am

-32-

Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)). "If an employee establishes a *prima facie* case of retaliation under the ADA, the burden shifts to the employer to advance a legitimate, non-retaliatory reason for its adverse employment action." Krouse, 126 F.3d at 500. "If the employer satisfies its burden, the plaintiff must be able to convince the factfinder both that the employer's proffered explanation was false, and that retaliation was the real reason for the adverse employment action." Id. at 501.

A.  **Walker Never Engaged In A Protected Activity.**

Walker cannot make out a *prima facie* case of retaliation because she never engaged in a protected activity. Protected activity includes either opposing an alleged discriminatory act or participating in the investigation or proceeding of a complaint. Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405, 2415 (2006); Barber v. CSX Distrib. Servs., 68 F.3d 694, 701-02 (3d Cir. 1995) (plaintiff's complaint must specifically mention belief that he or she was discriminated against based on a protected class). Walker admits that she never complained to anyone at the Company about discrimination or retaliation, including any of the aforementioned incidents. (Ex. 10 at 57). Nor are there any allegations that she participated in anyone else's discrimination complaint. Because Walker never made a complaint of discrimination or retaliation, she has not engaged in protected activity and cannot establish a *prima facie* case of illegal retaliation.

B.  **Telephone Calls Regarding Medical Status And A Medical Exam Do Not Rise To The Level Of An Adverse Employment Action.**

Even assuming Walker's recollection of the so-called conversations between herself and Hines and Rumpf were accurate, they do not rise to the level of adverse employment actions. Similarly, the Company's decision to send Walker to the Concentra exam does not constitute adverse employment action. A plaintiff must show that the action "might have dissuaded a

reasonable worker from making or supporting a charge of discrimination." <u>Burlington</u>, 126 S. Ct. at 2415. In the evaluation, "it is important to separate significant from trivial harms[,] as Title VII ... does not set forth a general code for the American workplace." <u>Id.</u> Importantly "not everything that makes an employee unhappy qualifies as retaliation." <u>Robinson v. City of Pittsburgh</u>, 120 F.3d 1286, 1300 (3d Cir. 1997) (abrogated by <u>Burlington N.</u>, 126 S. Ct. at 2415 on other grounds) (holding that "unsubstantiated oral reprimands" and "derogatory comments" do not rise to the level of adverse employment action).

### 1.    <u>Hines's Conversations With Walker.</u>

Walker appears to pursue a retaliation claim against Hines concerning a series of telephone calls which she contends were "hostile" and "disturbing" and were in retaliation for her absence from work. (Ex. 10 at 103). While it is true that Hines and Walker had various telephone conversations while Walker was absent from work, Walker generally initiated these calls to Hines after her purported doctors' appointments to advise that she was still "disabled." (Hines Aff. ¶ 21). Each conversation lasted for less than five minutes, and the only subject matter discussed during these conversations was Walker's benefit-related issues. (Ex. 10 at 103, 104). Interestingly, Walker admits that she may have been just "groggy" from the medication during her conversation with Hines. (Ex. 10 at 103). Further, any telephone calls made to Walker by Hines were pursuant to Hines's position as the Company's benefits manager. (Hines Aff. ¶ 36).

### 2.    <u>Rumpf's Conversations With Walker.</u>

Also, Walker purports to argue that her supervisor, Rumpf, retaliated against her when she contacted Walker on July 23, 2004 at her home. (Ex. 10 at 128, 238). According to Walker, Rumpf harassed her by asking her questions concerning her medical status and when she would be returning to work. (Ex. 10 at 126). However, Rumpf contacted Walker only after she did not

-34-

return to work as Rumpf had expected based on an earlier call they had. (Rumpf Aff. ¶ 22). In June 2004, Walker informed Rumpf that she was feeling better and that she hoped to be back to work soon. (Rumpf Aff. ¶ 22; Ex. 10 at 95). Thus, Rumpf's sole reason for contacting Walker in July 2004 was to see how she was feeling and check on a potential return to work date. (Rumpf Aff. ¶ 22).

### 3.   Walker's Concentra Exam With Dr. Surdo.

Walker argues that she was sent to Concentra so that the Company could "retaliate against [her] doctor," since her doctor would not release her to return to work. (Ex. 10 at 213). However, the Company's Plan specifically states, in part, in exchange for the STD benefits, "At its discretion, the Company may require written information from your personal physician or through an examination by a company-selected physician, before payments under this plan are authorized." (Hines Aff Ex. B). The Company needed to determine Walker's continued eligibility for Plan benefits. Since the notes provided by Walker's doctor were vague, the Company arranged for an exam.

All of these actions were legitimate business actions. Therefore, any alleged comments made by Hines and Rumpf and the Concentra exam do not rise to the level of adverse employment actions.

### C.   No Causal Link Exists Because There Is No Protected Activity.

Arguably, the elimination of Walker's position is the only alleged retaliation claim that can be viewed as an adverse employment action. Nonetheless, all allegations of retaliation fail because there is no protected activity to link to any alleged adverse action. To establish a causal link, the plaintiff must present evidence sufficient to raise the inference that her protected activity was the likely reason for the adverse action. Ferguson v. E.I. duPont de Nemours & Co., 560 F. Supp. 1172, 1200 (D. Del. 1983) (quoting Cohen v. Fred Meyer, Inc., 686 F.2d 703, 796

-35-

(9th Cir. 1982)).  As explained herein, Walker's position was eliminated as a result of a company-wide RIF to alleviate financial and budgetary concerns.  Accordingly, Walker's claim based on the elimination of her position is without merit.

## IV.  DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT BECAUSE THERE IS NO EVIDENCE TO SUPPORT WALKER'S ADEA CLAIM.

Walker's ADEA claim must fail because she has failed to put forth any evidence in support.  In order to establish a *prima facie* case of ADEA discrimination, the plaintiff must demonstrate that (1) she is over 40, (2) she is qualified for the position in question, (3) she suffered from an adverse employment decision, and (4) her replacement was sufficiently younger to permit a reasonable inference of age discrimination.  Potence v. Hazleton Area Sch. Dist., 357 F.3d 366, 370 (3d Cir. 2004) (citing Duffy v. Paper Magic Group, Inc., 265 F.3d 163, 167 (3d Cir. 2001)).  Once the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to produce evidence of a legitimate non-discriminatory reason for the adverse decision.  McDonnell Douglas, 411 U.S. at 802.  If the defendant carries this burden, the presumption of discrimination drops from the case, and plaintiff must "cast sufficient doubt" upon defendant's proffered reasons to permit a reasonable fact finder to conclude that the reasons are fabricated.  Sheridan v. E.I. duPont de Nemours & Co., 100 F.3d 1061, 1072 (3d Cir. 1996) (en banc), cert. denied, 521 U.S. 1129 (1997).

In response to the basis of her age claim, Walker simply relies on the fact that she was 45 years old at the time of her car accident in 2004, "with a known disability" which she "felt was a liability to the company." (Ex. 10 at 214, 216).[25]  She admits that there were no age-related comments made by employees at the Company. (Ex. 10 at 216).  Walker did not even claim age

---

[25] As to the other women Walker had previously alleged as comparators, she admitted they did not apply to her age claim. (Ex. 10 at 215-16).

discrimination in her Charge.[26]  Therefore, due to the failure to offer any evidence in support of a *prima facie* case, Defendants are entitled to summary judgment on Walker's age discrimination claim.  Even if she could, as earlier explained, the Company had a legitimate, non-discriminatory reason; specifically, it needed to reduce staff and Walker was cleared to return to work but did not.  (Pinto Aff. ¶¶ 11, 16, 17).  If Walker returned to work, the position was hers.  (Pinto Aff. ¶ 11).

## V.    WALKER'S FAILURE TO MITIGATE PRECLUDES ANY WAGE DAMAGES.

Walker has failed to mitigate any alleged damages as required by the ADA and ADEA. The plaintiff has a duty to mitigate losses, but the employer has the burden of proving the failure to mitigate.  Booker v. Taylor Milk Co., 64 F.3d 860, 864 (3d Cir. 1995).  Thus, "where the employer demonstrates that an employee did not exercise reasonable diligence in his or her efforts to secure employment, then it has established that the employee has not properly mitigated his or her damages."  Tubari Ltd., Inc. v. NLRB, 959 F.2d 451, 454 (3d Cir. 1992).

### A.    Back Pay Is Precluded Because Walker Never Entered The Job Market.

The record is clear that Walker never entered the job market.  An employer can meet its mitigation burden by demonstrating that the employee has withdrawn from the job market. Tubari, 959 F.2d at 451; Wooley v. Colonial Sch. Dist., 1993 WL 431208, at *3 (D. Del. May 11, 1993).  Thus, the Defendants are excused from establishing that there was substantially equivalent work available, as Walker made no attempt to pursue employment.  Id.

The Third Circuit in Tubari explicitly recognized that where the employer demonstrates that the employee has withdrawn from the employment market, then the failure of the employee

---

[26] Walker's failure to allege age discrimination on her Charge is the subject of Defendants' Motion to Dismiss that is currently pending before this Court.  As such, Defendants respectfully refer the Court to the arguments set forth therein.

to properly mitigate her damages has been established. 959 F.2d at 454, 459. <u>See also</u> <u>Wagner v. Dillard Dept. Stores, Inc.,</u> 17 Fed. Appx. 141, 153 (4th Cir. 2001) ("Although an employer ordinarily must come forward with evidence that comparable work is available … that is not the case if the plaintiff makes little or no effort to seek employment."); <u>Greenway v. Buffalo Hilton Hotel,</u> 143 F.3d 47, 54 (2d Cir. 1998) (same).

Thus, "[a] Title VII claimant's voluntary refusal to seek or accept substantially equivalent employment … risks or even insures a loss of back pay." <u>Brady v. Thurston Motor Lines, Inc.,</u> 753 F.2d 1269, 1273 (4th Cir. 1985). Accordingly, summary judgment is appropriate when the plaintiff fails to mitigate her damages by failing to search, stopping her job search efforts, or accepting only part-time work. <u>See, e.g., Hunter v. Allis-Chalmers Corp.,</u> 797 F.2d 1417 (7th Cir. 1986) (granting summary judgment because non-movant sought new employment only every couple of months during five years of unemployment); <u>Myer v. United Airlines, Inc.,</u> 950 F. Supp. 874, 876 (N.D. Ill. 1997) (granting summary judgment because employee failed to mitigate when she accepted part-time employment).

Walker's admitted lack of effort to find subsequent employment, from her termination in August 2004 to the present, demonstrates that she voluntarily chose not to enter the employment market. By her own testimony, Walker does not possess a continuing commitment to be a member of the work force and has not remained ready, willing and available to accept employment. (Ex. 10 at 186). Rather, Walker visited only one employer, Wilmington Transportation, with the hope that it was hiring. (Ex. 10 at 186) This action comprises the total effort that Walker made to obtain comparable employment. Walker never sent a single resume to any company, nor did she attend a job fair or engage a headhunter. (Ex. 10 at 187). In fact,

-38-

since her termination three years ago, Walker has not even prepared an updated resume. (Ex. 10 at 187).

Not surprisingly, Walker has not found a new job, let alone a substantially equivalent job. Accordingly, because Walker did not exercise reasonable diligence to secure employment, as a matter of law, she has not mitigated her damages and should be precluded from receiving any back or front wages.

**B.    Alternatively, No Damages Should Be Awarded Because Walker Failed To Exercise Reasonable Diligence.**

Alternatively, an employer can show that the plaintiff has failed in its duty to mitigate damages by demonstrating that (1) substantially equivalent positions were available, and (2) plaintiff failed to use reasonable care and diligence in seeking such positions. Finch v. Hercules Inc., 941 F. Supp. 1395 (D. Del. 1996). Although substantially equivalent work was available, Walker did not exercise reasonable diligence to obtain such employment.

First, the Company can show via the undisputed record that substantially equivalent jobs were available.  In September 2005, the temporary employee in the Finance Department, Johnson, transferred to a different department and her temporary position was converted into a full-time position. (Rumpf Aff. ¶ 37). In accordance with Company policy, the Company posted a full-time regular credit clerk position both internally and externally in September 2005 and in July 2006, by advertising in The News Journal. (Rumpf Aff. ¶¶ 38, 40). This was the very same position that Walker held before her employment ended at the Company, but she chose not to apply despite being advised in writing on two occasions to contact the Company when she was ready. (Rumpf Aff. ¶ 42).

Second, Walker failed to use reasonable care and due diligence in seeking a substantially equivalent position as explained above, when she chose not to undertake any job search. EEOC

-39-

v. Serv. News Co., 898 F 2d 958, 963 (4th Cir. 1990) ("Looking through want ads for an unskilled position, without more, is insufficient to show mitigation").[28]  Thus, as a matter of law, Walker is precluded from receiving any award of economic damages.

## CONCLUSION

WHEREFORE, for the reasons explained herein, Defendants respectfully request that the Court grant their Motion for Summary Judgment on all counts of the Complaint.

Jennifer C. Jauffret (#3689)
Jauffret@rlf.com
Lori A. Brewington (#4522)
Brewington@rlf.com
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware  19899
302-651-7700
Attorneys for Defendants

Dated:  October 4, 2007

---

[28] Again, Walker applied for and received unemployment benefits during this time despite not looking for employment.

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I hereby certify that on October 4, 2007, I electronically filed the foregoing Opening

Brief in Support of Defendants' Motion for Summary Judgment with the Clerk of Court using

CM/ECF which will send notification of such filing to the following and on October 4, 2007,

hand delivered copies of the same to:

Vernette Walker
29 Richard Road
New Castle, Delaware  19720
*Pro Se* Plaintiff

Jennifer C. Jauffret (#3689)
Jauffret@rlf.com
Lori A. Brewington (#4522)
Brewington@rlf.com
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware  19899
(302) 651-7700
Attorneys for Defendants

# EXHIBIT 1

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

| | ENTER CHARGE NUMBER |
|---|---|
| ☐ FEPA | 04100780 |
| ☐ EEOC | 17CA500028 |

### Delaware Department of Labor
**(State, or local Agency, if any)**    and **EEOC**

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Ms. Vernette Walker | (302) 324-9175 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 29 Richard Road | New Castle DE 19720 NCC | |

**NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (If more than one, list below.)**

| NAME | NO. OF EMPLOYEES OR MEMBERS 300+ | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| The News Journal | | (302) 324-2505 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| 950 Basin Road, New Castle, DE 19720 | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|

☐ RACE ☐ COLOR ☐ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☐ RETALIATION ☒ DISABILITY ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | 8/30/2004 |
| LATEST | 8/30/2004 |
| ☐ CONTINUING ACTION | |

**THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):**

Jurisdiction: Charging Party was employed by Respondent in the state of Delaware.

Charging Party's protected class: Disability

Adverse employment action: Discharge

Employment harm: I am a qualified individual with a disability who is able to perform the essential functions of my position, with or without reasonable accommodation. I was out on approved medical leave beginning April 27, 2004. During the time of my leave, I received frequent harassing telephone calls from Ann Hines, Benefits Manager and Shelley Rumpf, Credit Manager. They kept asking me to provide more records, and also repeatedly asked when I would return to work. On 8/30/04 I was discharged.

Applicable law(s): Americans with Disabilities Act; Delaware Handicapped Persons Employment Protections Act

Respondent's explanation: I was informed that I was discharged due to business necessity.

Comparator(s) or other specific reason(s) for alleging discrimination: Discharged while on medical leave.

Additional information and verification of these facts are provided by the attached Affidavit.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT |
|---|---|
| | |
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

| I declare under penalty of perjury that the foregoing is true and correct. | NOTARY - (When necessary to meet State and Local Requirements) |
|---|---|
| 10/7/04 _Vernette Walker_ | |
| Date           Charging Party (Signature) | Subscribed and sworn to before me this date        (Day, month, and year) |

EEOC FORM 5
REV 6/92

PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

# EXHIBIT 2

ADA INTAKE QUESTIONNAIRE - Pg. 5

feel I was being agressive in making them get me
well, she stated I was just laying around everyday
doing nothing & a 3 day a week massag is all I
probably need, none of my Dr. care about me, she
didn't expect my medical to extend past June, I'm
not trying hard enough & backing my Drs in a corner
she have no disc + arthris thru out her back + she's workin

8.  Do you (or did you) need a reasonable accommodation in order to perform the job in        + mor
    question?  If yes, describe for what part or parts of the job you required an                ↓
    accommodation.  Indicate how frequently this part of the job is done and the   - over
    importance of this part of the job to the total job.

Unknown

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

9.  Are you (or were you) able to perform all parts of the job in question other than the
    part(s) described above for which you require an accommodation?  Describe the
    major functions of the job which you are able to perform without an accommodation.

_____

_____

_____

ADA INTAKE QUESTIONNAIRE - Pg. 6

_____

_____

_____

_____

_____

_____

_____

_____

10.    Have you ever sought a reasonable accommodation because of your disability?  If yes, describe the circumstances surrounding your request to include: date of request, name and job title of the person(s) to whom the request was made, the type of accommodation requested, and response(s), if any, to the request.

no _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# EXHIBIT 3

STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS – DISCRIMINATION PROGRAM

Ms. Vernette Walker
29 Richards Road
New Castle, DE  19720

State Case No:  04100780

vs.

The News Journal
950 Basin Road
New Castle, DE  19720

## FINAL DETERMINATION AND RIGHT TO SUE NOTICE

Pursuant to 19 Del. C. § 710, *et seq.*, the parties in the above-captioned matter are hereby Noticed of the Department's Final Determination and Right to Sue Notice, as follows:

### *No-Cause Determination and Dismissal with Corresponding Right to Sue Notice.*

In this case, the Department has completed its investigation and found that there is no reasonable cause to believe that an unlawful employment practice has occurred.  The Department hereby issues a No-Cause Determination and Dismissal and provides the Charging Party with a Delaware Right to Sue Notice.

This No Cause determination is based on the following facts:  In this case, Charging Party must show that she is a qualified individual with a disability who can perform the essential functions of her position, with or without a reasonable accommodation, and that adverse action was taken against her because of her disability.

