IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VERNETTE WALKER,       )
                       )
          Plaintiff,   )
                       )
    v                  )        Civil Action No. 06-138-MPT
                       )
THE NEWS JOURNAL and ANN )
HINES,                 )        **REDACTED - PUBLIC VERSION**
                       )
          Defendants   )

## AFFIDAVIT OF DOLORES PINTO

STATE OF DELAWARE    )
                     ) SS.
NEW CASTLE COUNTY    )

DOLORES PINTO does swear and affirm as follows:

1    I am an employee and the Vice President of Human Resources ("HR") for The News Journal ("The News Journal" or "Company")  I began employment with the Company on April 12, 2004

2    The Company is a publication and distribution company with its principal place of business at 950 Basin Road, New Castle, Delaware 19720   Currently, The News Journal employs approximately 700 employees in various departments, including, but not limited to, Information Technology ("IT"), Finance, Advertising, Human Resources, News and Production

3    As Vice President of HR, my job duties include the oversight and administration of the Company's policies and procedures, including, but not limited to, recruitment, retention, reduction in force, discipline, benefits, compensation, training and development, employee relations and diversity programs.  I am also responsible for ensuring that the Company's policies and procedures are consistent with local, state and federal law

RLF1-3207718-2

4      On or about August 16, 2004, I learned from Curtis Riddle ("Mr Riddle"), the publisher, that the Company needed to significantly cut expenses due to financial and budgetary pressure

5      The News Journal's Operating Committee ("OC"), comprised of the Vice Presidents of each functional area and other key managers, was asked by Mr Riddle on or about August 16, 2004 to identify areas, if any, within The News Journal where non-payroll and possibly payroll expenses could be reduced  (See Ex. A)  Additionally, Mr Riddle's August 16, 2004 email to the OC made clear that there was a hiring freeze on all open positions

6      Many department heads identified non-payroll areas where expenses could be reduced  Unfortunately, we still found that those savings would not be sufficient and we needed to lay off some employees company-wide in a reduction in force ("RIF")  On or about August 17, 2004, Mr Riddle asked me to evaluate possible staff reductions and to develop a proposed buyout plan targeting five or six positions  (See e-mail at Ex. B)

7      As Vice President of HR, I was responsible for providing details and proposing possible scenarios to Mr. Riddle that would accomplish the Company's goal of reducing the Company's payroll expenses  Mr Riddle, other department heads, VP/Finance Don Lemire and I met regularly in August to discuss payroll reductions and budget issues  It was a fluid process, and the prospective positions and individuals to be eliminated changed due to business needs and unexpected events, such as voluntary resignations

8      In connection with our plans to reduce payroll expenses, on or about August 20, Mr Riddle made handwritten notes during a meeting concerning which potential positions the company planned to freeze, eliminate and lay off  A copy of Mr. Riddle's handwritten notes is attached as Ex  C.  That list became our starting point as we looked at the jobs we had open in each area and those to whom we might offer a buyout and possibly involuntarily terminate  I had

-2-

RLF1-3207718-2

started a spreadsheet entitled "Proposed Cuts" to frame our initial earlier discussions  (Ex D).[1] The next version of that spreadsheet aligns my notes and data with Mr. Riddle's notes and the specifics of our discussion  (See Ex E)

9    For example, in connection with the proposed cuts, at one point, the Company planned to lay off ten employees company-wide; specifically, one employee in the Information Technology ("IT") Department, two employees in the Circulation Department, three employees in the News Department, two employees in the Finance Department, and two employees in the Advertising Department  Further, the Company planned to eliminate four positions company-wide; specifically, one position in the Human Resources Department, two positions in the Circulation Department, and one position in the Advertising Department  All but one of those positions was already vacant  Under the hiring freeze, those positions would simply not be filled   The Company also planned to offer buyouts to two employees in the Advertising Department, two employees in the Circulation Department, one employee in the IT Department, three employees in the News Department, and one employee in the Finance Department  (See Ex  E)

10    On or about August 20, 2004, and subsequent to my meeting with Mr. Riddle, the OC received an email from Mr. Riddle informing us that the Company's revenue projections for August 2004 did not look good

REDACTED

A copy of the email correspondence I received is attached as Ex. F

---

[1] Unfortunately, each version was not redated   However, to the best of my knowledge at this time, I believe I have ordered the versions attached hereto correctly