The evidence and information provided during the investigation reveal that Charging Party is not a covered disabled individual according to the Americans with Disabilities Act (ADA).  Also, Charging Party has provided no corroborative evidence that she was harassed or denied a reasonable accommodation because of a disability while on medical leave to address her auto accident injury.

See the attached Notice of Rights.

This Final Determination is hereby issued on behalf of the Department of Labor, Division of Industrial Affairs, Discrimination Program.

10/30/05
_____
Date issued

*Julie K. Cutler*
_____
Julie K. Cutler, Administrator

*Delaware Department of Labor, Division of Industrial Affairs, 4425 N. Market St., Wilmington, DE 19802*

DOL Form C-12NC : 05/05

# EXHIBIT 4

# ORIGINAL

06  138 .

JS 44 (Rev 11/04)

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**

My Vernett Walker

**DEFENDANTS**

The News Journal et al

(b) County of Residence of First Listed Plaintiff   New Castle
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant   New Castle
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)

29 Richard Rd
New Castle, DE 19720

Attorneys (If Known)

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☒ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt. Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☒ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | Habeas Corpus: | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900 Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☒ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☒ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

**V. ORIGIN** (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 U.S.C. 2000e-5

Brief description of cause:
Wrongful termination of employment, benefits + Pay

**VII. REQUESTED IN COMPLAINT:**

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY**

(See instructions):  JUDGE                    DOCKET NUMBER

DATE

3-1-06

SIGNATURE OF ATTORNEY OF RECORD

Vernette Walker

FOR OFFICE USE ONLY

RECEIPT #          AMOUNT          APPLYING IFP          JUDGE          MAG. JUDGE

(Del. Rev. 12/98)

**ORIGINAL**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Vernette Walker

_____
(Name of Plaintiff or Plaintiffs)

v.

The News Journal

Ann Hines
(Name of Defendant or Defendants)

CIVIL ACTION No. _0 6_ _1 3 8_

## COMPLAINT UNDER TITLE VII
## OF THE CIVIL RIGHTS ACT OF 1964

1   This action is brought pursuant to *Title VII of the Civil Rights Act of 1964*, as amended, for employment discrimination. Jurisdiction exists by virtue of 42 U.S.C. §2000e-5. Equitable and other relief are also sought under 42 U.S.C. §2000e-5(g).

2.   Plaintiff resides at 29 Richard Rd.
                          (Street Address)
New Castle        N.C.        DE        19720
(City)          (County)      (State)      (Zip Code)
302 324 9175
(Area Code) (Phone Number)

3.   Defendant resides at, or its business is located at 950 Basin Rd
                                                      (Street Address)
New Castle        NC        DE        19720
(City)          (County)    (State)      (Zip Code)

4.   The discriminatory conduct occurred in connection with plaintiff's employment at, or application to be employed at, defendant's The News Journal place of business
                                          (Defendant's Name)
located at 950 Basin Rd
          (Street Address)
New Castle        NC        DE        19720
(City)          (County)    (State)      (Zip Code)

5.   The alleged discriminatory acts occurred on ~~August 30~~, August , 2004 .
                                              (Day)          (Month)    (Year)

6.   The alleged discriminatory practice   ☒ is   ◯ is not  continuing.

7.   Plaintiff filed charges with the Department of Labor of the State of Delaware,
     _____4425 n. market st._____ wilmington_____
     (Agency)      (Street Address)          (City)
     DC_____ DE_____ 19802_____ . regarding
     (County)   (State)   (Zip Code)
     defendant's alleged discriminatory conduct on ___30___ , August , 2005 .
                                                    (Day)    (Month)    (Year)

8.   Plaintiff filed charges with the Equal Employment opportunity Commission of the United States
     regarding defendant's alleged discriminatory conduct on: _____ , June , 2005
                                                              (Day)    (Month)    (Year)

9.   The Equal Employment Opportunity Commission issued the attached Notice-of-Right-to-Sue letter
     which was received by plaintiff on: ___8?___ , December 2005
                                         (Day)     (Month)      (Year)

### (NOTE: ATTACH NOTICE-OF-RIGHT-TO-SUE LETTER TO THIS COMPLAINT.)

10.  The alleged discriminatory acts, in this suit, concern:
     A.  ◯ Failure to employ plaintiff.
     B.  ☒ Termination of plaintiff's employment.
     C.  ◯ Failure to promote plaintiff.
     D.  ☒ Other acts (please specify below)
     denial of pay merit eligible benefits +
     retaliation, Severance pay, vacation pay

11.    Defendant's conduct is discriminatory with respect to the following:

    A.   ○  Plaintiff's race

    B.   ○  Plaintiff's color      *age + disability*

    C.   ○  Plaintiff's sex

    D.   ○  Plaintiff's religion

    E.   ○  Plaintiff's national origin

12.    A copy of the charges filed with the Equal Employment Opportunity Commission is attached to this complaint and is submitted as a brief statement of the facts of plaintiff's claim.

13     If relief is not granted, plaintiffs will be irreparably denied rights secured by Title VII of the 1964 Civil Rights Act, as amended.

14.    Plaintiff's has no adequate remedy at law to redress the wrongs described above.

*THEREFORE*, Plaintiff prays as follows: (Check appropriate letter(s))

    A.  ☒  That all fees, cost or security attendant to this litigation be hereby waived.

    B  ☒  That the Court appoint legal counsel

    C.  ☒  That the Court grant such relief as may be appropriate, including injunctive orders, damages, cost and attorney's fees.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 3|1|06

Vernette Walker
(Signature of Plaintiff)

(Signature of additional Plaintiff)

# EXHIBIT 5

EEOC Form 161 (3/98)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: Vernette Walker<br>29 Richard Road<br>New Castle, DE 19720 | From: Philadelphia District Office<br>21 South 5th Street<br>Suite 400<br>Philadelphia, PA 19106 |
|---|---|

| ☐ | On behalf of person(s) aggrieved whose identity is<br>CONFIDENTIAL (29 CFR § 1601.7(a)) | |
|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17C-2005-00028 | Charles Brown, III,<br>State & Local Coordinator | (215) 440-2842 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans with Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge.

☐ Having been given 30 days in which to respond, you failed to provide information, failed to appear or be available for interviews/conferences, or otherwise failed to cooperate to the extent that it was not possible to resolve your charge.

☐ While reasonable efforts were made to locate you, we were not able to do so.

☐ You were given 30 days to accept a reasonable settlement offer that affords full relief for the harm you alleged.

☐ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☒ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

## - NOTICE OF SUIT RIGHTS -
### (See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt **of this Notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

_Marie M. Tomasso_                                          December 5, 2005

Marie M. Tomasso,                                          (Date Mailed)
District Director

Enclosure(s)

cc: THE NEWS JOURNAL
950 Basin Rd
New Castle, DE 19720

# EXHIBIT 6

6

**DELAWARE**
**DEPARTMENT OF**
# LABOR
**KEEPING**
**DELAWARE FIRST**

Division of Unemployment Insurance
Employer Contributions Operations
P. O. Box 9953
Wilmington, DE 19809-0953
(302) 761-8482

NEWS-JOURNAL COMPANY

950 W BASIN ROAD
NEW CASTLE          DE   19720

---

*\* PLEASE DETACH, COMPLETE AND RETURN THE LOWER TWO THIRDS OF THIS DOCUMENT, ENSURING \**

*\* THAT THE RETURN ADDRESS IN THIS SECTION SHOWS THROUGH THE ENVELOPE WINDOW \**

Division of Unemployment Insurance
P. O. Box 9953
Wilmington, DE 19809-0953

## NJ000132

---

| REASON FOR SEPARATION | REMARKS: (ADDITIONAL SPACE FOR REMARKS PROVIDED ON BACK) |
|---|---|
| ☐ LAY-OFF FOR LACK OF WORK | reduction in workforce |
| ☐ OTHER REASON (PLEASE EXPLAIN UNDER "REMARKS") | ☐ CHECK HERE IF TEMPORARY LAYOFF IS NOT MORE THAN 45 DAYS. IF FORMER EMPLOYEE IS ELIGIBLE FOR A PENSION. PLEASE COMPLETE REVERSE SIDE. |

LAST DAY WORKED >        EXPECTED REHIRE DATE >

FORMER EMPLOYEE
V   WALKER

EMPLOYER
NEWS-JOURNAL COMPANY        0000019780

950 W BASIN ROAD
NEW CASTLE        DE   19720

DATE OF NOTICE
12/30/04

**REDACTED**

TOTAL WAGES: $   35,766.81

DATE OF CLAIM: 12/19/04        LO: 1        CBD: 12/27/04

The above named individual has filed a claim for benefits under the Delaware Unemployment Compensation Law in which you are named as a base period employer. It is required that you return this form within 7 days from the date of notice indicated above and provide in detail, the reason for this individual's separation from your employ. Failure to return this form within the period prescribed shall result in benefit wages being charged to your account, regardless of the reason for separation.

EMPLOYER: The News Journal

UNEMPLOYMENT INSURANCE DIVISION
APPLICATION FOR BENEFITS

Claim Date: 12 19 04

REDACTED

First: VERNETTE    MI:    Last Name: WALKER

**NOTICE TO EMPLOYER:** The individual named above has filed a claim for unemployment benefits against the State of Delaware. As the last employer, you are entitled to notification of this filing and to provide information concerning the reason for separation. Please complete this form and include facts known to you which may affect this claimant's eligibility for benefits. Failure to return this separation notice within 7 calendar days may cause the Department to declare the claimant eligible for benefits on the basis of available information and your employer account may receive a benefit wage charge. As provided under Delaware State Law and regulation, failure to return this request within the prescribed period will bar the employer from subsequently claiming that the individual should be disqualified under any section of Title 19. Benefits will be paid promptly when due, even though an appeal may be filed. *If you desire an appointment to appear in person or have any questions, please contact the appropriate Local Office. (All area codes are 302, (1) Wilmington - 761-8446; (2) Newark - 368-6602; (4) Dover - 739-5461; (7) Georgetown - 856-5611; or (0) Interstate - 761-8428.*

Register: ( 1 ) 2

Last Employer: NEWS JOURNAL CO.

Street Address: 950 W. Basin Rd.

Employer's Phone Number: 302 324-2500

Will you be recalled? ☐ Yes (1)  ☒ No (2)

NJ000133

File Date: 12 23 0

City: New Castle    State: DE    Zip Code: 19110

Date of Recall:

Are you employed through a Union Hiring Hall? ☐ Yes (1)  ☒ No (2)

Clerk: etg    Office: 1    M/T: M

Last period of employment:
From: 2 /01 /88    To: 8 /30 /04

I am unemployed because: Position eliminated

In accordance with the applicable provisions of the Privacy Act (PL 93-579), the above mentioned claimant has authorized his/her former employer(s) to release all information requested in connection with his/her claim for unemployment compensation.

FIT ☐ Y ☐ N

Claimant's Signature: x Vernette Walker    12/22/04    Date

---

## SEPARATION INFORMATION

REASON FOR SEPARATION (Check One):
☐ Lack of Work  ☐ Discharge  ☐ Voluntary Quit  ☐ Illness/Disability/Injury  ☒ Other (specify): position eliminated

Last Date of Actual Employment: 8-30-04

Give full details of other than "Lack of Work":

Type of Separation: ☒ Permanent  ☐ Temporary

Expected Date of Rehire:

| Has this person received (or is entitled to receive) any of the following: | Yes | No | Dates From: | To: | Gross Amount |
|---|---|---|---|---|---|
| Holiday Pay | | | | | $ |
| Vacation Pay | | | | | $ |
| Severance Pay | | | | | $ |
| Pension | | | | | $ |

### TEMPORARY AGENCY EMPLOYERS ONLY

Did you advise the above named employee of the requirement to contact your agency at the end of every assignment? ☐ Yes  ☐ No

Did this employee contact you? ☐ Yes  ☐ No

How was the contact made? ☐ Phone  ☐ In Person ☐ _____

Who did this employee contact? (Name and/or Title)

Was there any work available? ☐ Yes  ☐ No

Please provide the following information:

Company Telephone Number: 324-250 6

Company Fax Number: 324-257 8

Contact Person (please print): BEVERly HERRICK

E-mail:

Company Address (if different than above): Berry Hurt

Employer Representative Signature: Berry Hurt    Date: 1/10/05

Title: HRIS Specialist

# EXHIBIT 7

7

## REQUESTS FOR ADMISSION

FILED
CLERK U.S. DISTRICT COURT
DISTRICT OF DELAWARE

2007 SEP 13 PM 4:10

### REQUEST FOR ADMISSION NO. 1

Admit that the document attached was written by you. (See Exhibit A).

*Yes I fully admit I wrote the attached letter.*

**RESPONSE:**

*I hold this letter to be truth in evidence on my behalf. As I stated in the deposition August 16, 2007. Ann tines okay my Aug 30, 2004 appt + knew I had an atty.*

### REQUEST FOR ADMISSION NO. 2    *I did Misprint Tue. 8/31/04 as 9/1/04*

Admit that you provided and/or wrote this letter to the attorney(s) in handling your claim

against State Farm in regards to your 2004 car accident. (See Exhibit A).

*Yes.*

**RESPONSE:**

*I wroted this letter to the atty. while I was out of work followed by excerbation of my work auto accident related injury. the letter was in regaurd to being terminated. after being approved for Aug 30, 2004 Surgery.*

*Vernitte Walker*

Jennifer C. Jauffret (#3689)
Jauffret@rlf.com
Lori A. Brewington (#4522)
Brewington@rlf.com
Richards, Layton & Finger
One Rodney Square
P. O. Box 551
Wilmington, Delaware 19899
(302) 651-7700
Attorneys for Defendant

Dated: September 7, 2007

RLF1-3198478-1

Mr. Fridlin                                    1 of 3

I spoke to Ann Hines 8/25/04. She ask me if I could return to work 8/30/04. I explained to her I was scheduled for an injection 8/30/04. She said Okay call me by Tuesday 9/1/04. I called Ann this morning 9/1/04. She asked how I was doing, I stated Sore. She responded she just wanted to know how I was & to call her when I can return to work. My Daughter came in the door & handed me this UPS envelope. Inside was this letter of termination, I also told Ann 8/25/04 I could not call until 9/1/04 because the injections are painful.

Vernette Walker
29 Richard Rd
New Castle, DE 19720
302-324-9175

Please Call me

# 06-138-mpt

Notice of Service

I certify On September 13, 2007, I hand delivered request for denial against defendants motion to dismiss to the clerk of court and defendants Attorney; Jennifer Jauffret one Rodney Square Wilmington, DE 19801

Venette Walker.

# EXHIBIT 8

-31-2004 10:42 AM    WALKER    302 324 1012    P.01

Mr. Fridkin                                        1 of 3

I spoke to Ann Hines 8/25/04. she ask Me if I could return to work 8/30/04. I explained to her I was scheduled for an injection 8/30/04. She Said okay Call Me by Tuesday 9/1/04. I Called Ann this morning 9/1/04. She asked how I was doing, I Stated Sore. She responded she Just wanted to know how I was & to Call her when I can return to work. My Daughter came in the door & handed me this UPS envelope. Inside was this letter of termination. I also told Ann 8/25/04 I could not Call until 9/1/04 because the injections are painful.

Vernette Walker
29 Richard Rd
New Castle, DE 19720
302-324-9175

Please Call me

# EXHIBIT 9

M7

# Social Security Administration
# Retirement, Survivors, and Disability Insurance
## Notice of Award

REDACTED

Office of Central
Operations
1500 Woodlawn Drive
Baltimore, Maryland 21241-1500
Date: August 22, 2007



VERNETTE WALKER
29 RICHARD ROAD
NEW CASTLE, DE  19720-1729

You are entitled to a monthly disability benefit for
October 2004 through February 2007.

## What We Will Pay And When

The day we make payments on this record is based on your date
of birth.

## We Can Only Pay You For A Short Time

We found that you were disabled according to our rules
beginning April 27, 2004 and ending December 2006. The first
month for which we could pay you benefits was October 2004. We
could pay you for the month your disability ended and the
following two months. This means that the last month for which
you were entitled to benefits was February 2007.

## Your Benefits

The following chart shows your benefit amount(s) before any
deductions or rounding. The amount you actually receive(s) may
differ from your full benefit amount. When we figure how much
to pay you, we must deduct certain amounts, such as Medicare
premiums. We must also round down to the nearest dollar.

| Beginning Date | Benefit Amount | Reason |
|---|---|---|
| October 2004 | $ 1,125.50 | Entitlement began |
| December 2004 | 1,155.80 | Cost-of-living adjustment |
| January 2005 | 1,166.60 | Credit for additional earnings |
| December 2005 | 1,214.40 | Cost-of-living adjustment |
| December 2006 | 1,254.40 | Cost-of-living adjustment |

SEE NEXT PAGE

## Other Government Payments Affect Benefits

We are holding your Social Security benefits for October 2004 through February 2007. We may have to reduce these benefits if you received Supplemental Security Income (SSI) for this period. We will not reduce your past-due benefits if you did not get SSI benefits for those months.

However, we will withhold part of any past-due benefits to pay your representative. Later in this letter, we will tell you more about the money we are withholding to pay your representative. When we decide how much you are due for this period, we will send you another letter.

## Information About Medicare

You are entitled to Medicare hospital and medical insurance beginning October 2006.

We will send you a Medicare card. You should take this card with you when you need medical care. If you need medical care before receiving the card and your coverage has already begun, use this letter as proof that you are covered by Medicare.

If you do not want medical insurance, please complete the enclosed card and return it to us in the envelope we have provided. You will need to do this by the date shown on the card. If you decide you do not want the insurance, we will return any premiums that you have paid.

Since you are no longer entitled to monthly Social Security benefits, we are stopping your hospital and medical insurance coverage under Medicare. Your hospital and medical insurance coverage ends on the last day of February 2007. Please destroy your Medicare card after the coverage ends.

## Information About Representative's Fees

We have approved the fee agreement between you and your representative.