11    In regards to the Finance Department, the Credit Department had traditionally operated with a manager and four credit clerks  From the time of the initial discussions of which departments would lose staff and which specific jobs would be impacted, there was always a full-time credit clerk position on the list  In August 2004, when we decided that one full-time clerk position needed to be eliminated, there were four credit clerk positions, including Vernette Walker's ("Ms. Walker"), who was on leave, two other regular full-time employees, and one temporary full-time employee (Andrea Johnson)  We did not know when or if Ms Walker would return to work  Her return or failure to do so would impact which credit clerk position was eliminated  If Ms Walker was unable to return, her position would be eliminated  Conversely, if she could return to work, the position was hers

12    Earlier, before the RIF discussions began, on or about July 28, 2004, Ms. Ann Hines, former Benefits Manager (Ms Hines),[2] sent me an email (Ex. G) informing me that the doctors' notes Ms. Walker had been providing contained no diagnosis or prognosis for returning to work as required by our short-term disability policy  Given that Ms Walker had a "light duty" position, Ms. Hines suggested we get a second medical opinion  In early August 2004, Ms Hines followed-up and scheduled the return to work exam at Concentra Medical Center ("Concentra") on August 18, 2004 to take place on August 23, 2004

13    Thereafter, I learned from Ms Hines[3] that Ms Walker was released to return to work regular duty as of August 23, 2004 by Dr Surdo  Accordingly, we needed to know Ms Walker's return to work status and intentions  The second version of the "Proposed Cuts" spreadsheet (Ex E) contains my handwritten note in the top right-hand corner to "call Vernette."  That note indicates the need to determine whether or not Ms Walker would be returning to work

_____

[2] Ms Hines began employment with the Company on May 4, 1998 and retired in August 2007.

[3] Ms Hines was not involved in the RIF decision making process

in order for us to finalize our plans  A later version of the "Proposed Cuts" spreadsheet shows Ms. Walker's name crossed off and Ms. Johnson's name substituted in handwriting.  (See Ex. H)  We clearly intended to bring Ms. Walker back to work if she could.

14      Further, my typewritten notes dated August 26, 2004 addressing unusual circumstances affecting specific individuals included a note about the credit clerk position  (Ex I)  That note indicated that the Company would lay off Ms. Johnson if Ms. Walker returned to work.

15.     The final "Proposed Cuts" spreadsheet, which I emailed to Mr. Riddle and Mr. Lemire on August 26, 2004, indicates that Ms. Johnson would be laid off, along with other employees

16      It is my understanding that Ms. Walker did not report to work or call the day after the exam at Concentra (August 24, 2004)   Ms. Hines called Ms. Walker soon after the Concentra exam to discuss her return to work status  After the telephone call, Ms. Hines told me that she had conveyed to Ms. Walker the need to return to work and that Ms. Walker refused to return to work in any capacity, even with the accommodations Ms. Hines offered; namely, that the Company could work around her treatment schedule  Thus, I began to think that her credit clerk position should be eliminated if she was not willing (or even able, as she had exhausted her FMLA leave) to return to work.  I gave her the benefit of doubt and decided to wait until Monday, August 30, 2004 to make a final decision.

17.     By August 30, 2004, Ms. Walker had not returned to work, nor did we have information that her return to work was imminent  We needed to move forward on the entire RIF plan and, accordingly, decided to eliminate her position effective August 30, 2004   I informed Ms. Hines of the decision and that Ms. Walker was no longer eligible for short-term disability because she was able to work and we had a job for her  Ms. Hines indicated she would

-5-

notify Ms Walker in writing, which she did, dated August 30, 2004  Prior to receipt of the letter,
Ms Walker did not attempt to return to work on August 31, 2004.

18    In the end, the final revised plan included offering nine buyouts of which five
were eventually accepted  All of those positions were permanently eliminated  In addition, five
positions, including Ms Walker's, were eliminated

19    My decision to eliminate Ms Walker's position was solely based upon business
needs and budgetary constraints and had nothing to do with any protected class  In fact, it had
been the Company's preference to bring Ms Walker back to work due to her good performance.