Your past-due benefits are $34,558.50 for October 2004 through February 2007. Under the fee agreement, the representative cannot charge you more than $5,300.00 for his or her work. The amount of the fee does not include any out-of-pocket expenses (for example, costs to get copies of doctors' or hospitals' reports). This is a matter between you and the representative.

If we approve your claim for SSI, the representative may be able to charge an additional amount for his or her work. We will send you another letter about SSI, telling you the additional amount of the fee, if any, he or she can charge.

SEE NEXT PAGE

REDACTED                                                    Page 3



## How To Ask Us To Review The Determination On The Fee Amount

You, the representative or the person who decided your case can ask us to review the amount of the fee we say the representative can charge.

If you think the amount of the fee is too high, write us within 15 days from the day you get this letter.  Tell us that you disagree with the amount of the fee and give your reasons. Send your request to this address:

        Social Security Administration
        Office of Disability Adjudication and Review
        Attorney Fee Branch
        5107 Leesburg Pike
        Falls Church, Virginia  22041-3255

The representative also has 15 days to write us if he or she thinks the amount of the fee is too low.

If we do not hear from you or the representative, we will assume you both agree with the amount of the fee shown.

## Information About Past-Due Benefits Withheld To Pay A Representative

Because of the law, we usually withhold 25 percent of the total past-due benefits to pay an approved representative's fee.  We withheld $5,300.00 from your past-due benefits to pay the representative.

We are paying the representative from the benefits we withheld. Therefore, we must collect a service charge from him or her. The service charge is 6.3 percent of the fee amount we pay, but not more than $77, which is the most we can collect in each case under the law.  We will subtract the service charge from the amount payable to the representative.

The representative cannot ask you to pay for the service charge.  If the representative disagrees with the amount of the service charge, he or she must write to the address shown at the top of this letter.  The representative must tell us why he or she disagrees within 15 days from the day he or she gets this letter.

## Other Social Security Benefits

The benefit described in this letter is the only one you can receive from Social Security.  If you think that you might qualify for another kind of Social Security benefit in the future, you will have to file another application.

SEE NEXT PAGE

REDACTED

## Other Information

We are sending a copy of this notice to GARY LINARDUCCI and
STEVEN L BUTLER.

## Do You Disagree With The Decision?

You have already been notified of your appeal rights regarding
the decision made by the Administrative Law Judge and what you
must do to have that decision reexamined.  If you believe that
any other determination made by us in carrying out the
Administrative Law Judge decision is incorrect, you may also
request that part of your case be reexamined.

If you want this reconsideration, you may request it through
any Social Security office.  If additional evidence is
available, you should submit it with your request.  We will
review your case and consider any new facts you have.  A person
who did not make the first decision will decide your case.  We
will correct any mistakes.  We will review those parts of the
decision which you believe are wrong and will look at any facts
you have.  We may also review those parts which you believe are
correct and may make them unfavorable or less favorable to you.

- You have 60 days to ask for an appeal.

- The 60 days start the day after you receive this letter.
  We assume you got this letter 5 days after the date on it
  unless you show us that you did not get it within the 5-day
  period.

- You must have a good reason for waiting more than 60 days
  to ask for an appeal.

- You have to ask for an appeal in writing.  We will ask you
  to sign a Form SSA-561-U2, called "Request for
  Reconsideration".  Contact one of our offices if you want
  help.

Please read the enclosed pamphlet, "Your Right to Question the
Decision Made on Your Social Security Claim".  It contains more
information about the appeal.

## Things To Remember For The Future

If your health gets worse and you think you are disabled before
you reach full retirement age, 66 and 08 months, you should
contact us about applying again for disability benefits.  Also,
please get in touch with us three months before you reach age
62 to find out whether you qualify for retirement benefits.

Please tell us if there is a change in the mailing address
and/or direct deposit information.  We need this information to
make sure payments are deposited timely and important notices
regarding your payments reach you.

SEE NEXT PAGE

REDACTED

## If You Have Any Questions

We invite you to visit our website at www.socialsecurity.gov on the Internet to find general information about Social Security. If you have any specific questions, you may call us toll-free at 1-800-772-1213, or call your local Social Security office at 1-302-323-0304.  We can answer most questions over the phone. If you are deaf or hard of hearing, you may call our TTY number, 1-800-325-0778.  You can also write or visit any Social Security office.  The office that serves your area is located at:

> SOCIAL SECURITY
> SUITE 200
> 920 W BASIN ROAD
> NEW CASTLE,DE 19720

If you do call or visit an office, please have this letter with you.  It will help us answer your questions.  Also, if you plan to visit an office, you may call ahead to make an appointment. This will help us serve you more quickly when you arrive at the office.

Michael J. Astrue
Commissioner
   of Social Security

Enclosure(s):
     Form CMS-2690
     Return Envelope
     SSA Pub No 05-10058

SOCIAL SECURITY ADMINISTRATION

Refer To:  **REDACTED**

Office of Disability Adjudication and Review
2nd Floor
500 W Loockerman St
Dover, DE 19904

Date:  AUG 0 3 2007

Vernette Walker
29 Richard Road
New Castle, DE 19720

### NOTICE OF DECISION – FULLY FAVORABLE

I have made the enclosed decision in your case.  Please read this notice and the decision carefully.

**This Decision is Fully Favorable To You**

Another office will process the decision and send you a letter about your benefits.  Your local Social Security office or another may first ask you for more information.  If you do not hear anything for 60 days, contact your local office.

**The Appeals Council May Review The Decision On Its Own**

The Appeals Council may decide to review my decision even though you do not ask it to do so.  To do that, the Council must mail you a notice about its review within 60 days from the date shown above.  Review at the Council's own motion could make the decision less favorable or unfavorable to you.

**If You Disagree With The Decision**

If you believe my decision is not fully favorable to you, or if you disagree with it for any reason, you may file an appeal with the Appeals Council.

**How to File an Appeal**

To file an appeal you or your representative must request that the Appeals Council review the decision.  You must make the request in writing.  You may use our Request for Review form, HA-520, or write a letter.

You may file your request at any local Social Security office or a hearing office.  You may also mail your request right to the **Appeals Council, Office of Disability Adjudication and Review, 5107 Leesburg Pike, Falls Church, VA 22041-3255**.  Please put the Social Security number shown above on any appeal you file.

See Next Page

**Time to File an Appeal**

To file an appeal, you must file your request for review **within 60 days** from the date you get this notice.

The Appeals Council assumes you got the notice 5 days after the date shown above unless you show you did not get it within the 5-day period. The Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**Time to Submit New Evidence**

You should submit any new evidence you wish to the Appeals Council to consider **with** your request for review.

**How an Appeal Works**

Our regulations state the rules the Appeals Council applies to decide when and how to review a case. These rules appear in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N).

If you file an appeal, the Council will consider all of my decision, even the parts with which you agree. The Council may review your case for any reason. It **will** review your case if one of the reasons for review listed in our regulation exists. Section 404.970 and Section 416.1470 of the regulation list these reasons.

Requesting review places the entire record of your case before the Council. Review can make any part of my decision more or less favorable or unfavorable to you.

On review, the Council may itself consider the issues and decide your case. The Council may also send it back to an Administrative Law Judge for a new decision.

**If No Appeal and No Appeals Council Review**

If you do not appeal and the Council does not review my decision on its own motion, you will not have a right to court review. My decision will be a final decision that can be changed only under special rules.

·Vernette Walker (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)

## If You Have Any Questions

If you have any questions, you may call, write or visit any Social Security office.  If you visit an office, please bring this notice and decision with you.  The telephone number of the local office that serves your area is (302)323-0304.  Its address is Social Security, Suite 200, 920 W Basin Road, New Castle, DE 19720.

Judith A. Showalter
Administrative Law Judge

cc:    Steven Butler, Esquire
       Linarducci & Butler
       910 W. Basin Road
       Suite 100
       New Castle, DE 19720

**SOCIAL SECURITY ADMINISTRATION**
**Office of Disability Adjudication and Review**

**ORDER**

| IN THE CASE OF | CLAIM FOR |
|---|---|

**CLAIM FOR**

Period of Disability, Disability Insurance
Benefits, and Supplemental Security Income

Vernette Walker
(Claimant)

REDACTED

(Wage Earner)                                    (Social Security Number)

I approve the fee agreement between the claimant and her representative subject to the condition
that the claim results in past-due benefits.

My determination is limited to whether the fee agreement meets the statutory conditions for
approval and is not otherwise excepted. I neither approve nor disapprove any other aspect of the
agreement.

**HOW TO ASK US TO REVIEW THE FEE AGREEMENT DETERMINATION**

You or your representative may ask us to review the determination on the fee agreement. If you
decide to ask us for a review, write us within 15 days from the day you get this order. Tell us
that you disagree and give your reasons.
Send your request to this address:

- Jasper J. Bede (Acting)
  Regional Chief Administrative Law Judge
  SSA ODAR Regional Ofc
  4th Floor
  PO Box 13496
  Philadelphia, PA 19101

Your representative also has 15 days to write us if he or she does not agree with the
determination on the fee agreement.

You should include the social security number(s) shown on this order on any papers that you
send us.

Judith A. Showalter
Administrative Law Judge

AUG 0 3 2007
Date

**SOCIAL SECURITY ADMINISTRATION**
**Office of Disability Adjudication and Review**

**DECISION**

<table>
<tr><td>

<u>**IN THE CASE OF**</u>

Vernette Walker
_____
(Claimant)

_____
(Wage Earner)

</td><td>

<u>**CLAIM FOR**</u>

Period of Disability, Disability Insurance
Benefits, and Supplemental Security Income
_____

REDACTED
_____
(Social Security Number)

</td></tr>
</table>

<u>**JURISDICTION AND PROCEDURAL HISTORY**</u>

On May 25, 2005, the claimant filed a Title II application for a period of disability and disability insurance benefits. The claimant also filed a Title XVI application for supplemental security income on July 8, 2005. In both applications, the claimant alleged disability beginning April 27, 2004. These claims were denied and are now before the undersigned Administrative Law Judge on a timely written request for hearing filed on May 16, 2006 (20 CFR 404.929 *et seq.* and 416.1429 *et seq*). On July 3, 2007, the undersigned held a Video Hearing (20 CFR 404.936(c) and 416.1436(c)). The claimant appeared in New Castle, Delaware, and the undersigned presided over the hearing from Dover, Delaware. Jan D. Howard-Reed, an impartial vocational expert, also appeared at the hearing. The claimant is represented by Steven Butler, Esq.

By letter dated July 3, 2007, the claimant, through her representative, requested a closed period of disability from April 27, 2004 through December 18, 2006.

<u>**ISSUES**</u>

The issue is whether the claimant is disabled under sections 216(i), 223(d) and 1614(a)(3)(A) of the Social Security Act. Disability is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment or combination of impairments that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of sections 216(i) and 223 of the Social Security Act are met. The claimant's earnings record shows that the claimant has acquired sufficient quarters of coverage to remain insured through December 31, 2009. Thus, the claimant must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

After careful consideration of all the evidence, the Administrative Law Judge concludes that the claimant was "disabled" within the meaning of the Social Security Act from April 27, 2004 through December 18, 2006. On December 19, 2006, medical improvement occurred that is

See Next Page

related to the ability to work, and the claimant has been able to perform substantial gainful activity from that date through the date of this decision. Thus, the claimant's disability ended on December 19, 2006.

## APPLICABLE LAW

The claimant is a forty eight year old individual who was forty five years of age on her alleged onset date. She has a high school education and past relevant work as a newspaper office worker. In her application, she alleged disability due to back and neck sprain and depression. At the hearing, she testified she has also been treated for left shoulder injury and has a recent left foot injury.

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled (20 CFR 404.1520(a) and 416.920(a)). The steps are followed in order. If it is determined that the claimant is or is not disabled at a step of the evaluation process, the evaluation will not go on to the next step.

At step one, the undersigned must determine whether the claimant is engaging in substantial gainful activity (20 CFR 404.1520(b) and 416.920(b)). Substantial gainful activity (SGA) is defined as work activity that is both substantial and gainful. "Substantial work activity" is work activity that involves doing significant physical or mental activities (20 CFR 404.1572(a) and 416.972(a)). "Gainful work activity" is work that is usually done for pay or profit, whether or not a profit is realized (20 CFR 404.1572(b) and 416.972(b)). Generally, if an individual has earnings from employment or self-employment above a specific level set out in the regulations, it is presumed that she has demonstrated the ability to engage in SGA (20 CFR 404.1574, 404.1575, 416.974, and 416.975). If an individual engages in SGA, she is not disabled regardless of how severe her physical or mental impairments are and regardless of her age, education, and work experience. If the individual is not engaging in SGA, the analysis proceeds to the second step.

At step two, the undersigned must determine whether the claimant has a medically determinable impairment that is "severe" or a combination of impairments that is "severe" (20 CFR 404.1520(c) and 416.920(c)). An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work (20 CFR 404.1521 and 416.921; Social Security Rulings (SSRs) 85-28, 96-3p, and 96-4p). If the claimant does not have a severe medically determinable impairment or combination of impairments, she is not disabled. If the claimant has a severe impairment or combination of impairments, the analysis proceeds to the third step.

At step three, the undersigned must determine whether the claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925,

and 416.926). If the claimant's impairment or combination of impairments meets or medically equals the criteria of a listing and meets the duration requirement (20 CFR 404.1509 and 416.909), the claimant is disabled. If it does not, the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the undersigned must first determine the claimant's residual functional capacity (20 CFR 404.1520(e) and 416.920(e)). An individual's residual functional capacity is her ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. In making this finding, the undersigned must consider all of the claimant's impairments, including impairments that are not severe (20 CFR 404.1520(e), 404.1545, 416.920(e), and 416.945; SSR 96-8p).

Next, the undersigned must determine at step four whether the claimant has the residual functional capacity to perform the requirements of her past relevant work (20 CFR 404.1520(f) and 416.920(f)). The term past relevant work means work performed (either as the claimant actually performed it or as it is generally performed in the national economy) within the last 15 years or 15 years prior to the date that disability must be established. In addition, the work must have lasted long enough for the claimant to learn to do the job and have been SGA (20 CFR 404.1560(b), 404.1565, 416.960(b), and 416.965). If the claimant has the residual functional capacity to do her past relevant work, the claimant is not disabled. If the claimant is unable to do any past relevant work or does not have any past relevant work, the analysis proceeds to the fifth and last step.

At the last step of the sequential evaluation process (20 CFR 404.1520(g) and 416.920(g)), the undersigned must determine whether the claimant is able to do any other work considering her residual functional capacity, age, education, and work experience. If the claimant is able to do other work, she is not disabled. If the claimant is not able to do other work and meets the duration requirement, she is disabled. Although the claimant generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience (20 CFR 404.1512(g), 404.1560(c), 416.912(g) and 416.960(c)).

If the claimant is found disabled at any point in the process, the undersigned must also determine if her disability continues through the date of the decision. In making this determination, the undersigned must follow an eight-step evaluation process for the Title II claim and a seven-step process for the Title XVI claim (20 CFR 404.1594 and 416.994). If the undersigned can make a decision at a step, the evaluation will not go on to the next step.

At step one for the Title II claim, the undersigned must determine if the claimant is engaging in substantial gainful activity. If the claimant is performing substantial gainful activity and any applicable trial work period has been completed, the claimant is no longer disabled (20 CFR 404.1594(f)(1)). For the Title XVI claim, the performance of substantial gainful activity is not a factor used to determine if the claimant's disability continues (20 CFR 416.994(b)(5)).

At step two for the Title II claim and step one for the Title XVI claim, the undersigned must determine whether the claimant has an impairment or combination of impairments which meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926). If the claimant does, her disability continues (20 CFR 404.1594(f)(2) and 416.994(b)(5)(i)).

At step three for the Title II claim and step two for the Title XVI claim, the undersigned must determine whether medical improvement has occurred (20 CFR 404.1594(f)(3) and 416.994(b)(5)(ii)). Medical improvement is any decrease in medical severity of the impairment(s) as established by improvement in symptoms, signs and/or laboratory findings (20 CFR 404.1594(b)(1) and 416.994(b)(1)(i)). If medical improvement has occurred, the analysis proceeds to the fourth step for the Title II claim and the third step for the Title XVI claim. If not, the analysis proceeds to the fifth step for the Title II claim and the fourth step for the Title XVI claim.

At step four for the Title II claim and step three for the Title XVI claim, the undersigned must determine whether medical improvement is related to the ability to work (20 CFR 404.1594(f)(4) and 416.994(b)(5)(iii)). Medical improvement is related to the ability to work if it results in an increase in the claimant's capacity to perform basic work activities (20 CFR 404.1594(b)(3) and 416.994(b)(1)(iii)). If it does, the analysis proceeds to the sixth step for the Title II claim and the fifth step for the Title XVI claim.

At step five for the Title II claim and step four for the Title XVI claim, the undersigned must determine if an exception to medical improvement applies (20 CFR 404.1594(f)(5) and 416.994(b)(5)(iv)). There are two groups of exceptions (20 CFR 404.1594(d) and (e) and 416.994(b)(3) and (b)(4)). If one of the first group exceptions applies, the analysis proceeds to the next step. If one of the second group exceptions applies, the claimant's disability ends. If none apply, the claimant's disability continues.

At step six for the Title II claim and step five for the Title XVI claim, the undersigned must determine whether all the claimant's current impairments in combination are severe (20 CFR 404.1594(f)(6) and 416.994(b)(5)(v)). If all current impairments in combination do not significantly limit the claimant's ability to do basic work activities, the claimant is no longer disabled. If they do, the analysis proceeds to the next step.

At step seven for the Title II claim and step six for the Title XVI claim, the undersigned must assess the claimant's residual functional capacity based on the current impairments and determine if she can perform past relevant work (20 CFR 404.1594(f)(7) and 416.994(b)(5)(vi)). If the claimant has the capacity to perform past relevant work, her disability has ended. If not, the analysis proceeds to the last step.