20    Attached as Ex  J is a true and correct copy of the pertinent policies from the
Company's Employee Handbook in effect at the time of Ms Walker's medical leave and
subsequent termination

21    The Company provided Ms Walker with twelve weeks of FMLA job protection
Further, the Company provided her with more than an additional month after her FMLA benefits
were exhausted. The Company also provided Ms Walker with short-term disability benefits as a
result of the April 27, 2004 car accident through August 30, 2004 (which was a week after she
had been cleared to return to work by Dr Surdo at Concentra)  The period of time for which an
employee qualifies for benefits under the Company's short-term disability plan does not
guarantee a corresponding amount of time that the Company will hold an employee's position
open (after the twelve-week FMLA period)  We specifically make no guarantees of continued
employment after exhaustion of FMLA eligibility  (See, e.g., letter to Walker from Hines)

22.    The Company, as Ms Hines explained to Ms Walker, would have accommodated
Ms Walker's physician appointments and treatment

23    Granting Ms Walker, had she asked, any additional time off without a definite return date after August 30, 2004 would have created an undue burden for the Company because of the financial pressures detailed above.

24    To date, Ms Walker has not contacted me to advise that she is able to return to work or to inquire about available positions at the Company

25    It is not the Company's general practice to contact employees who have separated from the Company to ask them to return to work

26    Ms Walker was able to walk with a normal gait during breaks taken during her deposition

27    In regards to the alleged comparators Ms Walker identified in relation to her Charge (Ms Davis, Ms. Govens or Ms. Drummond), during the time of Ms. Walker's leave, unlike the leave periods of her alleged comparators, the Company was experiencing increasing and serious budgetary and financial constraints which resulted in a company-wide reduction in force. Unlike the decision to terminate Ms Walker, because I had not yet started with the Company, I was not involved in any prior leave of absence issue related to Ms. Davis, Ms Govens or Ms. Drummond.


Dolores Pinto, Vice President of Human Resources

SWORN TO AND SUBSCRIBED before me this 3rd day of October, 2007

Notary Public
My Commission Expires: 12/18/08

## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I hereby certify that on October 10, 2007, I electronically filed the foregoing Redacted -

Public Version of the Affidavit of Dolores Pinto with the Clerk of Court using CM/ECF which

will send notification of such filing to the following and on October 10, 2007, hand delivered

copies of the same to:

> Vernette Walker
> 29 Richard Road
> New Castle, Delaware  19720
> *Pro Se* Plaintiff

> Jennifer C. Jauffret (#3689)
> Jauffret@rlf.com
> Lori A. Brewington (#4522)
> Brewington@rlf.com
> Richards, Layton & Finger
> One Rodney Square
> P. O. Box 551
> Wilmington, Delaware  19899
> (302) 651-7700
> Attorneys for Defendants

# EXHIBIT A

**Pinto, Dolores**

| | |
|---|---|
| From: | Riddle, Curtis |
| Sent: | Monday, August 16, 2004 12:39 PM |
| To: | Ledford, David; Cochran, Robert; Silverstein, Joni; Pinto, Dolores |
| Cc: | Steffen, Doreen; Lemire, Don; Cochran, Robert; Franceschini, Antoinette; Kane, Michael (Wilmington); Ledford, David; Lemire, Don; Maness, Michael; Pinto, Dolores; Riddle, Curtis; Silverstein, Joni; Steffen, Doreen; Steigerwald, Bill; Sullivan, Matt; Taylor, John (Wilmington); Vowels, Diana |
| Subject: | follow to this a.m. brief O.C. gathering |

Folks ---

REDACTED

I know. Not fun! Not good!

It will take a lot of effort on all of our parts to keep this from being "a back-breaker.!"

1

# EXHIBIT B

**Pinto, Dolores**

| | |
|---|---|
| From: | Riddle, Curtis |
| Sent: | Tuesday, August 17, 2004 11:58 AM |
| To: | Pinto, Dolores |
| Cc: | Steffen, Doreen; Lemire, Don |
| Subject: | Expense cuts |

Dolores ----

REDACTED

I'm heading to Cincy Wed and Thurs with GLW. That wont get us any relief, but I hope to gauge from him how deep he really wants folks to go......

We will need to touch base and discuss.

Thanks
Curtis

1

# EXHIBIT C

# Circulation Merchandising Workshop

March 14 - 16, 2000

HR — 1
NEWS — 3

11 — Layouts
6 — job eliminations
   — Frozen ?