At the last step, the undersigned must determine whether other work exists that the claimant can perform, given her residual functional capacity and considering her age, education, and past work experience (20 CFR 404.1594(f)(8) and 416.994(b)(5)(vii)). If the claimant can perform other work, she is no longer disabled. If the claimant cannot perform other work, her disability continues. Although the claimant generally continues to have the burden of proving disability at

this step, a limited burden of going forward with the evidence shifts to the Social Security Administration. In order to support a finding that an individual is not disabled at this step, the Social Security Administration is responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that the claimant can do, given the residual functional capacity, age, education, and work experience.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

After careful consideration of the entire record, the undersigned makes the following findings:

**1.   The claimant met the insured status requirements of the Social Security Act as of April 27, 2004, the date the claimant became disabled.**

**2.   The claimant has not engaged in SGA since April 27, 2004, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).**

**3.   At all times relevant to this decision, the claimant has had the following severe impairments:  status post left shoulder injury with arthroscopic decompression surgery, chronic cervical and lumbar strain/sprain due to motor vehicle accident, and depression secondary to loss of job and pain (20 CFR 404.1520(c) and 416.920(c)).**

The above impairments caused and continue to cause significant limitations in the claimant's ability to perform basic work activities.

The claimant testified that she developed a recent left foot problem in January 2007 for which she underwent foot surgery in March 2007. Neither the claimant nor her representative contend that her foot problem is expected to last for a continuous period of at least 12 months. Therefore, the claimant cannot be found disabled based on this impairment, as it does not meet the twelve-month durational requirement (20 CFR 404.1509 and 416.909).

**4.   From April 27, 2004 through December 18, 2006, the period during which the claimant was disabled, the claimant did not have an impairment or combination of impairments that met or medically equaled an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d) and 416.920(d)).**

The undersigned has considered the listings governing musculoskeletal disorders, particularly sections 1.02 and 1.04. There is no evidence of gross anatomical deformity together with findings on appropriate medically acceptable imaging techniques showing joint space narrowing, bony destruction or ankylosis. The medical evidence of record does not establish an inability to ambulate effectively or to perform fine and gross dexterous movements effectively, as defined in sections 1.00B(2)(b) and (c), which would meet the criteria of sections 1.02 and 1.04C of the listings. In addition, there is no evidence of nerve root compression or spinal arachnoiditis to the degree specified in sections 1.04A and 1.04B. More particularly, treatment records fail to document motor loss (atrophy with associated muscle weakness or muscle weakness), accompanied by sensory or reflex loss.

See Next Page

During this period, the claimant had the following degree of limitation in the broad areas of functioning set out in the disability regulations for evaluating mental disorders and in the mental disorders listings in 20 CFR, Part 404, Subpart P, Appendix 1: mild restriction of activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no episodes of decompensation. The claimant's mental impairment(s) does not satisfy the paragraph "C" criteria of the applicable mental disorder listing(s) during this period.

The claimant's representative does not contend that a listing has been met or equaled. Moreover, no treating or examining physician has mentioned any findings equivalent in severity to any listed impairment, nor are such findings indicated or suggested by the evidence of record.

5.   **After careful consideration of the entire record, the undersigned finds that, from April 27, 2004 through December 18, 2006, the claimant had the residual functional capacity to lift/carry five pounds occasionally, stand/walk 15 to 20 minutes at a time and 45 to 60 minutes total in an eight-hour workday, sit 45 to 90 minutes at a time and two to three hours total in an eight-hour workday, with the need for unscheduled breaks two to three times a day for 15 to 20 minutes at a time, no twisting, stooping, crouching/squatting, climbing, reaching, pushing/pulling, and occasional handling and fingering. Depressive symptoms and medication side effects limited her to simple, unskilled work.**

In making this finding, the undersigned considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

At the hearing, the claimant testified that she was involved in a work-related accident in 1999 in which she injured her left shoulder and a subsequent motor vehicle accident on April 27, 2004 which exacerbated her neck and back pain. She reported that her employer terminated her four months later because she could not return to work. She testified that, during the requested closed period, she was under the care of Craig D. Sternberg, M.D., an orthopedist, who treated her with injections as well as pain medications, including morphine. She also used a TENS unit at home as well as application of heat. The claimant further testified that she received outpatient counseling treatment in 2005 and 2006 for depression over losing her job and pain. She stated that she experienced exacerbation of left shoulder pain during this period as well, for which she received treatment from Delaware Diagnostic and Rehabilitation in 2005 and eventually underwent arthroscopic decompression of the left shoulder in November 2006. In terms of daily activities, the claimant testified that she did very little during this period and that her daughter cooked and did the laundry and cleaning.

After considering the evidence of record, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms, and that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are generally credible from April 27, 2004 through December 18, 2006.

The undersigned assigns significant weight to the opinion of Conrad King, Jr., M.D., the claimant's treating pain management specialist, expressed in a Residual Functional Evaluation form dated June 12, 2006 to the extent that it describes the claimant functional capacity during the requested closed period (Exhibit 25F). Dr. King's opinion is well-supported by the medical evidence of record, including the claimant's medical history and clinical and objective signs and findings as well as detailed treatment notes, which provides a reasonable basis for the claimant's chronic symptoms and resulting limitations during the requested closed period (Exhibits 7F, 25F). Moreover, Dr. King is a treating specialist who has seen the claimant on a regular basis and is best able to provide a detailed, longitudinal picture of the claimant's impairments and resulting limitations (20 CFR 404.1527(d) and 416.927(d)).

The record shows that the claimant was involved in a work-related accident on February 8, 1999 in which she suffered a post-traumatic cervical strain and sprain with herniated nucleus pulposus at C5-6 and right C6-7 as well as low back and left shoulder pain. The claimant was subsequently involved in a motor vehicle accident on April 27, 2004, which exacerbated her neck injury (Exhibit 1F). She developed chronic neck pain radiating into the upper extremities. MRI scans demonstrated cervical spondylosis with degenerative changes at C5-6 and C6-7 and a right central disc herniation at C6-7 (Exhibit 3F) and a central disc protrusion with degenerative changes at L4-5 (Exhibit 17F). The claimant was treated with injections and pain medications by Dr. Sternberg through at least August 17, 2005, with a diagnosis of cervical and lumbar strain and sprain. Dr. Sternberg noted on physical examination tenderness in the cervical and lumbar spine as well as guarding in the lumbar region. Dr. Sternberg consistently maintained that the claimant was unable to work in any occupation while under his care (Exhibits 4F, 17F). During the requested closed period, the claimant, in addition to ongoing neck pain, also developed recurrence of lower back pain for which she received physical therapy (Exhibit 21F).

Dr. King diagnosed chronic residuals of herniated nucleus pulposus at C5-6 indenting the ventral aspect of the cervical cord. The claimant developed recurrence of left shoulder pain for which she was treated with physical therapy (Exhibit 22F) and eventually underwent arthroscopic decompression on November 20, 2006 (Exhibit 25F). Dr. King diagnosed the claimant with chondral lesion of the humeral head of the left shoulder with bursitis. Pertinent clinical findings reported by Dr. King included cervical and shoulder myospasm and bilateral trapezial muscle tightness and tenderness (Exhibits 7F, 25F). According to Dr. King, the claimant's symptoms limited her ability to perform various activities of daily living and she had difficulty with overhead reaching, lifting, pushing, and pulling.   Electrodiagnostic studies were consistent with a left C6-7 radiculitis (Exhibit 23F).

During the requested closed period, the claimant also received outpatient counseling services through Community Mental Health for major depressive disorder, single episode. She was assessed a GAF score of 40 (See DSM-IV at page 32 for Global Assessment Functioning (GAF) scale. A score in the 31-40 range indicates some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood). Carolyn Kozma, Ph.D., noted that the claimant experienced depression following her motor vehicle accident and job loss. Clinical findings included poor memory and concentration, sleep and appetite disturbance, mood disturbance, anhedonia, and decreased energy. According to Dr. Kozma, psychotherapy and medications resulted in only partial

improvement. Dr. Kozma expressed her opinion that the claimant would not be able to maintain regular attendance and deal with work schedules, complete a normal workday or workweek without psychologically-based interruptions, perform at a consistent pace, or deal with a normal work routine (Exhibit 12F). The undersigned assigns significant weight to Dr. Kozma's opinion, as it is well-supported by Dr. Kozma's detailed, contemporaneous treatment notes, which provides a reasonable basis for the claimant's chronic symptoms and resulting limitations (Exhibit 8F). Moreover, Dr. Kozma is a treating source who has seen the claimant on a regular basis and is best able to provide a detailed, longitudinal picture of the claimant's impairments and resulting limitations (20 CFR 404.1527(d) and 416.927(d)).

In accordance with Social Security Ruling 96-6p, the undersigned has considered the State agency medical consultants' opinions (Exhibits 5F, 10F, 11F). These opinions are weighed as statements from nonexamining expert sources. The undersigned affords greater weight to the findings and opinions of the examining and treating sources during the requested closed period. These opinions are well supported by medically acceptable clinical and laboratory findings, and are more consistent with the record when viewed in its entirety (20 CFR 404.1527(d) and 416.927(d)). Moreover, additional medical evidence received in the course of developing the claimant's case for review at the hearing, as well as evidence in the form of credible testimony at the hearing, consistent with medical evidence in the record, justifies a conclusion that the claimant's impairments were more limiting during the requested closed period than what was concluded by the State agency consultants.

6.    **From April 27, 2004 through December 18, 2006, the claimant was unable to perform past relevant work (20 CFR 404.1565 and 416.965).**

The vocational expert credibly testified that the claimant has past relevant work as a newspaper office worker, which the expert described as sedentary and semiskilled. Based on the residual functional capacity as determined, which does not allow for the performance of sustained work activities in an ordinary work setting over an eight-hour day, five days a week, or an equivalent work schedule, on a regular and continuing basis, as defined at Social Security Ruling 96-8p, the undersigned finds that the claimant is unable to perform her past relevant work.

7.    **Born on September 14, 1958, the claimant was a younger individual age 45-49 on the established onset date (20 CFR 404.1563 and 416.963).**

8.    **The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).**

9.    **The claimant's acquired job skills do not transfer to other occupations within the residual functional capacity assessed for the period from April 27, 2004 through December 18, 2006 (20 CFR 404.1568 and 416.968).**

The undersigned finds no evidence in the record of transferable skills to work within the claimant's residual functional capacity as determined.

See Next Page

10. From April 27, 2004 through December 18, 2006, considering the claimant's age, education, work experience, and residual functional capacity, there were no jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

From April 27, 2004 through December 18, 2006, if the claimant had the residual functional capacity to perform the full range of sedentary work, considering the claimant's age, education, and work experience, a finding of "not disabled" would be directed by Medical-Vocational Rule 201.21. However, the additional limitations narrowed the range of work the claimant could have performed to the extent that a finding of "disabled" is appropriate under the framework of this rule. Because the evidence supports a finding that the claimant had a substantial loss of ability to meet the demands of basic work-related activities on a sustained basis, the unskilled sedentary occupational base was significantly eroded and a finding of disability is justified under SSRs 85-15 and 96-9p. Therefore, administrative notice is taken that there were no jobs existing in significant numbers in the national economy which the claimant could have performed.

**11. The claimant was under a disability, as defined by the Social Security Act, from April 27, 2004 through December 18, 2006 (20 CFR 404.1520(g) and 416.920(g)).**

**12. Medical improvement occurred as of December 19, 2006, the date the claimant's disability ended (20 CFR 404.1594(b)(1) and 416.994(b)(1)(i)).**

At the hearing, the claimant testified that her neck and back pain eventually improved with treatment. She confirmed that her pain is generally controlled with medications. She acknowledged that she is able to turn her head from side to side and nod, with some limitation. The claimant testified that surgery performed in November 2006 as well as pain medications helped to alleviate her left shoulder pain, although she reported that she still has trouble raising her left arm above her head, has tingling in two of her fingers in the right hand, and has trouble combing her hair. She acknowledged that she is right-hand dominant. She further testified that mental health treatment in 2005 and 2006 helped her depressive feelings. She acknowledged that she was slowly recovering from her left foot surgery earlier this year. She stated that she is able to drive and use her hands for fine manipulation and gross motor function. She reported that she was doing more household chores. Additionally, she is looking for work.

See Next Page

**13. Beginning on December 19, 2006, the claimant has not had an impairment or combination of impairments that meets or medically equals one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1594(f)(2) and 416.994(b)(5)(i)).**

The undersigned refers to Finding No. 4 in this decision. As the medical evidence demonstrates that the severity of the claimant's impairment has decreased in terms of signs, symptoms, and/or laboratory findings, the undersigned continues to find that no listing has been met or equaled.

**14. After careful consideration of the entire record, the undersigned finds that, beginning on December 19, 2006, the claimant has had the residual functional capacity to perform light work, with occasional lifting/carrying up to 20 pounds and frequent lifting/carrying up to 10 pounds, standing/walking about six hours in an eight-hour workday, sitting about six hours in an eight-hour workday, unlimited pushing/pulling, occasional climbing, balancing, stooping, kneeling, crouching, and crawling, and occasional reaching.**

In making this finding, the undersigned notes that the claimant has requested a closed period of disability and does not allege being disabled as of December 19, 2006. Additionally, the medical and other evidence shows that the claimant's functioning has significantly improved.

Dr. King's treatment records indicate that the claimant obtained good relief with iontophoresis treatments. In addition, following her left shoulder arthroscopy in November 2006, progress notes reflect significant improvement, with less pain and improved range of motion (Exhibit 25F). The claimant appeared at the hearing using a cane due to recent podiatric problems. She reported that she had not yet returned to work, but that she planned on vocational rehabilitation once her foot problems resolved. The claimant's representative submitted a Mental Impairment Questionnaire dated June 13, 2007 completed by Dr. Samuel Romirowsky (Exhibit 26F). Dr. Romirowsky reported that he had only seen the claimant on one occasion on May 18, 2007. His session note reflects that the claimant was referred to him by the claimant's representative in relation to her Social Security disability appeal. Dr. Romirowsky indicated in his assessment significant symptoms and mental functional limitations. However, as previously indicated, the claimant reported at the hearing that her depressive symptoms had improved with counseling. Moreover, a review of the record reveals no ongoing counseling after October 17, 2005. Therefore, the undersigned does not afford significant weight to Dr. Romirowsky's opinion.

The physical and mental residual functional capacity assessments by the State agency medical consultants (Exhibits 5F, 10F, 11F) are found to be persuasive and entitled to considerable weight with regard to the period beginning on December 19, 2006, as these opinions are consistent with the evidence of record showing gradual improvement in the claimant's condition following her left shoulder surgery and in her depressive symptoms with counseling as well as the claimant's acknowledgement that there has been medical improvement to the point that she started to look for work after the requested closed period.

**15. The medical improvement that has occurred is related to the ability to work (20 CFR 404.1594(b)(4)(i) and 416.994(b)(1)(iv)(A)).**

See Next Page

Vernette Walker                REDACTED                          Page 11 of 11

In comparing the above residual functional capacities, the undersigned finds that the claimant's functional capacity for basic work activities has increased.

**16. Since December 19, 2006, the claimant's age category has not changed (20 CFR 404.1563 and 416.963).**

**17. Beginning on December 19, 2006, the claimant has been able to perform past relevant work (20 CFR 404.1565 and 416.965).**

Beginning on December 19, 2006, the claimant has been capable of performing past relevant work as a newspaper office worker as it is generally performed within the national economy. This work, according to the vocational expert's description, does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

**18. The claimant's disability ended on December 19, 2006 (20 CFR 404.1594(f)(8) and 416.994(b)(5)(vii)).**

## DECISION

Based on the application for a period of disability and disability insurance benefits filed on May 25, 2005, the claimant was disabled under sections 216(i) and 223(d) of the Social Security Act, beginning on April 27, 2004 and ending on December 19, 2006.

Based on the application for supplemental security income filed on July 8, 2005, the claimant was disabled under section 1614(a)(3)(A) of the Social Security Act, beginning on April 27, 2004 and ending on December 19, 2006.

The component of the Social Security Administration responsible for authorizing supplemental security income will advise the claimant regarding the nondisability requirements for these payments, and if eligible, the amount and the months for which payment will be made.

Pursuant to Section 224 of the Social Security Act, and 20 CFR 404.408, the claimant's disability insurance benefits may be offset by her receipt of workers' compensation payments.

Judith A. Showalter
Administrative Law Judge

_____AUG 0 3 2007_____
Date

SOCIAL SECURITY ADMINISTRATION                                           TOE 710

Form Approved
OMB No. 0960-0622

## REQUEST FOR RECONSIDERATION

*(Do not write in this space)*

| NAME OF CLAIMANT | NAME OF WAGE EARNER OR SELF-EMPLOYED PERSON *(If different from claimant)* |
|---|---|
| *Vernette Walker* | |
| SOCIAL SECURITY CLAIM NUMBER | SUPPLEMENTAL SECURITY INCOME (SSI) OR SPECIAL VETERANS BENEFITS (SVB) CLAIM NUMBER |
| REDACTED | – – – |
| SPOUSE'S NAME *(Complete ONLY in SSI cases)* | SPOUSE'S SOCIAL SECURITY NUMBER *(Complete ONLY in SSI cases)* |
| | – – – |

CLAIM FOR *(Specify type, e.g., retirement, disability, hospital insurance, SSI, SVB, etc.)*

I do not agree with the determination made on the above claim and request reconsideration. My reasons are:

*Physical and mental disability not able to work per disabilities and Doctor order.*

### SUPPLEMENTAL SECURITY INCOME OR SPECIAL VETERANS BENEFITS RECONSIDERATION ONLY
(See the three ways to appeal in the How To Appeal Your Supplemental Security Income Or Special Veterans Benefit Decision instructions.)
"I want to appeal your decision about my claim for Supplemental Security Income (SSI) or Special Veterans Benefits (SVB). I've read about the three ways to appeal. I've checked the box below."