Frozen   (3)

2 class. fied
     Big
1 — Maintenance
2 — production

Layous   (10)

— I.T
— Asst cashier
— credit person
— 3 news on / out
— 2 ad
— circ ?
— Dist manager
— Asst HR

Elimnin   (4)

— HR
— Dispatch
— CSR
— 2 classified
MAC

# EXHIBIT D

The News Journal
Proposed Cuts
August 25, 2004

| Department | Job Title | Employee Name | Hours | Salary | Age | Gender & Race |
|---|---|---|---|---|---|---|
| **Frozen Positions** | | | | | | |
| Adv-Class | | | 35 | 32500 | n/a | n/a |
| Adv-Class | | | 19 | 9386 | n/a | n/a |
| Adv-DSS | | | 35 | 25610 | n/a | n/a |
| Circulation | | | 35 | 20712 | n/a | n/a |
| Circulation | | | 32 | 12480 | n/a | n/a |
| Finance | | | 35 | 26988 | n/a | n/a |
| Finance | | Vernette Walker | 35 | 31518 | n/a | n/a |
| **Buyouts** | | | | | | |
| Adv | | | 35 | 34939 | 62 | WF |
| Adv | | | 35 | 26594 | 59 | BF |
| Circulation | | | 35 | 60161 | 60 | WM |
| Circulation | | | 35 | 36429 | 62 | WF |
| IT | | | 35 | 73500 | 59 | WM |
| News | | | 35 | 68829 | 72 | WM |
| News | | | 35 | 29848 | 66 | BM |
| News | | | 35 | 88680 | 62 | WF |
| News | | | 35 | 38324 | 60 | WF |
| Finance | | | 35 | 44100 | 60 | BF |
| **Layoffs** | | | | | | |
| HR | | | 35 | 44000 | 52 | WF |
| IT | | | 35 | 53040 | 34 | AF |
| Circ | | | 35 | 30992 | 22 | WF |
| News | | | 35 | 57980 | 48 | WF |

*(Handwritten notes: "? pick someone to do something" near Buyouts; "89,680" near News row; "35,000 Sussex" near Layoffs; "REDACTED" stamp; "Combine districts"; "Hold open")*

# EXHIBIT E

*1) Calculate cost of buyout*
*2) Draft list*
*3) Call Vernette*
*4) Check Leslie's review*

The News Journal
Proposed Cuts
August 25, 2004

| Department | Job Title | Employee Name | Hours | Salary | Age | Gender & Race |
|---|---|---|---|---|---|---|
| Frozen Positions | 3 5 | | | | | |
| Adv-Class froz | | REDACTED | | | n/a | n/a |
| Adv-Class froz | | | | | n/a | n/a |
| Adv-DSS elim | | | 35 | 25610 | n/a | n/a |
| Circulation elim | | | 35 | 20712 | n/a | n/a |
| Circulation elim | | | 32 | 12480 | n/a | n/a |
| Finance | | | 35 | 26988 | n/a | n/a |
| ③ Finance | | Vernette Walker | 35 | 31518 | n/a | n/a |

says she'll have to use spvrs to maintain press &

| Buyouts ④ | | | Yr Mo | | | |
|---|---|---|---|---|---|---|
| Adv | | | 41 11 | 35 | 34939 | 62 | WF |
| Adv | | | 36 11 | 35 | 26594 | 59 | BF |
| Circulation | | | 39 7 | 35 | 60161 | 60 | WM |
| Circulation | | | 23 5 | 35 | 36429 | 62 | WF |
| IT | | | 41 10 | 35 | 73500 | 59 | WM |
| News | | | 29 2 | 35 | 68829 | 72 | WM |
| News | | | 19 10 | 35 | 88680 | 66 | BM |
| News | | | 18 10 | 35 | 31720 | 62 | WF |

Elimination 4

| Layoffs 10 | | | | | | |
|---|---|---|---|---|---|---|
| HR | | 35 | 44000 | 52 | WF |
| IT | | 35 | 53040 | 34 | AF |
| Circ | | 35 | 30992 | 22 | WF |
| News | | 35 | 57980 | 48 | WF |
| Finance | | 35 | 44100 | 60 | BF |
| News | | 35 | 38324 | 60 | WF |

① IT
Adv
② Fin
③ News
Circ

10

28

# EXHIBIT F

Pinto, Dolores

| | |
|---|---|
| From: | Riddle, Curtis |
| Sent: | Friday, August 20, 2004 6:27 PM |
| To: | Cochran, Robert; Franceschini, Antoinette; Kane, Michael (Wilmington); Ledford, David; Lemire, Don; Maness, Michael; Pinto, Dolores; Riddle, Curtis; Silverstein, Joni; Steffen, Doreen; Steigerwald, Bill; Sullivan, Matt; Taylor, John (Wilmington); Vowels, Diana |
| Subject: | PRIVATE |

Folks -----

First, thanks for your efforts to identify expense reduction areas!