☐ Case Review      ☐ Informal Conference      ☐ Formal Conference

### EITHER THE CLAIMANT OR REPRESENTATIVE SHOULD SIGN - ENTER ADDRESSES FOR BOTH

I declare under penalty of perjury that I have examined all the information on this form, and on any accompanying statements or forms, and it is true and correct to the best of my knowledge.

| CLAIMANT SIGNATURE | SIGNATURE OR NAME OF CLAIMANT'S REPRESENTATIVE ☒ NON-ATTORNEY  ☐ ATTORNEY |
|---|---|
| *Vernette Walker* | *Ruchel Marlow* |
| MAILING ADDRESS *29 Richard Rd* | MAILING ADDRESS *462 Kemper Dr* |
| CITY *New Castle* | STATE *DE* | ZIP CODE *19720* | CITY *Newark* | STATE *DE* | ZIP CODE *19702* |
| TELEPHONE NUMBER (Include area code) *(302) 324-9175* | DATE *9-7-05* | TELEPHONE NUMBER (Include area code) *(302) 832-8073* | DATE *9/7/05* |

### TO BE COMPLETED BY SOCIAL SECURITY ADMINISTRATION

See list of initial determinations

| 1. HAS INITIAL DETERMINATION BEEN MADE? | ☐ YES  ☐ NO | 2. CLAIMANT INSISTS ON FILING | ☐ YES  ☐ NO |
|---|---|---|---|
| 3. IS THIS REQUEST FILED TIMELY? *(If "NO", attach claimant's explanation for delay and attach only pertinent letter, material, or information in social security office.)* | | | ☐ YES  ☐ NO |

| RETIREMENT AND SURVIVORS RECONSIDERATIONS ONLY (CHECK ONE) REFER TO (GN 03102.125) | SOCIAL SECURITY OFFICE ADDRESS |
|---|---|
| ☐ NO FURTHER DEVELOPMENT REQUIRED   (GN 03102.125) ☐ REQUIRED DEVELOPMENT ATTACHED ☐ REQUIRED DEVELOPMENT PENDING, WILL FORWARD OR ADVISE STATUS     WITHIN 30 DAYS | |

| ROUTING INSTRUCTIONS (CHECK ONE) | ☐ DISABILITY DETERMINATION SERVICES *(ROUTE WITH DISABILITY FOLDER)* ☐ ODO, BALTIMORE | ☐ PROGRAM SERVICE CENTER ☐ OIO, BALTIMORE ☐ OEO, BALTIMORE | ☐ DISTRICT OFFICE RECONSIDERATION ☐ CENTRAL PROCESSING SITE (SVB) |
|---|---|---|---|

NOTE: Take or mail the **signed original** to your local Social Security office, the Veterans Affairs Regional Office in Manila or any U.S. Foreign Service post and keep a copy for your records.

Form SSA-561-U2 (7-2003)  ef (7-2003) Destroy Prior Editions

Claims Folder

# EXHIBIT 10

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VERNETTE WALKER,           )
                           )
     Plaintiff,            )
                           )
     v.                    )  C.A. No. 06-138-MPT
                           )
THE NEWS JOURNAL and       )
ANN HINES,                 )
                           )
     Defendants.           )

            Deposition of VERNETTE WALKER taken
pursuant to notice at the law offices of Richards Layton
& Finger, One Rodney Square, Wilmington, Delaware,
beginning at 10:00 a.m., on Thursday, August 16, 2007,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.

APPEARANCES:

          JENNIFER C. JAUFFRET, ESQUIRE
          RICHARDS LAYTON & FINGER
            One Rodney Square
            Wilmington, Delaware 19801
            for the Defendants

ALSO PRESENT:

          ANN HINES
          DOLORES PINTO

            WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                www.wilfet.com



**WILCOX & FETZER LTD.**
Registered Professional Reporters

Vernette Walker

7

1    A.    No.

2    Q.    Any computer training you received was at The

3    News Journal?

4    A.    That was at The News Journal, yes.

5    Q.    Was that your only job prior to your

6    termination that led you to this case?  Going back in

7    time, you were terminated in 2004.  Was this your first

8    real job?

9    A.    No.  I worked -- it was M Bank U.S.A.

10   Q.    In what position?

11   A.    I did credit verification.

12   Q.    Why did you leave that position?

13   A.    To go to The News Journal.

14   Q.    Why would you want to go to a new job?  Why did

15   you want to go to a new job at that time?

16   A.    News Journal was a job that I always dreamed

17   I'd have.  Always a place I wanted to work.

18   Q.    Better pay, better benefits?

19   A.    None of the above.  Always heard good things

20   about The News Journal.  Always a place I wanted to work.

21   Q.    Do you have any children?

22   A.    I have two children.

23   Q.    What are their ages?

24   A.    Twenty-six and thirty.

Vernette Walker

9

1    Q.    Your grandson, though, lives with you in the

2    house?

3    A.    Yes, he lives with me in the house all the

4    time.

5    Q.    Is your current address still 29 Richard Road?

6    A.    Yes.

7    Q.    How long have you lived there?

8    A.    Fifteen years.

9    Q.    Are you working currently today?

10   A.    No.

11   Q.    Do you recall starting at The News Journal in

12   February of 1996?

13   A.    No.  I started at The News Journal

14   December 1987 part-time.

15   Q.    I apologize.  I looked at the wrong sheet.

16   Yes.  I'm sorry.  Can you repeat the date again?

17   A.    I started part-time in December of 1987.

18   Q.    In what position?

19   A.    Advertising.

20   Q.    What were your job duties?

21   A.    Solicit customers to sell ads.

22   Q.    Did you like that position?

23   A.    Loved it.

24   Q.    How long did you remain in that position?

Vernette Walker

10

1      A.    That I can't remember.  It's been so long.  But

2   I did get several promotions.

3      Q.    At one point you became a full-time employee?

4      A.    Yes.

5      Q.    Does June 13, 1988, seem possible as the date

6   you were hired full-time as an input outside sales rep at

7   $275 a week?

8      A.    Possible, but I'm not sure.  It's been so long.

9   It's been many, many years.

10     Q.    You would have no reason to doubt The News

11  Journal's records on when you were hired and when you

12  were promoted?

13     A.    I do not doubt that.

14     Q.    You indicate that you received several

15  promotions down the way?

16     A.    Yes.

17     Q.    In terms of position or just salary?

18     A.    Both.

19     Q.    Do you recall when you were transferred to the

20  finance department?

21     A.    I want to say maybe February of 2000.  No, I'm

22  sorry.  Maybe 2001.

23     Q.    I have a date of February 12, 2001.

24     A.    That sounds correct.



11

1    Q.    Why did you move from advertising to finance?

2    A.    Because I was injured on the job.  Moving to

3    the finance department was also something I always wanted

4    to do and I could work pretty much at my own pace, making

5    my goals and working with customers.

6    Q.    Was the advertising position a job in which you

7    had to go out and travel and meet the customers?

8    A.    No.

9    Q.    How was it different that it allowed you to

10   work with an injury?

11   A.    In advertising at that last level before I

12   moved, it was a position of originally four people and it

13   was down to just myself doing the job of four people.  So

14   my injuries -- it was becoming a lot more stressful for

15   me.  To avoid going back out on injuries, I chose to

16   promote to something that would balance me and keep me on

17   the job.

18   Q.    Did you like your job in finance?

19   A.    I loved it.

20   Q.    Your position was a credit assistant position?

21   A.    Credit clerk.

22   Q.    I think the documents indicated several times

23   credit assistant or credit clerk, but it's basically the

24   same position?

Vernette Walker

12

1    A.    I really don't know.  I just know I did retail

2    advertising, collections on delinquent accounts.

3    Q.    Who was your first boss?

4    A.    Nick Choruzy.

5    Q.    Did you have any problems with Nick?

6    A.    Not at all.

7    Q.    Did Shelly take over after Nick left?

8    A.    Yes.

9    Q.    Were you aware when you were hired that you

10   were hired as an at-will employee, meaning you could

11   leave at any time and The News Journal could fire you at

12   any time?

13   A.    No.

14   Q.    Did you come to learn that at some point?

15   A.    Now as I'm going through this process.

16   Q.    Shelly was new to The News Journal?

17   A.    Yes.

18   Q.    Is it fair to say that you helped her get

19   situated with The News Journal's processes and systems in

20   the departments since you had been there a while?

21   A.    Yes.

22   Q.    Did you two have a good working relationship?

23   A.    Yes.

24   Q.    Did you respect her?

Vernette Walker

13

```
1    A.    Yes.

2    Q.    Did she seem to respect you?

3    A.    Yes.

4    Q.    Did she appear to know what she was doing in

5    terms of managing the department?

6    A.    No.

7    Q.    Because it was a new position?

8    A.    I can't answer that.

9    Q.    Did it impact your job in any way?

10   A.    Just caused more work, but not as far as my

11   duties, no, not at all, because I had knowledge of my

12   duties.

13   Q.    Can you tell me what you were doing back in

14   April of 2004 prior to the car accident?  Can you

15   describe what a typical day would be working in the

16   finance department as a credit clerk?

17   A.    I would come in in the morning, I would get my

18   call sheets, call customers who had past-due balances or

19   customers who had discrepancies, something to resolve the

20   discrepancies, do reconciliations where there was a

21   customer who felt they paid money, we had to find that

22   money to see if it was either misposted or not received.

23   Had to prepare reports for monthly meetings to say why a

24   customer didn't pay or why there's a discrepancy, and we
```

Vernette Walker

17

1    Q.    So spreadsheets that were created by someone
2    else that you would be inputting?
3    A.    No, I'm sorry.  Spreadsheets are something
4    that, once Shelly came, we learned ourselves to create
5    spreadsheets because that was another duty that she
6    imposed on us.  So we had to learn to do spreadsheets.
7    Q.    You now have that skill?
8    A.    No.  I just knew how to do it at The News
9    Journal.
10   Q.    Was the majority of your job sitting?
11   A.    Yes.
12   Q.    Were you able to walk around and take breaks?
13   A.    Yes.
14   Q.    Go to the bathroom when needed?
15   A.    Yes.
16   Q.    Based on your 1999 workers' comp. injury, did
17   that require you to have any special desk equipment, any
18   special stools?
19   A.    I had to get a chair.  I had to get the plastic
20   floor mat to slide back and forth, headset.
21   Q.    Did The News Journal provide that to you?
22   A.    Yes.
23   Q.    Did you request that from them?
24   A.    Yes.

Vernette Walker

23

1   the credit position, is that a job that could have been

2   done from home?

3       A.    I believe so.  Well, I have to say part of it,

4   but not the reconciliation or discrepancies.  That part

5   could not be done because there were files that I would

6   not have had access to.

7       Q.    Is it fair to say that you could have made

8   phone calls at home?

9       A.    Yes.

10      Q.    But when the customer told you information, you

11  would have no way to verify it without being at work?

12      A.    Right.

13      Q.    What about entry into the system of notes,

14  etcetera, could that be something done from home?

15      A.    Considering I had the proper programs, yes.

16      Q.    Did you interact with your colleagues on a

17  daily basis?

18      A.    Yes.

19      Q.    Did you need information that your colleagues

20  had in order to do the job?

21      A.    I needed their assistance to answer some of the

22  questions, yes.

23      Q.    Did you have internal meetings in your

24  department?

Vernette Walker

24

1    A.    Yes.

2    Q.    How often?

3    A.    I don't recall.  Maybe once every so often,

4  because I recall that being part of my evaluation.  I

5  felt we needed more meetings.

6    Q.    For the purpose of what?

7    A.    Of coworkers and us interacting as far as

8  helping each other, knowing each other's jobs and how we

9  could pretty much help each other more.

10   Q.    To make processes more efficient, for example?

11   A.    Right.

12   Q.    You mentioned that you had had the workers'

13  comp. injury in 1999.  At that point was that covered by

14  workers' compensation benefits as to your wages?

15   A.    Yes.

16   Q.    Did The News Journal pick up the difference in

17  terms of short-term disability coverage?

18   A.    Yes.

19   Q.    You were paid 100 percent during that time?

20   A.    I believe so.

21   Q.    During that leave you missed some time from

22  that injury, correct?

23   A.    Yes.

24   Q.    Did anyone pressure you to return to work?

**W&F**

WILCOX & FETZER LTD.
Registered Professional Reporters

Vernette Walker

26

1      Q.    Who was the previous person in her position?

2      A.    I can't remember his name.  I can't remember

3  his name.

4      Q.    Would that have been Ann Hines's boss?

5      A.    I have no idea.

6      Q.    When was the first time you met Ann?

7      A.    I met Ann -- I know I met her back in '99 when

8  I was injured, because I went down to do my reports, but

9  I can't recall prior to that.

10     Q.    In 1999 did you and Ann have an

11  average-to-above-average working relationship?

12     A.    I never had to work with Ann, but we would

13  speak and had a good rapport passing in the hallway, yes.

14     Q.    A good relationship at work, although your job

15  duties didn't overlap?

16     A.    Right.

17     Q.    She was your contact person in HR for benefits?

18     A.    Yes.

19     Q.    Do you know who Eric Walburn is?

20     A.    He would have been the finance director.

21     Q.    Shelly's boss?

22     A.    Yes.

23     Q.    Do you recall that he was replaced at some

24  point?

**W&F**

Vernette Walker

34

1   Q.    Were you taken by ambulance to the hospital?

2   A.    Yes.

3   Q.    Were you conscious?

4   A.    Yes.

5   Q.    In pain?

6   A.    Yes.

7   Q.    Was your car totaled?

8   A.    Yes.

9   Q.    How did The News Journal come to find out about

10  your accident, if you know?

11  A.    I don't know.

12  Q.    Did you ever ask the police to call Shelly?

13  A.    Yes.  I'm sorry.  Yes.

14  Q.    You gave the police Shelly's number?

15  A.    Yes.

16  Q.    What did you ask them to tell her, if you

17  remember?

18  A.    I was in an accident.

19  Q.    Did Shelly come to the hospital?

20  A.    Yes.

21  Q.    Were you okay with her showing up at the

22  hospital?

23  A.    Originally, yes.

24  Q.    You say "originally."  Did something change?

Vernette Walker

35

1    A.    It did change.  Once I had a conversation with
2   Shelly and the things that she was saying to me, "When I
3   saw you at the hospital, there didn't appear to be
4   anything wrong with you.  The doctors don't care about
5   you.  You're not being aggressive."
6    Q.    Let's wait.  I have heard those allegations
7   before.  We will get to those.  I want to explore those.
8   At that point at the hospital did she do or say anything
9   at that hospital on 4/27?
10   A.    No.
11   Q.    Did she appear kind and concerned?
12   A.    Yes.
13   Q.    Did she stay with you until your family members
14  arrived?
15   A.    No.  She stayed for a while and then I gave
16  her -- I think I gave her -- I went through my purse
17  because I could only remember her number at the time.  I
18  believe I gave her my fiance's number and she called him
19  and then she left and he came.  Or was she there when he
20  arrived?  I think she may have been.  I don't recall.  I
21  think she may have been.
22   Q.    While you were on your leave of absence that
23  stemmed from that car accident, did you talk with anyone
24  at work?

**W&F**

36

1    A.    Yes.

2    Q.    Let's exclude Shelly and Ann for a moment.  Did

3    you talk to any coworkers?

4    A.    Yes.

5    Q.    Who were you talking with?

6    A.    I talked with one of my coworkers, Joan Raser.

7    I'm not certain what her last name would be now.  I

8    believe she was Shazor when I was there.

9    Q.    Anyone else?

10    A.    I may have talked to Cheryl Drummond once.  I

11    may have talked to both of them maybe or twice, which was

12    basically returning calls to Shelly or calling Shelly to

13    update.  When I didn't get Shelly, I would call one of

14    them to get to Shelly.

15    Q.    These individuals weren't your friends outside

16    of work?

17    A.    No.  I had no friends at work.  Outside of work

18    when the work was done, I was done.

19    Q.    Let me back up.  Sorry.  You were admitted to

20    the hospital that night?

21    A.    No.

22    Q.    You were released then?

23    A.    Yes.

24    Q.    What was the next step you took in order to

Vernette Walker

37

1   make The News Journal aware of the accident?

2       A.    Of course, the next morning I called

3   Shelly Rumpf to let her know I wouldn't be there.  From

4   that point I received paperwork from Ann.

5       Q.    In the beginning you didn't talk to Ann

6   directly?

7       A.    No.

8       Q.    You were just communicating with Shelly --

9       A.    Yes.

10      Q.    -- your symptoms in the beginning?

11      A.    It's hard to say, because I was already in

12  pain, so I really -- just major more of a pain on what I

13  had.

14      Q.    In what locations of the body?

15      A.    My neck and my back.

16      Q.    Upper or lower back?

17      A.    Lower.  I did have a little in the upper.

18      Q.    There were no broken bones?

19      A.    No.

20      Q.    With impact did the airbags inflate?

21      A.    No.

22      Q.    How are your symptoms different today?

23      A.    Well, I'm treating.  I'm taking care of myself.

24  So it's not as -- I don't get the spasms as tough and

Vernette Walker

39

1      Q.    Are they similar today as they were in 2004

2  prior to the car accident?

3      A.    I believe so.  Maybe a little better.  Not

4  much, but a little better.

5      Q.    How long have you had this improvement?

6      A.    It's hard to answer that because I may have a

7  good couple days and then I may have just a bad week.

8  But it varies.

9      Q.    Generally, could you estimate a time when the

10  improvement has become more good days than bad days?

11      A.    No.

12      Q.    Are you at a point where you're having more

13  good days than bad days?

14      A.    Balanced.

15      Q.    In July 2004 did you believe that you would be

16  able to come to work soon?

17      A.    Yes.

18      Q.    Did you communicate that to Shelly at some

19  point?

20      A.    Yes, I did.

21      Q.    Can you tell me what you said to her and how

22  the conversation occurred?

23      A.    Actually, I believe it may have been in June

24  that I may have communicated that to Shelly, because in

Vernette Walker

45

1    Q.    There was a five-day elimination period before

2    STD would start, correct?

3    A.    Yes.

4    Q.    In total there was a 26-week period of time?

5    A.    Yes.

6    Q.    You saw in the letter that "The duration of

7    benefits is solely based on medical information, and

8    periodic updates will be requested"?

9    A.    Uh-huh.

10    Q.    And then in the last paragraph you were also

11    told that your sick days and short-term disability would

12    run continuous with your FMLA from the first day.