After spending the last two days with GLW, it is clear that this is a MORE THAN SERIOUS effort on his part. He expects us ( the division) to deliver the number, regardless how difficult.

Moreover, Don and I just finished reviewing our flash for August,          REDACTED

Beyond the non-payroll areas you have identified, we will be forced to reduce the number of fulltime employees here.

If you didn't think this was serious, I hope you do now.

Finally, I have asked Ant to look at a couple of production "moves" for the product  While I would not label them drastic, they fall out of the norm. The areas include the TV Book and Business Monday.

Next week, and it will probably be the later part of the week, we will finalize our plans for submission to corporate. Any other "good" ideas will be gladly accepted.

Again, thanks for your help in this  It's not easy.

Curtis

1

# EXHIBIT G

**Pinto, Dolores**

| | |
|---|---|
| From: | Hines, Ann |
| Sent: | Wednesday, July 28, 2004 9:50 AM |
| To: | Pinto, Dolores |
| Cc: | Hines, Ann |
| Subject: | Vernette Walker - Finance Dept. |
| | |
| Importance: | High |

Dolores,

Vernette Walker has been on sick leave/STD since 5/3/04 due to an auto accident on 4/27/04. Her doctor has not provided a diagnosis or prognosis. Her physician is Dr. Sternberg @ Delaware Back Pain & Sports Rehabilitation Centers. Each physician's certification reads the same. Vernette's condition has not improved since the accident. Since her job of Credit Representative is a "light duty" position, I would like to get a second medical opinion. Please advise. Thanks!!

# EXHIBIT H

The News Journal
Proposed Cuts
August 25, 2004

| Department | Job Title | Employee Name | Hours | Salary | Age | Gender & Race |
|---|---|---|---|---|---|---|
| **Frozen Positions** | | | | | | |
| Adv-Class | | | 35 | 32500 | n/a | n/a |
| Adv-Class | | | 19 | 9386 | n/a | n/a |
| Production | | | | | n/a | n/a |
| Production | | | | | n/a | n/a |
| Production | | | | | n/a | n/a |
| **Job Eliminations** | | | | | | |
| Adv-DSS | | Vacant | 35 | 25610 | n/a | n/a |
| Circulation | | | 35 | 20712 | n/a | n/a |
| Circulation | | | 32 | 12480 | n/a | n/a |
| HR | | | 35 | 44000 | 52 | WF |
| **Buyouts** | | | | | | |
| Adv | | | 35 | 34939 | 62 | WF |
| Adv | | | 35 | 26594 | 59 | BF |
| Circulation | | | 35 | 60161 | 60 | WM |
| Circulation | | | 35 | 36429 | 62 | WF |
| IT | | REDACTED | 35 | 73500 | 59 | WM |
| News | | | 35 | 68829 | 72 | WM |
| News | | | 35 | 88680 | 66 | BM |
| News | | | 35 | 31720 | 62 | WF |
| Finance | | | 35 | 44100 | 60 | BF |
| **Layoffs** | | | | | | |
| IT | | | 35 | 53040 | 34 | AF | 2 wks |
| Circ | | | 35 | 30992 | 22 | WF | 2 wks |
| Circ | | | | 30160 | 25 | WM | 2 wks |
| News | | | 35 | 57980 | 48 | WF | 15/11 |
| News | | | 35 | 38324 | 60 | WF | 369 |
| News | | | 35 | 23640 | 41 | HM | 2 wks |
| Finance | | | 35 | 26988 26663 | n/a 52 | n/a B/B = 317 |
| Finance | | Vernette Walker Andrea Johnson | 3540 35 | 31518 17,200 | n/a 21 | n/a BF 2 wks or 4 |
| Adv | | | 35 | 26,000 | 21 | WF 2 wks |
| Adv | | | 35 | 24,000 | 31 | BF 2 wks |

_(handwritten) Job Elim._

# EXHIBIT I

REDACTED

August 26, 2004

Vernette – If she's not coming back, she solves our problem.  Our MD released her.  No more STD and no job.  Otherwise, Andrea goes.

- Offer opportunity to come back and work here.  Pick someone from the bottom of the _____

- Can offer buyout, but can also just layoff least senior person.  If she doesn't take it, we'll have to do that anyway.

- Layoff if position is being eliminated since she's the only one in the job and if you offer buyout and she doesn't take it, you're stuck.

Make it a cash deal, maybe extend medical coverage.  One option, salary continuation until year-end with medical coverage.  Pay out lump sum balance at year-end.