13    A.    Yes.

14    Q.    And attached to that letter did you receive the

15    Gannett income protection plan?

16    A.    Yes.

17    Q.    You would agree with me that the income

18    protection plan discusses sick pay, short-term

19    disability, and long-term disability?

20    A.    Yes.

21    Q.    Did you read this document at that time?

22    A.    Yes.

23    Q.    The cover letter basically summarized what was

24    inside in more detail the short-term disability plan,

1    correct?

2        A.    Yes.

3        Q.    Did you see towards the bottom of page 2 that

4    it says, "At its discretion, the Company may require

5    proof of illness either in written form from your

6    personal physician or through an examination by a

7    company-selected physician, before payments under this

8    plan are authorized"?

9        A.    Yes.

10       Q.    Are you aware also that the plan requires that

11   your doctor indicate the nature of your condition,

12   illness, or injury and the length of time you're expected

13   to be absent from work?  And that's up at the top of the

14   second page.

15       A.    Yes.

16       Q.    And continuing with the next sentence, that the

17   plan also requires that short-term disability will

18   continue until you are medically fit to return to work.

19   "A physical exam or periodic reports from your attending

20   physician may be requested in order to commence or

21   continue payment of benefits."

22       A.    Yes.

23       Q.    Did you calculate in your mind or on a calendar

24   how long your 26 weeks would last?

1    accident.  I understood you correctly a few minutes ago

2    you understood that a family leave policy was in effect;

3    you just didn't know the exact terms of that?

4        A.    Right.

5        Q.    Were you aware that it provided basic job

6    protection for 12 weeks?

7        A.    No.

8        Q.    Did you come to find that out later through

9    another letter from Ann?

10       A.    Yes.

11       Q.    You would agree with me that you were given

12   12 weeks of job protection?

13       A.    Yes.

14       Q.    And that this claim in no way is an FMLA claim

15   that you filed?  You filed this claim as a discrimination

16   claim, not as an FMLA claim, correct?

17       A.    Yes.

18            MS. JAUFFRET:  Mark this as the next

19   exhibit, please.

20            (Walker Deposition Exhibit No. 4 was marked

21   for identification.)

22   BY MS. JAUFFRET:

23       Q.    Ms. Walker, I'm showing you Walker Exhibit 4,

24   which is another excerpt from the handbook in effect at

Vernette Walker

57

1   anyone at The News Journal was harassing you?

2        A.    Did I report to --

3        Q.    Anyone at The News Journal.

4        A.    No.

5        Q.    Why not?

6        A.    While I was on the job?

7        Q.    I know you told me before everything was fine

8   before you got in your car accident.

9        A.    Okay.

10       Q.    There would have been nothing to report,

11   correct?

12       A.    Right, correct.

13       Q.    At some point I know you made allegations of

14   harassment and discrimination.

15       A.    Correct.

16       Q.    That's why we're here today.

17       A.    Correct.

18       Q.    Before we get into the actual allegations, I

19   meant to ask:  Did you ever call anyone at The News

20   Journal to say, listen, I think I'm being harassed or

21   discriminated against, and you told me no.  So I asked

22   you why.

23       A.    No, because my only contact person at The News

24   Journal that I spoke with was Ann.  So I can't call

Vernette Walker

67

1    Q.    It's okay to ask her to verify she received it?

2    A.    Right.    The July 1st which stated they were

3    going to fill my position, that one I can almost say I do

4    believe he spoke with her because he said she told him

5    that letter was just procedure; I have until October 20th

6    to come back and hit 26 weeks.  I spoke to Ann and Ann

7    stated the same exact thing to me.  So that's another

8    reason why I felt I had 26 weeks.

9    Q.    And then you said there was a third time he

10   supposedly called Ann on August 30th?

11   A.    That's when I actually received the letter that

12   my job benefits and everything ceased.  So he stated he

13   called Ann then because Ann knew I was having a procedure

14   on the 30th.  She approved it.  So he spoke with Ann

15   then, and he said Ann requested a HIPAA form from him

16   which he faxed to her.

17   Q.    So after you were terminated, Ann's requesting

18   a HIPAA form from you?

19   A.    According to the attorney.  Which would have

20   been August 31st because that's the day I received the

21   letter between my door.

22   Q.    What would have been the point of getting the

23   HIPAA form?

24   A.    I don't know.  I have no idea.  The only thing

Vernette Walker

77

1    other administrative claims against anyone?

2        A.    No.

3        Q.    Other than the workers' comp. case through The

4    News Journal regarding that accident in '99, do you have

5    any other workers' comp. claims out there?

6        A.    No.

7        Q.    No other employers?

8        A.    No.

9        Q.    There was only one accident injury date?

10       A.    Yes.

11       Q.    You have never commuted out your IAB award

12   where you -- there had been letters sent to you from

13   Young Conaway asking you to commute the claim.  Have you

14   ever agreed to one lump sum to satisfy everything?

15       A.    No.

16       Q.    You did receive a permanency award at one

17   point?

18       A.    Yes.

19       Q.    What relief are you looking for in this

20   lawsuit?

21       A.    Well, for one, I think -- of course, I guess at

22   this point I can't have my job back.  That would be

23   first.  I would love that.  At least my short-term that I

24   was due.  I was due like four weeks' vacation.  I guess I

Vernette Walker

81

1   have sick days left to cover that?

2       A.    Yes.

3       Q.    When you said some type of retirement package,

4   why do you believe that you would be entitled to a

5   retirement package?

6       A.    If I wasn't terminated, I would be there to

7   work to retire.

8                (Walker Deposition Exhibit No. 8 was marked

9   for identification.)

10  BY MS. JAUFFRET:

11      Q.    Do you recall receiving this letter dated

12  May 13th, 2004?

13      A.    Yes.

14      Q.    This had a claim for disability form attached?

15      A.    Yes.

16      Q.    You had your doctor to complete that form?

17      A.    Yes.

18      Q.    Did you and Ann talk at any time in regards to

19  this form?

20      A.    No.

21      Q.    Before we go any further, we're up into the

22  point of May 13th, 2004.  Who, if anyone, have you talked

23  to at The News Journal?  I know you said you talked to

24  Shelly at the hospital and one time you called her.  From

Vernette Walker

86

1    Dr. Chang.

2        Q.    Was Dr. Chang in the same practice?

3        A.    Yes.

4        Q.    This form was completed by Dr. Sternberg on

5    May 19th, 2004, correct?

6        A.    Yes, according to his signature and date.

7        Q.    Do you remember when you turned it into the

8    company?

9        A.    Normally I send everything the same day.  So if

10    he did this on the 19th and gave it back to me, then it

11    would have been given to Ann on the 19th or the 20th at

12    the latest.

13        Q.    Looking at the second page, it says, "Dates of

14    Treatment," under "c.," "Frequency of Treatment."  On the

15    right-hand side he makes a note.  Do you understand what

16    he's saying there?

17        A.    Three weeks something.

18        Q.    You don't know what that says either?

19        A.    No.

20        Q.    At the top of the page you're in agreement that

21    your diagnosis at that time was a cervical lumbosacral

22    sprain or strain?

23        A.    Yes.

24        Q.    In the nature of treatment, do you know what

Vernette Walker

95

1    temp. worker, had put in her last day.  She just

2    basically at that point I guess asked me how I was doing

3    and when I thought I was coming back.  I believe that may

4    be in this particular call.

5        Q.    How did you respond?

6        A.    I'm sorry to hear that they were leaving and I

7    know with that one coworker leaving, it would be pressure

8    on the department, that type of thing, which again sinks

9    into me because I feel for the coworkers.  It affected me

10   mentally and I just apologized that I was out.  And as

11   far as Eric, that didn't really touch me too much.  I

12   believe that was it.

13       Q.    Did you give any indication to Shelly that you

14   were doing better?

15       A.    I did.

16       Q.    This was the call when you thought the

17   injections might be helpful?

18       A.    Yes, I believe so.

19       Q.    Did you give her an estimated return-to-work

20   date?

21       A.    No.

22       Q.    What about even an estimated return to month?

23       A.    No.  I just gave her hope.  Like I said, I hope

24   I can come back next month, I hope I can wake up to a

Vernette Walker

103

1    which I believe was August 17th or 18th.

2        Q.    At that point was it a hostile or disturbing

3    call?

4        A.    For me?  Yes, because I went through the

5    injections and they were working, but I was at this time

6    medicated, so I'm just groggy.  It may have just been me

7    groggy myself I will say.

8        Q.    How long did the conversations last, like this

9    one, for example?

10       A.    Not even five minutes.

11       Q.    What was the longest you have ever talked to

12   Ann on the phone?

13       A.    I think when we discussed my position being

14   filled.

15       Q.    How long was that conversation?

16       A.    I don't recall, so I don't want to make a wrong

17   guess.

18       Q.    Less than half an hour?

19       A.    Oh, yes.

20       Q.    Less than 15 minutes?

21       A.    Yes.  I have never been on the phone with Ann I

22   don't believe longer than 10 minutes, if 10 ever.

23       Q.    What about Shelly, how long would you talk with

24   Shelly?

Vernette Walker

104

1    A.    I give that about a half-hour.

2    Q.    All the time?

3    A.    No.  Just that one call.  The other calls

4    lasted under ten -- under seven minutes, ten minutes.

5    Q.    Did Ann ever discuss anything with you on these

6    calls other than benefit-related issues?

7    A.    No, none other than allowing me to know that I

8    had the 26 weeks and it was okay to have my procedure

9    done on August 30th.

10   Q.    Always conversations regarding your benefits or

11   work issues?

12   A.    Yes.

13   Q.    Leave issues I should say.

14   A.    Yes.

15   Q.    You end the call with Ann, reminding her that

16   your medical records would be ready by the 17th.  What

17   then happens?

18   A.    I believe she called back on the 15th or 16th

19   again requesting the medical records and I reminded her

20   again they would be ready on the 17th or the 18th,

21   whatever day my next appointment was.

22   Q.    Did she say anything more about this IME up

23   until this point in time?

24   A.    I believe so.  In one of the other

106

1    Q.    Then Dr. Chang for the injections?

2    A.    Yes.

3    Q.    Did you see anyone else in that group?

4    A.    I saw quite a few.  I'm trying to remember,

5  though -- are we speaking '99 or after 2004?

6    Q.    In this 2004 time frame during this summer.

7    A.    I don't think so.

8    Q.    After dropping off the records, is the DME

9  scheduled?

10    A.    Yes.

11    Q.    Who tells you about it?

12    A.    Ann Hines called me.

13    Q.    She gave you the address and location?

14    A.    Yes.

15    Q.    Was that date changed at some point?

16    A.    No.

17    Q.    You went on the 23rd?

18    A.    Yes.

19    Q.    It was at Concentra Medical Center?

20    A.    Yes.

21    Q.    Did Ann give you any specific directions of

22  anything you needed to bring or do or be prepared for

23  during that exam?

24    A.    No.  She gave me directions only.

1    position and added some additional information.

2        A.    Right.  But my name is nowhere added.  So I

3    find this to be inappropriate for a doctor to give me a

4    physical.  This is what they sent to Linda Surdo.

5        Q.    Why do you think it's inappropriate if you

6    really do all of what's here?

7        A.    Because at the time my exam was August 23rd.

8    As of July 20th of 2004, this position of mine was

9    supposedly filled and I was offered no other position.

10   So I have no idea if this is what I was going to be doing

11   on the 30th or not.

12       Q.    I thought that you testified that Ann said you

13   have up to 26 weeks?

14       A.    That is correct.  That is correct.  But I'm

15   just going based on the letters that were sent.  That

16   26 weeks did not say as a credit clerk.  She just told me

17   I have nothing to worry about; I just have 26 weeks.

18       Q.    If Shelly needed you in this position when you

19   returned to work, is this what you would have been doing?

20   This is a fair representation of what you were doing at

21   the time of the accident?

22       A.    Collection of retail display advertising.  Yes.

23       Q.    Looking at that last page where it talks about

24   percentage of time, is it fair to say that you stood

Vernette Walker

113

1    A.    The position was open about six months where

2    the previous person did the retail collection.  I can't

3    recall what happened with her.  I don't know if she left

4    or -- I really don't remember.

5    Q.    But you did post for the job?

6    A.    I did.

7    Q.    Did you originally go back into advertising?

8    A.    Yes.

9    Q.    You mentioned that at your station you got a

10   new headset, a new chair, etcetera.  Was that in the

11   advertising position?

12   A.    Yes.

13   Q.    Were those accommodations moved forward to the

14   finance position?

15   A.    Yes.  They were taken with me.

16          (Walker Deposition Exhibit No. 14 was

17   marked for identification.)

18   BY MS. JAUFFRET:

19   Q.    I'm handing you what has been marked

20   Exhibit 14.  Did you ever make the company aware of this

21   note?

22   A.    Yes.

23   Q.    As of August 11th, 2004, your doctor was saying

24   once again that you would be out for another four weeks

**W&F**

Vernette Walker

117

1    experience, bending forward, bend back, none of that.

2        Q.    Did she ask you to walk?

3        A.    No.

4        Q.    Were you able to walk into the exam that day?

5        A.    Yes.

6        Q.    Were you driving at that point?

7        A.    Yes.

8        Q.    Was it more comfortable to lay down or sit?

9        A.    It varies.  I could lay down, sit.  Everything

10   was just uncomfortable.

11       Q.    Is standing more comfortable?

12       A.    No.  I just maneuver.  I lay down a while,

13   stand a while.

14       Q.    You need to keep rotating positions?

15       A.    Yes.  Thank you.

16             I'm trying to remember if she asked me to

17   walk.  I think maybe when she first came in.  I don't

18   remember that part.

19       Q.    Did she ask you about your job and what you did

20   every day?

21       A.    Yes.

22       Q.    Did she ask you about the accident?

23       A.    I believe so.

24       Q.    Did she ask you about your pain levels?

1    A.    No.

2    Q.    How did she end the appointment?

3    A.    Tell me to get dressed and wait out front.

4    Q.    When you got dressed and waited out front, what
5    happened then?

6    A.    I waited.  She gave some paperwork to one of
7    the girls that sit in the front.  And then at that point
8    I asked for a copy of that exam, which I was denied it,
9    and that was basically it.  I was just told the company
10   will get it and the company will contact me on a
11   return-to-work leave.

12   Q.    You were provided with something that day,
13   though, right?

14   A.    Yes.  That one page that says I can come back
15   to work.  Or I was able to return.

16                 (Walker Deposition Exhibit No. 15 was
17   marked for identification.)

18   BY MS. JAUFFRET:

19   Q.    Was she taking notes during your exam?

20   A.    No.

21   Q.    Were you ever provided with a copy of her
22   notes?

23   A.    No.

24   Q.    Were you ever provided with anything from

Vernette Walker

120

1   Dr. Surdo other than the document I have just laid in

2   front of you?

3       A.    No.   The only thing they gave me was

4   return-to-work evaluation.

5       Q.    That's Exhibit 15?

6       A.    Yes.

7       Q.    Concentra Return to Work Evaluation, you got

8   that that day on 8/23?

9       A.    Yes.

10      Q.    It says, "Patient may return to work on regular

11  activity without any restrictions."

12      A.    Yes.

13      Q.    Did you question that in any way?

14      A.    Yes.

15      Q.    Who did you question that of?

16      A.    The girl at the front desk when I asked for a

17  copy of everything and then I asked her what do I do with

18  this.  She said, "Well, that's your copy."

19            I said, "Do I go back now, tomorrow, next

20  week?  What do I do with this?"  And I also asked her can

21  I have a copy of my full records.

22            She says, "No one will get them."

23            I said, "What do I do with this?"

24            She said, "Well" -- when I asked about

1   I chose to end the call because my head started banging

2   and that's where we ended the call.

3       Q.    When you say you "rattled off," were you

4   actually yelling at her?

5       A.    I won't say yelling, but I was basically

6   telling her I'm here, I'm in pain.  I was hurt on that

7   job.  I went back to work.  If I'm going to fenagle, I

8   would have done it then.  Why would I do it now?  I love

9   my job.  For you to tell me there's nothing wrong with

10  me, this is ridiculous.  That type of rattling off.

11      Q.    What was her response, if any?

12      A.    She giggled.  She chuckled.  That part bothers

13  me.  So if I can just...

14      Q.    Up until this point in time she had seemed

15  sympathetic?

16      A.    I would say yes.

17      Q.    What do you think was the reason for the

18  change, if any, if you know, or if you can guess even?

19      A.    If you want me to assume, because I wasn't

20  released, because she actually said, "I didn't expect you

21  to be released past June."  She said, "Ann told me in

22  June I could fill your position, but I held it until

23  July 20th."

24              And I said, "Well, I thank you for doing

Vernette Walker

135

1    Q.    What were the things you would normally do?

2    A.    Garden.  I would normally plant flowers, cut my

3    grass, use the weed wacker.

4    Q.    After the accident you weren't able to?

5    A.    After the '99 accident I weren't able to.

6    Q.    Who takes care of your lawn?

7    A.    My cousin.  Up to a point my fiance was doing

8    it.  My daughter does it.  I had at one point hired

9    someone to do it until I could no longer afford it.

10   That's when the family members kicked in.

11   Q.    Do you like to bake?

12   A.    No.

13   Q.    Cook?

14   A.    I like to cook.

15   Q.    Are you able to cook for yourself now?

16   A.    With the help of my daughter, we both do it,

17   but I don't do big meals like I used to.

18   Q.    But if your daughter's at work, you can put

19   together a lunch for yourself?

20   A.    Yes.

21   Q.    In 2004 or that summer do you remember, was

22   your daughter living with you then?

23   A.    No, she wasn't living with me, but I couldn't

24   do it then.

Vernette Walker

137

1    Q.    What about exercise, do you exercise?

2    A.    No.  I just do my therapy.  Therapy exercises,

3  stretches, and that type of thing.

4    Q.    Have you ever been an exerciser?

5    A.    No.

6    Q.    Do you have a bike?

7    A.    No.

8    Q.    Shopping, are you a big shopper?

9    A.    No.

10    Q.    For grocery shopping, are you able to plan a

11  list?