*Draft letter – Curtis*
*Bill*
*Don*

*1/weeks     w/ + w/o limit     39 weeks     medical*
*2/weeks                    ||                      FICA*

# EXHIBIT J

# THE NEWS JOURNAL COMPANY

## MODEL

## EMPLOYEE HANDBOOK

## FAMILY LEAVE

Following completion of 90 days of employment, full-time employees (or part-time employees scheduled to work 1,250 hours per year) may receive up to 12 weeks unpaid leave per year to provide care for your newborn child or child newly placed for foster care with you, or child, spouse, or parent who has a serious health condition, or your own serious health condition (if you have already used your sick leave benefit). Family leave is available in addition to any disability coverage to which you may be entitled.

During Family Leave, benefits continue uninterrupted, on the same basis as an active employee. You must, however, arrange to continue your contributions to medical and life insurance (if the 401k Savings Plan and Gannett Spending Account is suspended during the leave, but may be resumed when you return to active employment.

Upon return from Family Leave, you are entitled to be reinstated in your prior job or to an equivalent position with equivalent pay, employment benefits and other terms and conditions of employment.

Family Leave related to care for newborns, adoption, or foster care placements is available to both mothers and fathers. If both parents are employed at The News Journal, the benefit (up to 12 weeks) applies per family per year.

Continuation of medical benefits and job reinstatement assurance end after 12 weeks. If you cannot return to active work at that time, you may request additional unpaid leave under the terms of our personal leave of absence policy.

matter to your satisfaction, either one or both of you can take the matter directly to your supervisor's immediate superior. If necessary, further discussion of the subject can be arranged with your department head. Your department head may choose to consult the Publisher on certain matters.

You are also welcome to contact any member of Personnel.

## HARASSMENT

We commit to our employees that the work environment will be free from all forms of discrimination. This includes harassment on the basis of race, color, religion, creed, national origin, ancestry, disability, marital status, veterans status, age, gender or sexual preference. Conduct, whether intentional or unintentional, that results in harassment will not be condoned.

Sexual harassment is prohibited. Unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature constitutes sexual harassment when: (1) submission to such conduct is made, either explicitly or implicitly, a term or condition of employment; (2) submission to or rejection of such conduct is used as a basis for employment decisions; or (3) such conduct has the purpose or effect of interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment.

No employee shall threaten or suggest, either directly or indirectly, that another employee's refusal to submit to sexual advances will adversely affect the employee's continued employment, evaluation, compensation, assignment, advancement, or any other aspect of employment. Similarly, no employee shall promise or suggest, either directly or indirectly, that another employee's submission to sexual advances will result in the improvement of a term or

condition of employment for the employee.

Other sexually harassing conduct in the workplace is also prohibited. This includes offensive sexual flirtations, advances, propositions, verbal abuse of a sexual nature, displays of sexually graphic pictures or objects in the workplace, and unnecessary or offensive touching of an employee, for example, patting, pinching, hugging or repeated brushing against another employee's body.

Supervisors and managers at all levels are responsible to ensure that the work environment is free from sexual and other forms of harassment. Managers and supervisors who learn of sexual harassment, be it an individual employee complaint, personal observation, or any other source, should immediately notify the personnel representative. The privacy and confidentiality of all such incidents must be strictly maintained by supervisors and managers.

Employees who feel they have been subjected to sexual harassment, or harassment on any other basis, should immediately report the incident directly to their supervisor, personnel representative or operating unit head.

The facts of the incident will be investigated and the validity of the complaint determined promptly.

If it is determined that a complaint is valid, we will take appropriate disciplinary action against the offender based on the severity of the harassment and the individual's employment history. Disciplinary action may include a written warning, suspension, demotion and/or termination of employment.

If it is determined that a complaint is a fabrication, appropriate disciplinary action will be taken against the employee who has fabricated the complaint.

To the extent possible, all persons involved in a complaint of sexual harassment, or harassment in any other form, will be given the utmost protection of privacy. Persons complaining of sexual or other

harassment will also be protected from reprisals and retaliation by the company or co-workers as a result of such complaints.

We expect that most, if not all, people associated with us will not engage in any sexual or other harassing activity. We will, however, to the fullest extent possible, protect all employees from the rare exceptions.

## HAZARD COMMUNICATION PROGRAM

Should your job involve use of potentially hazardous materials, you will be trained in appropriate use of such materials before you begin work. Our goal is to eliminate potential risks and hazards by effectively communicating and teaching safe work procedures through our Hazard Communication Program.