12    A.    Yes.

13    Q.    Were you able to that summer make a list for

14  someone to go grocery shop for you?

15    A.    Actually, we don't need a list.  My household

16  is pretty much routine.  My daughter know from being

17  young what we want.  Everything is routine.  So there was

18  no list.

19    Q.    Were you able to grocery shop in '04?

20    A.    I did a little, yes.

21    Q.    Can you carry groceries?

22    A.    Yes.  Small bags.  Or light bags, I'm sorry.

23    Q.    That was that summer in '04 you were able to

24  carry some light bags?

Vernette Walker

139

1    Internet or games?

2        A.    In 2004 I just went to the computer to pay my

3    bills pretty much.

4        Q.    You're able to bathe yourself?

5        A.    Yes.

6        Q.    Do you shower or bathe?

7        A.    No, bathe.

8        Q.    Can you wash and style your own hair?

9        A.    No.

10       Q.    Is that because of a limitation or a

11   preference?

12       A.    Limitation.  Shoulder limitation.

13       Q.    How long has that been in effect?

14       A.    It was in effect when I had the pain, but after

15   that first surgery in 2001, I believe, I have always had

16   problems with that shoulder, the left shoulder.

17       Q.    On overhead activity?

18       A.    Yes.  Or just in general.

19       Q.    Your daughter was doing all the laundry?

20       A.    Yes.

21       Q.    She's been doing it since '99?

22       A.    She's been doing it since -- pretty much, yes,

23   because there comes a time when I didn't have laundry.

24   If I'm out on medical, I maybe have a set of pajamas.

1    Not even a full basket in a month and a half.

2        Q.    Before you were using dry-cleaning for work

3    clothes?

4        A.    No.  When I was working, then I could do pretty

5    much my own or she would come over and help me if I had

6    like jeans or heavy stuff, but I never had that much.

7        Q.    Do you own a car?

8        A.    Yes.

9        Q.    Who washes it and takes care of it?

10       A.    No one.

11       Q.    What about maintenance?

12       A.    As far as?

13       Q.    Oil changes, that type of thing.

14       A.    She will take it and get an oil change.

15       Q.    Is "she" your daughter?

16       A.    My daughter, yes, I'm sorry.

17       Q.    Were you ever in a position where you were not

18   able to drive?

19       A.    Yes.  After the 2004 accident for a period

20   there I couldn't drive.

21       Q.    Do you remember when you were released to start

22   returning to driving?

23       A.    I don't recall.

24       Q.    But we know by August you definitely were

Vernette Walker

141

1    driving again?

2        A.    Yes.

3        Q.    Can you go to the mall at Christiana Mall and

4    walk around and shop?

5        A.    I don't do it.  I haven't tried it, so I can't

6    answer that.

7        Q.    If you need to buy a birthday present, how do

8    you accomplish that?

9        A.    I haven't bought any.

10       Q.    Do you visit family or friends at their house?

11       A.    Recently I have been.

12       Q.    What about entertaining at your house?

13       A.    No.

14       Q.    You're a singer?  You can sing?

15       A.    Do I sing?  I do sing just playing around.

16       Q.    You don't go to karaoke?

17       A.    Oh, no.

18       Q.    Have you taken any vacations since 2004, since

19    the car accident?

20       A.    I have gone away, yes.

21       Q.    Where have you gone?

22       A.    I rode with my mother to -- with my daughter to

23    my mother's, which is in New York.

24       Q.    Did you drive there?

**W&F**

Vernette Walker

144

1  Q.   Are you able to walk up and down the stairs?

2  A.   I go up and down the stairs maybe once every

3  three or four months or so because that's the area for my

4  daughter.  So there's no reason for me to go up there.

5  Q.   Is it a matter of a physical limitation or you

6  just don't need to go up there?

7  A.   I really don't have the need to go up there.

8  Q.   Can you walk up and down stairs if you have do?

9  A.   Yes, I do believe I can go up and down.  It's

10  only maybe seven steps.

11  Q.   Can you read the newspaper?

12  A.   Yes.

13  Q.   Magazines?

14  A.   I don't read magazines, but I'm sure I can.

15  Q.   Can you watch TV?

16  A.   Yes.

17  Q.   Do you do crossword puzzles?

18  A.   No.

19  Q.   Read novels?

20  A.   No.

21  Q.   You wear glasses?

22  A.   When I read, yes.

23  Q.   For reading.

24       You're able to brush your own teeth and

1    Q.    From your tone, I can tell you're able to speak
2  and hear me?
3    A.    Yes.
4    Q.    And no slurred speech?
5    A.    Yes.
6    Q.    Do you have any loss of balance?
7    A.    Sometimes, but not often.
8    Q.    What do you do to correct that?
9    A.    Sit down.
10    Q.    It's a light-headedness?
11    A.    I don't know what it is.  Sometimes I feel like
12  make my equilibrium is off.  It's hard to explain it.
13  It's not something that happens all the time.  Like maybe
14  you walking and a little stagger.
15    Q.    You just sit down and it goes away and you
16  continue what you're doing?
17    A.    Yes.
18    Q.    Were you able to go to the bathroom regularly
19  in 2004?
20    A.    Yes.
21    Q.    In 2004 was there any kind of work you could do
22  that summer?
23    A.    I'm not sure, because I didn't have the
24  opportunity to try anything.  I think anything that would

Vernette Walker

147

1    limit me, I mean frequent breaks as needed or something

2    like that, I'm sure I could have been able to do

3    something.

4       Q.    On a full-time basis?

5       A.    I doubt that I could have did full-time.  Even,

6    like I said, part-time would have been difficult unless I

7    was allowed to do breaks as necessary or get up or

8    something as necessary.

9       Q.    Back in '04 as you started to recover that

10   summer, you might have been able to work on a part-time

11   basis if you were able to get up and move and change

12   positions frequently?

13      A.    Right.

14      Q.    Would you still have been able to do computer

15   and phone work?

16      A.    I don't know, because -- again, it depends on

17   where I would have been working or what I would have been

18   doing.  If it required me to just sit there and don't

19   move, then no.

20      Q.    If you're able to move, then would computer be

21   a problem.  If you could sit 10 minutes, move, 10 minutes

22   more --

23      A.    I think I may have been able to do that.

24      Q.    Having an actual headset on your head, would

Vernette Walker

148

1    that have bothered your physical condition in any way?

2        A.    I don't think so.

3        Q.    You mentioned that you applied for Social

4    Security.  When was that?

5        A.    '05, but I don't remember the exact month.

6        Q.    What prompted you to apply?

7        A.    Not being able to physically get out and work,

8    the injuries -- the injuries I had, the depression I was

9    suffering, knowing it would be difficult to take on a new

10   job with these injuries, having to go to doctors every

11   week, every month, I can't sit there, be trained and in

12   the middle of training five minutes I have to get up,

13   take a walk, because that would result in me being fired

14   again.

15       Q.    Did anyone tell you that or was that just your

16   belief?

17       A.    That was just my belief.  And then again, like

18   I said, in '05 physically I had a lack of treatment,

19   medications.  So it did cause a setback to my injuries.

20   So I did have more problems in '95 -- I'm sorry, in 2005.

21       Q.    In 2005 you had a lack of treatment?

22       A.    Yes.  Treatments and medicine.  As far as like

23   the injuries and those type of things that were helping

24   me, I wasn't getting those anymore.

Vernette Walker

149

```
1      Q.    Why was that?

2      A.    I guess the doctors weren't prescribing them.

3  I really don't know.  It's been so long.  That part I

4  can't remember.  It's almost like once the injections

5  stopped and then something else happened -- when my

6  benefits stopped, then I had to try to find doctors and

7  get my treatments started over.  By then I had a major

8  flare-up again.

9      Q.    Did you apply for any social assistance?

10     A.    Not then.  I don't think I did.

11     Q.    Did any doctor or any other person prompt you

12 or encourage you to apply for Social Security?

13     A.    In 2005 my doctor did.

14     Q.    Which doctor was that?

15     A.    King.

16     Q.    You were applying based on the depression?

17     A.    Plus my physical -- my neck, back injuries,

18 because at that point it flared up so bad that I was in a

19 major state.

20     Q.    Was it granted?

21     A.    I don't know.  It's pending.

22     Q.    It's still pending?

23     A.    Yes.

24     Q.    Who helped you file that, if anyone?
```

Vernette Walker

152

1   to work?

2      A.    I really don't know that they have.  I haven't

3   gotten an actual note because I didn't have a job to go

4   to.

5      Q.    Did any doctor testify at the hearing on your

6   behalf?

7      A.    No.

8      Q.    Did any doctor fill out paperwork on your

9   behalf?

10     A.    I don't know.  I'm sorry, at what hearing?

11     Q.    For Social Security.

12     A.    No.  There was no doctors there.

13     Q.    But did anybody file supporting statements and

14  medical records on your behalf?

15     A.    I don't know.

16     Q.    Do you have a copy of what you filed with

17  Social Security?

18     A.    No.

19     Q.    You didn't retain a copy?

20     A.    You mean from my attorney?  I know he gave me

21  something.  I have to see --

22     Q.    Even originally you filed with a friend.  Do

23  you have a copy of what you originally filed?

24     A.    I have to check, because like I said, I don't

Vernette Walker

157

1  that my benefits and my job, that was my limit, but I

2  knew anything other than that date, October 20th.

3    Q.    Assuming that you were still qualified for

4  those benefits?

5    A.    Right.

6    Q.    So you said you didn't know the date, but you

7  knew you were to return to work.  How did you know you

8  were supposed to return to work?

9    A.    At what point?

10    Q.    After August 23rd.

11    A.    I didn't.  I didn't know what day to return to

12  work.  I knew I had to return to work by October 20th of

13  2004.

14    Q.    Even though Concentra told you that they were

15  going to tell the company that you had to return to work?

16    A.    Yes, but Concentra also said that the company

17  is responsible for sending me a return-to-work date.

18  They can only say I can go back, but they don't know when

19  the company want me back because they don't know that.

20  The company knows that.

21    Q.    What type of medication were you on in the

22  month of August?

23    A.    I don't recall because I had been switched so

24  many times.

Vernette Walker

158

1    Q.    Were you taking narcotics that summer?

2    A.    I do not recall.

3    Q.    Could Ann have called you and you just don't

4    remember based on medicine?

5    A.    No.

6    Q.    How can you be so certain?

7    A.    Because when Ann -- I remember the

8    conversations that I had with Ann.

9    Q.    Did you ever tell Ann about your upcoming

10   injections?

11   A.    Yes.

12   Q.    When did that conversation take place?

13   A.    It took place the beginning of August when we

14   discussed my getting the medical records and then when

15   she was scheduling that appointment for me at Concentra

16   or wherever she was going to schedule it, because she

17   didn't mention Concentra at the beginning.  Then I

18   reminded her then of that appointment and then she did

19   say to me, "Thanks for reminding me of that," the

20   August 30th injection.

21   Q.    You have said on more than one occasion that

22   she approved you.  Was Ann approving your medical

23   treatments on a routine basis?

24   A.    No.  When I say Ann approved me, what I mean is

Vernette Walker

162

1    A.    No.  For what days?  On what date?

2    Q.    I'm asking.  Were you talking about times

3  during the day when you were getting injections or

4  anything like that?

5    A.    I think I may have to have been there 8:30.

6  I'm not sure.  I think I may have -- I think my

7  appointment may have been at 10:00.  I think I may have

8  to have been there like an hour ahead.  I can't remember.

9  I can't remember.

10    Q.    On 8/26 --

11    A.    I may have spoken to her on the 26th.

12    Q.    About your future injections?

13    A.    Right.

14    Q.    Do you recall Ann telling you that the company

15  could accommodate your treatments?

16    A.    Ann never said that to me.

17    Q.    Did you and Ann ever have any discussions about

18  your treatments interfering with returning to work?

19    A.    No.  That never came up.

20    Q.    Did you ever ask for an accommodation?

21    A.    No.

22    Q.    On 8/26 you know at this time that you had the

23  Concentra medical exam.  What, if anything, did you and

24  Ann talk about during this call about Concentra?

Vernette Walker

163

1      A.    I don't recall.  I'm trying to think.  I don't

2   recall -- I don't recall.  That's what I'm trying -- I

3   don't know if I'm confusing the 26th with the 18th when

4   we talked about the injections or was the 26th when we

5   talked about the injections, because at some point I know

6   we did talk about the time frame of me being there or

7   when I was supposed to be at the doctor for my

8   injections.  And we talked about -- what did we talk

9   about?  The time I was supposed to be there, the time I

10  was scheduled.  I don't recall if we talked about

11  Concentra, unless that's what, again, brought out the

12  fact that I was having them and that's why I said she

13  knew I was having the injections or approved the

14  injections.  However it went and never said to me, well,

15  no, if you don't be here on the 30th, you're not going to

16  have a job.  At no point was that ever said to me

17  throughout at any point when I discussed the 30th with

18  her.

19     Q.    So Ann may have said to you you should return

20  to work and you may have said to her, well, I have these

21  appointments --

22     A.    No.  Ann has never told me when to return to

23  work.

24     Q.    But you may have talked about Concentra and the

Vernette Walker

165

1   appointments.  Not other than the one I had on the 20th

2   and the 30th.

3       Q.    Do you recall talking with Dr. Fisher about

4   your return-to-work status after that?

5       A.    I recall telling Dr. Fisher I received that one

6   paper from Concentra and I told her I didn't know what to

7   do with it.  That's the only thing that I recall as far

8   as that.

9       Q.    Do you recall what her suggestion was?

10      A.    To call back to Concentra or call Ann, and I

11  called back to Concentra.  I don't think I called Ann

12  again at that point because I told her that Concentra had

13  already told me Ann would compile everything -- not Ann,

14  I'm sorry, The News Journal would compile everything and

15  send it to me.

16      Q.    Why would you call Concentra again when you

17  already knew that?

18      A.    Because they're the ones who gave me the

19  release.

20      Q.    Why didn't you call Ann?

21      A.    I just chose to call the person that gave me

22  the release.

23      Q.    Even though you already knew that they couldn't

24  tell you the exact date, they told you Ann would tell

Vernette Walker

167

1  It wasn't no set morning or afternoon -- you mean this

2  day?

3      Q.    Yes.

4      A.    I'm sorry.  I think that one may have been in

5  the afternoon.

6      Q.    When did you call Concentra that second time?

7  I'm sorry, the first time but after leaving the

8  appointment.

9      A.    I want to think maybe after I left there.  I

10  think.  But I'm not sure on that.

11      Q.    What I'm failing to understand is why you

12  didn't call Ann.  I don't know that you have really

13  answered that.

14      A.    I don't know.  I just called back to Concentra,

15  the ones who gave me the release and the one who would be

16  able to give me the answer as to what to do with that

17  form.  I just wanted to make sure that when I walked out

18  of there, that is what they said to me.  So I called them

19  back.

20      Q.    What did they say during that phone call,

21  Concentra that is?

22      A.    The same thing.  They don't tell you when to go

23  back.  They tell you if you can or cannot go, but it's up

24  to the company to say when.

Vernette Walker

168

1    Q.    Why not call Ann and say when and ask when?

2    A.    I was basically waiting on something from Ann

3  being the employer because that's basically what

4  Concentra told me.  Had I gotten the note from Ann to do

5  any of this, then I probably would have called Ann.  Or

6  if Ann said, call me, I would have called Ann.  I went

7  back to the source which I guess -- I don't know.

8    Q.    But based on her phone log, it appears you two

9  talked on 8/26.

10   A.    And that is very possible.  I do believe we did

11 talk on 8/26, but 8/24 I know I did not because that was

12 the day after the exam.  I didn't talk to Ann 8/24.

13   Q.    You could have returned to work on the 26th if

14 she told you to?

15   A.    Had Ann told me on the 26th, if you're not in

16 here today, you're going to be fired, I would have been

17 in the front door.  Crutches, wheelchair, one leg, I

18 would have been in the front door.

19   Q.    I know I asked you whether Ann ever said the

20 company could accommodate you and your treatment

21 schedule.  Did she ever use the words instead "the

22 company wants to work with you"?

23   A.    No.

24   Q.    Did you ever discuss with Ann how it might be

Vernette Walker

169

1   possible to schedule these appointments and still come in

2   to work in the meantime?

3       A.    No, because when I scheduled my appointments, I

4   wasn't going through this with Ann.  I had not been

5   scheduled for this appointment.  So these dates -- I

6   hadn't gone to the 23rd yet.  There was no reason for me

7   to ask her about these dates.

8       Q.    I'm saying when you're talking on the 26th.

9       A.    On the 26th --

10      Q.    Are you exploring ways in which you can return

11  to work?

12      A.    On the 26th we basically, like I said, talked

13  about, I believe, the 30th, which is where I reminded

14  her, Ann, I have the 30th -- I do believe that's what it

15  was.  Which again, if it was going to cause me to be

16  fired, I think again, like you're saying, why didn't I

17  call Ann.  If we talked on the 26th, the strongest

18  employee, quote, I think Ann could have recommended if

19  you're not in here on the 30th, you're fired.  On the

20  30th she put an overnight letter in my door that I was

21  fired.  From the 26th to the 30th was plenty enough time

22  to send me a letter, if you're not in here on the 30th,

23  you're fired.

24      Q.    But you agree with me you didn't try to come to

Vernette Walker

171

1   with it because she had plenty of opportunity to say, if

2   you're not in here by the 30th, you're fired.  If you're

3   not in here today, you're fired.

4        Q.    At any point after August 23rd did Ann ever

5   bring up that October date again?

6        A.    No.

7        Q.    So the last time she brought up the October

8   date, she was under the impression that you still were

9   unable to work?

10       A.    Yes.  Yes.

11       Q.    I know you said that you would have shown up to

12  work had you been told to return to work.  Could you

13  physically have done the essential functions of that job

14  description we talked about with or without an

15  accommodation as of the 24th?

16       A.    I believe I could have done them, yes.

17       Q.    At any point in time on the 26th did you ask

18  Ann for an extended leave of absence?

19       A.    No.

20       Q.    At any point in time during the call on the

21  26th, did you tell Ann anything to this effect:  Ann, I

22  don't understand how they return me to work; my own

23  doctor is saying I'm disabled?