Prevention is the best personal protection for staffers. We provide the framework and resources for a safe working environment. You and your colleagues must follow safe work procedures.

The Federal Occupational Safety and Health Administration (OSHA) recently published a Hazardous Materials Communication Standard (more commonly known as the employee "Right To Know" regulation) that enables us to provide staffers with detailed information regarding hazardous materials. Our suppliers now provide Material Safety Data Sheets (MSDS) which identify hazardous chemicals and summarize health and safety information, including what to do in an emergency.

Using these data sheets as a base, we have established a written Hazard Communication Program and manual, which includes a list of potentially hazardous chemicals in each department where they exist, MSDS for each chemical in use, and appropriate MSDS interpretation guides.

If there are hazardous materials in use in your

All applicants who meet those qualifications are interviewed by the appropriate supervisor and/or Personnel. They are evaluated on the basis of skills, ability, experience, performance, and potential. Seniority will also be considered.

Employees in an introductory period (either new hires or internal transferees) are not eligible to apply for posted positions.

This policy does not limit the right of management to transfer assignment or job duties within a classification or within the company.

### JURY DUTY

Serving on a jury is a civic duty. If you are required to serve on a jury, you will be paid your regular salary less any pay received from the court. Mileage reimbursement is not considered ``pay.''

Notify your manager immediately if you are called to jury duty. Managers should not request that employees be excused from jury duty except in extraordinary circumstances.

This policy also applies to time required to appear in court as a witness by subpoena. It does NOT include appearances in court as a plaintiff or as a defendant.

You will be expected to work any part of your normal workday in which you do not have to report or are excused early from jury duty. You will be given due consideration if you work other than normal daytime hours.

### LEAVES OF ABSENCE

The News Journal recognizes that its employees may occasionally require time off for personal reasons. Among them are: education, community service, military service, urgent personal business, or

important family responsibilities. * Leaves are granted at the discretion of your department head and the publisher, and in accordance with our overall policies. Requests for leaves of absence must be submitted in writing to your manager in advance. A leave of more than 30 days also must be approved in advance by Corporate Personnel. Authorized leaves are generally granted without pay.

If your leave is granted, you will be notified in writing stating the reasons for the leave, its duration and your exact date of return. Failure to return on the specified date will be considered your voluntary resignation. A leave will not be granted for more than one year, but it may be renewed or extended in special cases.

The authorized leave should not be regarded as a guarantee of employment. If an employee's former position cannot be held open, an effort will be made to provide an appropriate alternative position at comparable salary. If no appropriate alternate employment is available, in the judgment of the company, separation would apply.

Service credit will not be earned for the duration of the leave. Medical insurance and life insurance may be continued at the employee's expense.

If you are considering applying for a leave of absence, consult your manager or personnel representative for an explanation of company policy concerning your needs.

---

\* Maternity: Leaves of absence preceding or following a maternity disability must be requested and approved in advance in accordance with our leaves of absence policy. During the time a staffer is medically disabled, the absence is treated the same as any illness or injury.

information can be obtained from Personnel.

## SAFETY AND SECURITY

We strive to maintain a safe and secure work environment, and we need your cooperation.
- Enter and exit the building through the employee entrance only. Part-time employees who do not have access cards should show their photo I.D.'s and sign in at the guard's station.
- Visitors should enter the building through the lobby and sign in. You will be notified that you have a visitor and you should go to the lobby to meet them and escort them to your area. Visitors should not move around the building unescorted. Visitors arriving after normal business hours must sign in with security, and again, be escorted through the building by an employee.
- We request that you not bring your children into the office during the hours you are working.

## SEPARATION

You and The News Journal both have an equal right to terminate your employment at any time, with or without cause. When possible and appropriate, you will be given the courtesy of advance notice.

Should you decide to resign, normal business practice is to give us the courtesy of 2 weeks' notice. Normally, you are expected to continue to work during your notice period, but in some circumstances you may be asked to stop work immediately. If that's the case, you'll receive pay through your notice period, generally a maximum of two weeks.

Illegal or unethical activities or other violation of company policies can result in immediate termination. For your protection, dismissals of this sort are generally reviewed by your manager, by his or her manager, and by the director of personnel.

When you leave us, we expect you to return anything of ours you have been given, including keys, identification and access cards, radios, etc. If for some reason you owe us money, we will ask you to make arrangements for payment before you leave. Pay for all vacation and compensatory time up to one week earned but not taken will be included in your final paycheck. Pay for vacation taken that has not yet been earned will be deducted from your final paycheck.