24       A.    No.



Vernette Walker

172

1      Q.    There was no dispute about whether you should

2   or shouldn't return to work?

3      A.    No.

4      Q.    Did you ever try to appeal the company's

5   determination that you should return to work?

6      A.    I didn't know -- no, I didn't.

7      Q.    Did you ever appeal your termination directly

8   through the company?

9      A.    Directly?  No.  No.

10     Q.    You know who Curtis Riddle is.  In addition or

11  alternatively to going to the Department of Labor, why

12  didn't you just write him a letter saying, I think

13  something unfair happened?

14     A.    Because, again, I had the attorney, quote, I

15  listened to and he said he talked to Ann and Ann asked

16  for the HIPAA form.  Why I didn't call Ann or no one in

17  the company after that, I have no answer for you.  Maybe

18  I should have, but I don't know.

19     Q.    Why did you only sue Ann?  I know you sued The

20  News Journal, but as an individual defendant, why did you

21  pick Ann?

22     A.    Because Ann is the one I relied upon for all my

23  information, for all my benefits, to represent me

24  properly based on what I was eligible for, not eligible

Vernette Walker

177

1      A.    My daughter.

2      Q.    Are you able to contribute?

3      A.    No.  Not with the mortgage.

4      Q.    Let's talk about that termination letter.

5            (Walker Deposition Exhibit No. 16 was

6   marked for identification.)

7   BY MS. JAUFFRET:

8      Q.    I'm showing you what's been marked as

9   Exhibit 16.  It's a UPS next-day delivery letter dated

10  August 30th, 2004, to you from and signed by Ann Hines,

11  Benefits Manager.

12            When did you receive this letter?

13     A.    August 31st.

14     Q.    When do you get your mail?

15     A.    This was overnight between my door around

16  11:00 a.m.

17     Q.    11:00 a.m. that morning?

18     A.    Yes.

19     Q.    When did you call Ann that day?

20     A.    I called Ann about 9:30 that morning.  9:00 or

21  9:30.

22     Q.    When you got this letter, did you call her

23  back?

24     A.    I don't believe I did.

Vernette Walker

181

1      A.    Oh, yes.  I didn't know that's what she meant,

2   it still applied.  I thought she was basically repeating

3   what they said here.  I'm sorry, I think she did make

4   some type of statement that The News Journal did

5   recommend that she -- yes, I think she did put that in

6   there that The News Journal recommend that I contact them

7   or something.

8      Q.    I'm looking at that letter right now, the

9   letter to the Department of Labor by Ms. Cufflet dated

10  December 1st, 2004, indicating, "The company would like

11  to reiterate the charge.  She should contact the company

12  when she's ready to return to work so an assessment of

13  available position may be conducted to see if there are

14  any openings for which she is qualified."

15            After reading this letter, did you do

16  anything as a result?

17     A.    No.

18     Q.    Your testimony today is that you would be happy

19  to have a job back at The News Journal?

20     A.    I think I would, and after leaving out of here

21  on break, after this lunch and going out and thinking

22  about it, I just love working for the place.  I think I

23  would want to go back, but I don't know if it would be

24  wise for me -- you know what I mean -- to want to go back

Vernette Walker

186

1    A.    No.

2    Q.    Have you tried to start your own business?

3    A.    No.

4    Q.    What are your plans to start working again?

5    A.    Right now I'm going through a foot thing.  Once

6    my foot is healed, I'm going to go out and do a job

7    search.

8    Q.    Is this foot injury new?

9    A.    It's new, yes.

10   Q.    What happened?

11   A.    It's hereditary.  It's nothing that happened.

12   Q.    What steps have you taken up until this point

13   of finding employment?

14   A.    I haven't.  I talked to Ann on the 31st.  I did

15   call Wilmington Transportation once, but that's basically

16   all I have done.

17   Q.    When you called Wilmington Transportation, what

18   time frame was that?

19   A.    I believe that was somewhere in 2004-'5,

20   something like that.

21   Q.    What was your intent?

22   A.    Just to go there and hopefully I could sell the

23   tickets.

24   Q.    Were you offered an interview?

Vernette Walker

187

1    A.    No.  There was nothing available.

2    Q.    You weren't responding to an ad?

3    A.    No.

4    Q.    Do you get The News Journal?

5    A.    No.

6    Q.    Are you aware that The News Journal has hired

7    from time to time since you left?

8    A.    Through this paper that you have given me, but

9    I haven't really -- I don't purchase the newspaper.

10   Unless I'm at a doctor's office or something like that, I

11   don't see the paper.

12   Q.    Have you gone to any job fairs or engaged a

13   headhunter?

14   A.    Nothing.

15   Q.    Do you have a resume created?

16   A.    No.

17   Q.    Are you willing to relocate?  Are you

18   restricting your job search to the Delaware area?

19   A.    Possibly.  Possibly I would relocate.

20   Q.    Have you looked at ads on the Internet?

21   A.    No.

22   Q.    You have had no offers?

23   A.    No.

24             (Walker Deposition Exhibit No. 17 was

Vernette Walker

196

1    Q.    Did you ever file for unemployment?

2    A.    Yes.

3    Q.    At what point?

4    A.    I want to say December of '04 maybe.

5    Q.    Had you been returned to work?

6    A.    Only by company doctor.

7    Q.    What about your own doctor?

8    A.    No.

9    Q.    Were you able and willing to work then?

10    A.    I think I could have done something, but I just

11    couldn't -- and then I have to say I don't know.  I

12    really don't know.  Back then I really don't know.  I

13    know if -- if they told me I would have lost my job, I

14    would have made a way.  If it wasn't nothing but go there

15    and sit in front of that desk and pick up paper, I would

16    have been on that job.

17    Q.    For unemployment, at the time you were applying

18    for unemployment, would you have been able to do other

19    jobs?

20    A.    No.

21    Q.    Did you try to get jobs in order to satisfy the

22    unemployment requirements?

23    A.    No.

24    Q.    Who's providing for you currently?  You

Vernette Walker

198

Q.    Have you been on food stamps, Medicaid, and welfare -- why don't you tell me how long.

A.    I want to say maybe December of '06, I think. I think.

Q.    You applied for that after unemployment ran out?

A.    Yes.

Q.    Did you ever consider making a request for a personal leave of absence with The News Journal?

A.    I didn't feel the need to because I thought I had 26 weeks.

Q.    Do you believe anyone at the company was treated better than you in a similar situation?  Do you feel that anyone was treated better than you in a similar situation?

A.    The only thing I know, again it's hearsay, I know in other departments there was a person out for practically a year or more, quote, hearsay, for a domestic partner, not herself.  She was out to take care of someone else and came back to her job and all benefits.

        I know in my department two people went out on medical.  Temps were hired for both of them.  One of them never returned.  To this day I don't know why she

Vernette Walker

201

1  was fired they offered early retirement to some people.

2       Q.    Older individuals than yourself?

3       A.    I'm sorry?

4       Q.    Older individuals than yourself?

5       A.    Yes.  I do believe some were older, if not all.

6  But I'm not sure.

7       Q.    Did you end up getting your personal items from

8  The News Journal?  You mentioned they were left --

9       A.    On my porch?

10      Q.    Yes.

11      A.    Yes, I did get them and threw them out.

12      Q.    Did you say you threw them out?

13      A.    Yeah.  It was gone.  He packed it, the person

14  had it for a couple months, then it's on my porch.  I

15  don't know what was in that box.  I threw it out.  I

16  wasn't bringing it in my house.

17            MS. JAUFFRET:  If we could go off the

18  record.

19            (Discussion off the record.)

20  BY MS. JAUFFRET:

21      Q.    Who do you believe discriminated against you?

22      A.    Ann Hines and The News Journal.

23      Q.    Anyone else at The News Journal besides Ann?

24      A.    No.

Vernette Walker

202

1    Q.    That was based on your medical condition?

2    A.    Yes.

3    Q.    After you got that e-mail from, presumably, a

4 coworker in your mailbox, did you talk to any coworkers

5 since that point?

6    A.    No.

7    Q.    Do you feel your depression's improved?

8    A.    I think so.

9    Q.    What do you attribute that to?

10    A.    Attribute?  The improvement?

11    Q.    Has there been a reason for the improvement?

12    A.    I think I'm just learning to accept -- you know

13 what I mean, pretty much between the medication and

14 pretty much just accepting the fact that I can't do

15 anything about what has happened to me and what's going

16 on.  I'm kind of trying to learn to balance out more.  I

17 have talked to like psychologists, psychiatrists.  All of

18 that incorporated is helping me balance better.

19    Q.    Are you still receiving treatment from any

20 mental health professionals?

21    A.    Yes.

22    Q.    On an as-needed basis or routine?

23    A.    Pretty much routine.

24    Q.    What doctors are you seeing currently?

Vernette Walker

206

1    Q.    So you just went back to him?

2    A.    Yes.

3    Q.    When you last left Dr. Sternberg, he had still

4    not released you to return to work?

5    A.    No.

6    Q.    And Dr. Fisher, is it he or she?

7    A.    She.

8    Q.    She was not opining whether you could return to

9    work or not?

10   A.    No.

11   Q.    At some point in time you got help through

12   Community Legal Aid Society?

13   A.    Yes.

14   Q.    What led you there?

15   A.    My termination.

16   Q.    What were they helping you with?

17   A.    Denial of my short-term disability benefits.

18   Q.    They specifically told you they weren't helping

19   you with your employment discrimination charge?

20   A.    Yes.

21   Q.    What was their opinion as to the strength of

22   your ERISA case, your short-term disability case?

23   A.    I guess they repeatedly tried to get

24   information or request records and different things from

Vernette Walker

212

1    this office, because some of the dates on there are from

2    '02, '03.

3        Q.     The News Journal as a result of the workers'

4    comp. accident?

5        A.     Yes.

6        Q.     But not because of discrimination?

7        A.     Oh, no.

8        Q.     That's what I was trying to keep this case

9    focused on.

10       A.     I'm sorry.

11       Q.     That's okay.

12                   I have been asking questions before about

13   your doctor.  I want to come back to one thing.  We left

14   that Dr. Sternberg in '05 had not released you to work.

15   The records I have from Crain and King, you explained

16   that one's only treating for shoulder.  If he released

17   you for work, it was only as to the shoulder.  King, the

18   last record I had still was indicating in May that you

19   were totally disabled through July of this year.

20       A.     Yes.

21       Q.     Has that changed?

22       A.     No.

23                   (Walker Deposition Exhibit No. 22 was

24   marked for identification.)

Vernette Walker

213

BY MS. JAUFFRET:

    Q.    I'm showing you what has been marked as Walker Exhibit 22.  It's a copy of a complaint you filed in this action.

    A.    Yes.

    Q.    The last page is a right to sue letter.  It's called a "Dismissal and Notice of Rights."  It indicates it was mailed on December 5th, 2005.  Do you recall when you received that letter?

    A.    Somewhere within the December time frame.

    Q.    Are you aware that EEOC was adopting findings of the state department?

    A.    Yes.

    Q.    You're aware that the Delaware Department of Labor dismissed the case, finding no cause?

    A.    Yes.

    Q.    You list retaliation in your complaint.  What's the basis of the retaliation complaint here?

    A.    That was part of that -- basically I look at it when I -- I just went to my doctor for medical August 11th and 17th of 2004, and then seven days later the company sends me to their doctor because I guess my doctor wouldn't return me to work, so they send me to their doctor.  This was basically to retaliate against my

Vernette Walker

214

1   doctor.  We will send you here and we know we will get a

2   yes.

3        Q.     Turning to page 3 of the document, it says,

4   "Defendant's conduct is discriminatory with respect to

5   the following:"  There's a number of places to check and

6   you do not check race, color, sex, religion, national

7   origin, correct?

8        A.     Correct.

9        Q.     In the margin you write "age & disability"?

10       A.     Right.

11       Q.     We talked a lot about disability today.  What

12   is the basis for an age claim?

13       A.     Because I felt at the time I was old, 40 years

14   old.  I already had a preexisting history.  When you

15   combine my age and history, I'm basically a liability to

16   the company.

17       Q.     How old were you at the time of the car

18   accident?

19       A.     Forty-five.  I believe 45.

20       Q.     You mentioned there were some other people that

21   you believed were treated better than you.  I don't think

22   you named them by name.  Who were they?

23       A.     Melissa Govens was one that was out on medical.

24       Q.     How old was she?

Vernette Walker

216

1     Q.    Yes.

2     A.    Yes.  I was over 40 with a known disability.

3  So I just felt I was a liability to the company.

4     Q.    Did anyone ever make an age-related comment to

5  you?

6     A.    No.

7     Q.    Did anyone ever make a disability-related

8  comment, like a joke or something, harassing you about

9  your disability?

10     A.    While I was working?

11     Q.    While you were working or otherwise.

12     A.    While I was out on disability, the statements

13  that I made previously as far as Shelly Rumpf.

14     Q.    About not really being injured?

15     A.    Not being injured and comparing my injuries to

16  hers and her expectation of when I should be well and get

17  back to work, her expectations that all I need is a

18  three-day massage and I should be fine.

19     Q.    But no age comments?

20     A.    No.

21     Q.    At the Department of Labor you didn't claim age

22  in your charge, correct?

23     A.    No, I did not.

24     Q.    You didn't claim race, correct?

Vernette Walker

217

1    A.    I did not.

2    Q.    You're not pursuing a race claim?

3    A.    I am not.

4    Q.    This is your signature on the complaint?

5    A.    Yes, it is.

6    Q.    You're verifying everything in the complaint is

7    true and accurate?

8    A.    I am.

9    Q.    When you filled out this form, were you able to

10   perform the essential functioning of the job with or

11   without accommodation?

12   A.    Yes.

13   Q.    In March of 2006?

14   A.    Yes.

15   Q.    You believe that to be the case as well as in

16   September '06 when you filed your charge?

17   A.    Yes.

18   Q.    In October of '06 when you filed the subsequent

19   paperwork?

20   A.    Yes.

21            (Walker Deposition Exhibit No. 23 was

22   marked for identification.)

23   BY MS. JAUFFRET:

24   Q.    I'd like to show you what's been marked as

Vernette Walker

221

1    recommend in September, how is it effective August?

2        Q.    Isn't this the date, she's just verifying it?

3        A.    It says recommending manager.  I'm using that

4    to say she's the one who recommended this job

5    elimination, because it does say on here, "Reason, job

6    elimination."

7        Q.    Is this form something that you filled out in

8    your job duties at The News Journal?

9        A.    No.

10       Q.    You're not sure of how it's utilized?

11       A.    This form?

12       Q.    Yes.

13       A.    No.  This is the first I have seen this form

14   when I received it in the response from the counselor in

15   Virginia.

16       Q.    You believe Dolores, Shelly, and Ann had

17   something to do with your termination or your job

18   elimination?

19       A.    I can't say Ann because Ann's name is not on

20   here for the job elimination.  But Shelly, Dolores, and

21   the signature unknown is part of the job elimination.

22   Ann is who I received the job termination letter from.  I

23   can't include Ann as part of the elimination.  Her name

24   is not on here.

Vernette Walker

228

1    come to work?

2        A.    She said she did not tell me when to come back

3    to work, just "We wanted to know how you were doing.

4    Call us back when you feel better."

5        Q.    Other than what we have talked about today,

6    money from workers' comp. and money from your car

7    accident, have you received any other forms of income?

8    And from the state.

9        A.    I was going to say just the $123.

10       Q.    No. 8 asks when you have been medically cleared

11   to work and if so when and by whom.  You write

12   August 23rd, Dr. Surdo.  When did your doctor clear you

13   to return to work, if ever?

14       A.    To my knowledge, he hasn't.

15       Q.    None of your doctors have?

16       A.    Just Crain.

17       Q.    As to the shoulder only?

18       A.    Yes.

19       Q.    No. 6 says, " did attempt to talk to Ann Hines

20   August 31st." Were you unable to get through when you

21   called her?

22       A.    No.  I talked to Ann Hines on the 31st.

23       Q.    You write, "I did attempt to talk to Ann

24   Hines."  What did you mean by that?

Vernette Walker

238

1    Q.    Would you really equate that call by Shelly to

2    a rape?

3    A.    Yes, I would.

4    Q.    You also indicate that Ann provided you

5    deceptive information.  Is that anything different from

6    what you talked about today?

7    A.    No.

8    Q.    You indicate in a document you submitted to the

9    Department of Labor that you never received anything

10   denying you accommodation.  What accommodation request

11   did you make?

12   A.    My understanding from something that I read,

13   out of work is an accommodation.  I don't think, from

14   what I read, for illness of yourself or family member out

15   of work is an accommodation.

16   Q.    But you told me earlier that on August 31st you

17   did not ask for an extended leave of absence.

18   A.    I did not ask for one, but my doctor's note

19   that had me out of work pending seeing me four weeks

20   later, that note itself is what I'm -- you know what I

21   mean?  Relating to as far as accommodation for out of

22   work.

23   Q.    As of August 23rd did you turn in any new

24   information from your doctor, anything more up to date

Vernette Walker

240

1    could accommodate me and it was light duty, why didn't

2    they send that to my doctor or myself?  Maybe something

3    that my doctor may have known.  These are things that has

4    never been discussed on the job or no type of meeting or

5    training to say if you're out for beyond 12 weeks, this

6    is what you need to do.  We have never been in a meeting

7    to discuss with us how we handle our benefits.  So I

8    didn't know that.

9        Q.    You also indicated that a part-timer was hired

10   in the finance department as a credit clerk.  When was

11   that?

12       A.    My understanding, I believe that person was

13   hired maybe somewhere around end of December or January.

14   I think in the notes it is January.  That was the

15   part-time.  I think her name may have been Barbara

16   something.

17       Q.    What is the issue with that?

18       A.    They were downsizing.

19       Q.    This is six months later, correct?

20       A.    I'm going based on information I received in

21   December.

22       Q.    Had you applied for this position?

23       A.    No.  I didn't know about the position.

24       Q.    Part of this form is written in another