You will not be paid for sick days taken after submitting your resignation.

It is important that you provide us with a forwarding address if you are moving so that we may contact you if necessary and send you withholding tax information.

## SERIOUS ILLNESS/DISABILITY

Employees with disabilities, physical or mental, or life-threatening illnesses such as cancer or AIDS often benefit from the normal routines of daily life, including working at their regular job. At The News Journal, as long as you are able to perform your job satisfactorily, with or without reasonable accommodation, and your condition does not endanger you or other employees, you will be able to continue in employment on the same basis as all other employees.

If your illness/disability prevents you from being able to perform your job even with reasonable accommodations or endangers you or other employees, you may become eligible for benefits under the Income Protection Plan.

We believe your health status is private and make every effort to protect the confidentiality of medical records and information. We also make every reasonable effort consistent with business needs to accommodate employees with medical disabilities or

life-threatening diseases. Continued employment of valued, productive employees helps the company as well.

We may request a physician's statement that a specific medical condition does not pose a threat to others and does not render you unable to perform your job duties. We also reserve the right to ask any employee to be examined by one of our approved physicians should we deem it necessary. Unless there is a medical or health/safety reason to do so, we will not give special consideration to employees who feel threatened by another employee's condition.

To help employees deal with these issues, Personnel provides information and counseling, medical and social services agency referrals, and information regarding insurance and other benefits.

We are an equal opportunity employer. We do not discriminate against any employee based on his or her disability, history of disability, or perceived disability.

### SERVICE CREDIT

An employee who resigns and is subsequently rehired can be given credit for his/her previous employment if the break in service was no longer than the original period of employment. The adjustment must be approved by the department head and the Publisher and follows the successful completion of the introductory period.

If you transferred to the News Journal directly from another Gannett subsidiary, bridging service will be for pension purposes (if you were covered by a pension plan at the prior location), long term disability, life and medical insurance (after 90 day waiting period) only. Eligibility for News Journal benefits will be based on actual News Journal service time.

## SEVERANCE PAY

Employees whose terminations are involuntary, such as layoff, will receive severance pay at the rate of two weeks pay for each year of service or major fraction thereof to a maximum of 52 weeks.

Some instances where severance pay would not be applicable would be cases where there is clear violation of stated company policy (which includes any discharge for cause, including unsatisfactory performance), dishonesty or illegal activity. Final determination of such cases rests with the Publisher.

If an employee does not successfully complete his/her introductory period, severance pay does not apply.

## SICK LEAVE

Should an accident or illness leave you unable to work, full-time and part-time employees who were hired to work 20 hours or more a week are eligible for sick leave with full pay. During your first year you will be eligible for one day sick leave for each month of service (not to exceed 10 days for the year). Paid sick leave is not given during the initial introductory period.

Eligible employees are credited with two weeks sick leave each January. Any unused sick leave from the previous year will be carried into the next year and added to the two weeks. Should an extended illness exceed the length of your eligibility for full pay, additional leave at half pay may be considered.

An especially prolonged illness might qualify you for disability retirement or coverage under the company's long-term disability plan, if you are eligible. Family Leave (described in this handbook) can also be used if you have exhausted your sick leave benefit. Under the Family Leave Policy, eligible employees may receive up to 12 weeks of unpaid

leave per year.

Claims for group accident and health insurance benefits require a physician's verification in writing of any illness that prevents you from working for at least eight calendar days.

There is no compensation for unused sick leave at the time of termination.

Verification of illness during an absence may be required at the discretion of your supervisor.

### SICK LEAVE FOR DEPENDENT CARE

Full-time non-represented employees may use up to seven (7) days per year of earned sick leave to care for ill or injured dependents.

*must use reg sick leave 1st then Banked lead*

These are not additional days, but are days to which the employee is already entitled.

Verification of a dependent's illness during an absence may be required at the discretion of your supervisor.

### SMOKING POLICY

Smoking is permitted in the break room on the first floor only.

Violation of the smoking policy can result in disciplinary action up to and including discharge.

### SOLICITATION

Solicitation from employees at The News Journal by outside solicitors is not permitted.

We expect you to use your own good judgment when soliciting from other employees for any purpose. Solicitation should be conducted during non-working hours and should not interfere with company business. Breaks, meal times, time before and after work, and similar periods are not considered to be working time.

Distribution of non-work related literature is not